14-cv- 5216

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

HARVEY A. KALAN, M.D., INC.; HARVEY KALAN; DEBORAH KALAN; WILSHIRE PALISADES LAW GROUP, P.C.; DAVID I. LEFKOWITZ; and NORMA LEFKOWITZ,

## DEFENDANTS

KORESKO FINANCIAL LP; JOHN J. KORESKO, V; LAWRENCE KORESKO; BARRY BOSCOE;CIBC WORLD MARKETS CORP.;PENN MUTUAL LIFE INSURANCE COMPANY;THE LINCOLN NATIONAL LIFE INSURANCE COMPANY;JEFFERSON-PILOT LIFE INS.COMPANY;and DOES 1-50,

**(b)** County of Residence of First Listed Plaintiff   Los Angeles County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Ira Silverstein, Esq.
Feldman Morgado, P.A
140 Broadway, 46th Floor, Suite 4624
New York, New York 10005

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                        *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | Corrupt Organizations |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 480 Consumer Credit |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | Act |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☒ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | or Defendant) | Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party | Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | 26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | | State Statutes |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. §1132
Brief description of cause:
Claims for breach of fiduciary duty and fraud

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE   McLaughlin    DOCKET NUMBER   2-09-cv-00988-MAM

DATE
08/29/2014

SIGNATURE OF ATTORNEY OF RECORD
S.T.

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

SEP 10 2014

**UNITED STATES DISTRICT COURT**

**14   5216**

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: All Plaintiffs- c/o Ira B. Silverstein, Feldman Morgado PA, 46th FL. Ste. 462, NY, NY 10005

Address of Defendant: Koresko Financial LP- 200 West 4th Street, Bridgeport, PA 19405

Place of Accident, Incident or Transaction: ___Montgomery County, PA___
(Use Reverse Side For Additional Space)

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))  Yes☐  No☐   **UNKNOWN**

Does this case involve multidistrict litigation possibilities?  Yes☐  No☑
RELATED CASE, IF ANY:
Case Number: 2-09-cv-00988-MAM _____ Judge  McLaughlin _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☑  No☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☑  No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐  No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐  No☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☑ All Other Federal Question Cases
    (Please specify) Employee Retirement Income Security Act

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*

I, _____Ira B. Silverstein_____, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 09/10/2014 _____ _____ 17658
                         Attorney-at-Law        Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 09/10/2014 _____ _____ 17658
                         Attorney-at-Law        Attorney I.D.#

CIV. 609 (5/2012)

SEP 10 2014



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

HARVEY A. KALAN, M.D., INC.; HARVEY KALAN;
DEBORAH KALAN; WILSHIRE PALISADES LAW GROUP,        :        CIVIL ACTION
P.C.; DAVID I. LEFKOWITZ; and NORMA LEFKOWITZ,       :
                v.                                :
KORESKO FINANCIAL LP; JOHN J. KORESKO, V; LAWRENCE   :
KORESKO; BARRY BOSCOE; CIBC WORLD MARKETS CORP.;     :        NO. 14 5216
PENN MUTUAL LIFE INS. CO.; THE LINCOLN NATIONAL LIFE :
INS. CO.; JEFFERSON-PILOT LIFE INS.COMPANY; and DOES 1-50, :

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)                                                                       (✓)

(f) Standard Management – Cases that do not fall into any one of the other tracks.            ( )


| August 29, 2014 | Ira B. Silverstein | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 212-991-8431 | 212-991-8439 | isilverstein@fmlawgroup.us |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

SEP 10 2014

**Civil Justice Expense and Delay Reduction Plan**
**Section 1:03 - Assignment to a Management Track**

(a)        The clerk of court will assign cases to tracks (a) through (d) based on the initial pleading.

(b)        In all cases not appropriate for assignment by the clerk of court to tracks (a) through (d), the plaintiff shall submit to the clerk of court and serve with the complaint on all defendants a case management track designation form specifying that the plaintiff believes the case requires Standard Management or Special Management.  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

(c)        The court may, on its own initiative or upon the request of any party, change the track assignment of any case at any time.

(d)        Nothing in this Plan is intended to abrogate or limit a judicial officer's authority in any case pending before that judicial officer, to direct pretrial and trial proceedings that are more stringent than those of the Plan and that are designed to accomplish cost and delay reduction.

(e)        Nothing in this Plan is intended to supersede Local Civil Rules 40.1 and 72.1, or the procedure for random assignment of Habeas Corpus and Social Security cases referred to magistrate judges of the court.

**SPECIAL MANAGEMENT CASE ASSIGNMENTS**
**(See §1.02 (e) Management Track Definitions of the**
**Civil Justice Expense and Delay Reduction Plan)**

Special Management cases will usually include that class of cases commonly referred to as "complex litigation"  as that term has been used in the Manuals for Complex Litigation.  The first manual was prepared in 1969 and the Manual for Complex Litigation Second, MCL 2d was prepared in 1985.  This term is intended to include cases that present unusual problems and require extraordinary treatment.  See §0.1 of the first manual.  Cases may require special or intense management by the court due to one or more of the following factors:  (1) large number of parties; (2) large number of claims or defenses; (3) complex factual issues; (4) large volume of evidence; (5) problems locating or preserving evidence; (6) extensive discovery; (7) exceptionally long time needed to prepare for disposition; (8) decision needed within an exceptionally short time; and (9) need to decide preliminary issues before final disposition.  It may include two or more related cases.  Complex litigation typically includes such cases as antitrust cases; cases involving a large number of parties or an unincorporated association of large membership; cases involving requests for injunctive relief affecting the operation of large business entities; patent cases; copyright and trademark cases; common disaster cases such as those arising from aircraft crashes or marine disasters; actions brought by individual stockholders; stockholder's derivative and stockholder's representative actions; class actions or potential class actions; and other civil (and criminal) cases involving unusual multiplicity or complexity of factual issues. See §0.22 of the first Manual for Complex Litigation and Manual for Complex Litigation Second, Chapter 33.

$400



## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HARVEY A. KALAN, M.D., INC.; HARVEY KALAN; DEBORAH KALAN; WILSHIRE PALISADES LAW GROUP, P.C.; DAVID I. LEFKOWITZ; and NORMA LEFKOWITZ, | **C.A. NO.:** 14  5216 **JURY TRIAL DEMANDED AS TO ALL NON-ERISA CLAIMS** |
| Plaintiffs, | |
| vs. | |
| KORESKO FINANCIAL LP; JOHN J. KORESKO, V; LAWRENCE KORESKO; BARRY BOSCOE; CIBC WORLD MARKETS CORP.; PENN MUTUAL LIFE INSURANCE COMPANY; THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; JEFFERSON-PILOT LIFE INSURANCE COMPANY; and DOES 1-50, | |
| Defendants. | |

---

**COMPLAINT**

## INTRODUCTION

1.     Plaintiffs are victims of a long-term scam organized and operated by defendant John Koresko V ("Koresko").  The scam enticed employers to purchase cash-value life insurance policies on the lives of their principals through a trust arrangement.  The employers were assured that the arrangement would: (i) permit them to deduct the insurance premiums as business expenses; (ii) accumulate cash value in the policies through investment returns that the employers could access at any time by terminating their involvement in the arrangement; and (iii) provide a death benefit to the employees' designated beneficiaries equal to the face amount of the policies. In reality, the sole beneficiaries of the arrangement were Koresko, his brother Lawrence, the entities they controlled (collectively, "the Koresko Parties") and the brokers, financial institutions and insurance companies that assisted the Koresko Parties in marketing the arrangement. Victims, such as the Plaintiffs, have discovered that: (i) they were deceived about, and deprived access to, the key information concerning, the arrangement and the status of the life insurance policies; (ii) the Koresko Parties refused and failed to provide them access to the cash-value or the life insurance policies themselves if they decide they want to terminate their involvement in the arrangement; (iii) the insurance companies permitted the Koresko Parties to withdraw cash value from the policies

through unauthorized loans and surrenders; (iv) the Koresko Parties engaged in various pretexts to deprive beneficiaries of the proceeds of the life insurance policies in the event of the death of an insured; and (v) the Koresko Parties have embezzled trust assets through self-dealing and out-and-out conversion.

2.      A number of the Koresko Parties are currently Chapter 11 debtors-in-possession and for that reason, are not joined as defendants, but their role in the scam is crucial to understand the wrongdoing of the named defendants.  As a result, they are included in the allegations as unjoined co-defendants and co-conspirators.

3.      The complex scam perpetrated by the defendants and the unjoined co-defendants shall be referred to herein as the "Arrangement" or the "REAL VEBA Arrangement."

## PARTIES

4.      Plaintiffs are:

a.      Harvey A. Kalan, M.D., Inc. ("HAK, M.D."), a California corporation organized and existing under the laws of California.  HAK, M.D. is the sponsoring employer of the Harvey A. Kalan, M.D., Inc. Health and Welfare Benefit Plan ("HAK, M.D. WBP"). HAK, M.D. contributed over $1 million to the HAK, M.D. WBP.

b.      Harvey A. Kalan, a participant in and fiduciary of the HAK, M.D. WBP.  He is a citizen of California.

c.      Deborah Kalan, a participant in the HAK, M.D. WBP.  She is a citizen of California.

d.      Wilshire Palisades Law Group, P.C. ("WPLG"), a California professional corporation organized and existing under the laws of California, with its principal place of business in Santa Monica, California. WPLG is the sponsoring employer of the Wilshire Palisades Law Group Health and Welfare Benefit Plan ("WP WBP"). WPLG made over $716,000 in contributions to the WP WBP.

e.      David I. Lefkowitz, a participant in and fiduciary of the WP WBP.  Mr. Lefkowitz is a citizen of California; and

f.      Norma M. Lefkowitz, a participant in WP WBP.  Mrs. Lefkowitz is a citizen of California.

5.    The joined defendants are:

a.      Koresko Financial LP ("Koresko Financial"), a Pennsylvania limited partnership with its principal place of business in Bridgeport, Pennsylvania.   Upon information and belief, Koresko Financial was the

vehicle through which John and Lawrence Koresko were paid commissions by the insurance companies that participated in the arrangement.

b.  PennMont Benefits, Inc., a Delaware corporation with its principal place of business at the same address as Koresko Financial. PennMont Benefits, Inc. is the general partner of Koresko Financial and its officers are John and Lawrence Koresko.

c.  John J. Koresko, V ("Koresko"), a Pennsylvania citizen and an attorney currently suspended from the practice of law in the state and federal courts of Pennsylvania. Koresko is sued in his individual capacity and as a fiduciary of the WP WBP and HAK, M.D. WBP (collectively "Plaintiffs' WBPs"). He and his brother Lawrence are the controlling parties of the Koresko Entities. At all relevant times, Koresko was an agent of the defendant insurance companies.

d.  Lawrence Koresko, a Pennsylvania citizen, and one of the principals of the Koresko Entities. At all times relevant to this complaint, Lawrence Koresko was an agent of the defendant insurance companies. Lawrence Koresko is sued in his individual capacity and as a fiduciary of the Plaintiffs' WBPs in that he exercised discretionary control over the Plaintiffs' WBPs' assets.

e.    Jeanne Bonney, a Pennsylvania citizen, who at relevant times was, along with the Koreskos, a controlling party over the operations of many of the Koresko Entities. She is sued in her individual capacity and as a fiduciary of the Plaintiffs' WBPs.

f.    Penn Mutual Life Insurance Company ("Penn Mutual"), a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. At relevant times, Penn Mutual was a fiduciary of the WP WBP and authorized the Koreskos, Koresko Financial, and co-defendant Barry Boscoe to act as its agent in selling insurance policies. At all relevant times, Penn Mutual had actual, constructive or imputed knowledge of the nature of the Arrangement and exercised discretionary control over assets of the WPLG WBP including, but not limited to, the cash value of the insurance policies insuring the lives of the participants in the WPLG WBPs.

g.    The Lincoln National Life Insurance Company ("Lincoln National"), a Connecticut corporation with its principal place of business in Hartford, Connecticut. At relevant times, Lincoln National was a fiduciary of the HAK, M.D. WBP and authorized the Koreskos, Koresko Financial, and co-defendant Boscoe to act as its agent in selling insurance policies. At all relevant times, Lincoln National had actual, constructive or imputed

knowledge of the nature of the Arrangement and exercised discretionary control over assets of the HAK, M.D. WBP including, but not limited to, the cash value of the insurance policies insuring the lives of the participants in the HAK, M.D. WBP.

h.      The Jefferson-Pilot Life Insurance Company ("Jefferson-Pilot" and collectively with Lincoln National and Penn Mutual, the "Insurance Company Defendants"), a North Carolina corporation with its principal place of business in Greensboro, North Carolina. At relevant times, Jefferson-Pilot was a fiduciary of the HAK, M.D. WBP and authorized the Koreskos, Koresko Financial, and Boscoe to act as its agent in selling insurance policies. At all relevant times, Jefferson-Pilot had actual, constructive or imputed knowledge of the nature of the Arrangement and exercised discretionary control over assets of the HAK, M.D. WBP including, but not limited to, the cash value of the insurance policies insuring the lives of the participants in the HAK, M.D. WBP.

i.      Barry Boscoe, a California citizen, and a Certified Financial Planner at Brighton Advisory Group and Plan Corp. of America.  Boscoe acted as an agent of the Koresko Entities and the Insurance Company Defendants in marketing the Arrangement to the Plaintiffs.

j.      CIBC World Markets Corp. ("CIBC" and collectively with Koresko, Lawrence Koresko, Boscoe, Penn Mutual, Lincoln National, and Jefferson Pilot, the "Fiduciary Defendants"), an investment bank and investment firm organized in Canada, headquartered in Toronto, Ontario, with offices in California.  CIBC acted as an agent and/or co-conspirator of the Koresko Entities, Boscoe, and/or the Insurance Company Defendants in marketing the Arrangement to the Plaintiffs. Its representatives worked with co-Defendant Boscoe in meeting with Mr. Lefkowitz and soliciting Mr. Lefkowitz' participation in the Arrangement, and it pocketed substantial commissions in connection with those efforts.

k.      The true names and capacities of Defendants DOES 1 through 50, inclusive, are currently unknown to Plaintiffs, and such Defendants are sued under fictitious names until their identities are learned, at which time leave to amend will be requested.

6.      Co-defendants not formally joined are:

a.      The Regional Employers' Assurance Leagues Voluntary Employees' Beneficiary Association Trust (the "REAL VEBA"), an entity created by the Koreskos to serve as a trust for the purposes of the

Arrangement.   The REAL VEBA is currently a Chapter 11 debtor-in-possession;

b.   The Single Employer Welfare Benefit Plan Trust (the "SEWBPT"), another entity created by the Koreskos to serve as a trust for the purposes of the Arrangement.  The SEWBPT is currently a Chapter 11 debtor-in-possession;

c.   Penn Public Trust ("PPT"), a Pennsylvania corporation with its principal place of business in Bridgeport, Pennsylvania, and currently a Chapter 11 debtor-in-possession.  At relevant times, PPT was the trustee of the REAL VEBA and the SEWBPT.

d.   PennMont Benefit Services, Inc. ("PennMont"), a Pennsylvania corporation and currently a Chapter 11 debtor-in-possession with its principal place of business at the same address as Koresko Financial.  PennMont was the Plan Administrator of the Plaintiffs' WBPs.

e.   Koresko & Associates, P.C. and its successor, the Koresko Law Firm (collectively, "The Koresko Law Firm"), a Pennsylvania professional corporation and currently a Chapter 11 debtor-in-possession with its principal place of business at the same address as the Koresko Financial.  The Koresko

Law Firm provided plan administration services to the Plaintiffs' WBPs through PennMont as PennMont had no employees.

7.   Upon information and belief, at all relevant times, each of the Defendants, including DOES 1 through 50, inclusive, and each of the unjoined defendants:

   a.   Were the agents, partners, servants, employees, representatives, subsidiaries, members, alter egos, aider and abettors, and/or co-conspirators of the others in connection with the acts hereinafter mentioned;

   b.   Were acting within the course and scope of such relationship, and with the knowing assistance and active participation of each other; and/or

   c.   Ratified each act, omission, or activity done by each of the other Defendants.

## JURISDICTION AND VENUE

8.   This court has subject matter jurisdiction pursuant to § 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), and 18 U.S.C. § 1965.

9.   Venue is appropriate in the Eastern District of Pennsylvania as the Plaintiffs' WBPs were administered in the district, a substantial part of the events or

---

omissions giving rise to the claim occurred in the district, and a substantial part of the property that is the subject of the action is situated in the district.

## GENERAL ALLEGATIONS

### The History of Section 419(A)(f)(6) Plans

10.    In 1984, Congress passed Sections 419 and 419A of the Internal Revenue Code, restricting the previous deductibility of employer contributions to certain welfare benefit plans and funds.  At the same time, however, Congress carved out an exception for "10 or more employer plans."  IRC, §419(A)(f)(6).  Under this section, an employer could still deduct contributions to a "10 or more employer plan."  Id.

11.    Defendants Koresko and his brother Lawrence saw §419(A)(f)(6) as a money-making opportunity to market "Employer Welfare Benefit Plans" that claimed to come under this narrow exception to the limitations on the deductibility of welfare benefit expenditures.  They seized on this tax provision as a means of selling significant sums of life insurance as investment vehicles with purportedly favorable tax treatment.

### Koresko Gets Into the Game

12.    The particular complex of inter-related entities and governing documents the Koreskos put together to purportedly offer these benefits was marketed as the REAL VEBA. The REAL VEBA was also the name of a purported trust established by the Koreskos to hold the assets of the benefit plans participating employers would establish. The employer-established plans were designed to act a vehicle to provide death benefits by purchasing cash value life insurance policies on the lives of owner-employees while purchasing term life insurance on the lives of non-owner employees.

13.    As the cost of cash value life insurance is far more expensive than term insurance with an equal face value, Koresko had to find a way to convince employers that the benefits of investing in his Arrangement would outweigh the much higher premiums required for cash value policies. One of the main benefits that the Koresko Entities and their agents touted was their Plan's alleged safety and flexibility. Employers, like the Plaintiffs, were led to believe that an employer could terminate its Plan at any time and distribute the cash value of the life insurance policies to the employees. Per Koresko, virtually all of the cash value would go to the owner-employees.

**Misrepresentations and Non-Disclosures in Soliciting Plaintiffs' Participation**

14.    On PennMont's website, the REAL VEBA Plan claims the following advantages:

- Contributions are tax-deductible and assets accumulate and compound on a tax-deferred basis;

- Assets can be protected from creditors;

- Benefits can be paid from the plan before age 59 ½ or after 70 ½ with no penalties;

- Employees are not "vested" with respect to benefits;

- Survivor benefits can be free of all income taxes and estate taxes;

- Contributions and benefits are based upon sound and conservative actuarial assumptions;

- Plan assets are held by an independent corporate trustee and a major insurance company; and

- The plan can be amended or terminated by the employer at any time.

15.    The purchase of life insurance as the underlying purpose of the REAL VEBA Arrangement is made clear on the website:

PennMont's goal is to provide insurance agents, financial planners, attorneys and accountants with a working knowledge of cutting-edge legal developments in the area of employee welfare benefits, including the design, installation and maintenance of an employee welfare benefit plan as funded through life insurance; the fundamentals of estate planning; and issues governing corporate taxation.

*See* PennMont website, "About PennMont" http://www.pennmont.com/html pages/ about.html.

16.    The website also explains "why life insurance products fit a VEBA," claiming that life insurance products may be the only choice for [Multiple Employer Welfare Arrangements]," and describes the arrangement as a way to "acquire tax-deductible life insurance." A diagram shows how a VEBA Plan acts as a pass-through for life insurance premiums paid by employers to a life insurance company and a return pass-through for the death benefits paid by the life insurance company to the owners.

17.    The marketing materials on the PennMont website contain numerous misleading representations. In highlighting the alleged security of an investment in the REAL VEBA, PennMont makes claim to an "Independent 3rd party trustee (**Multibillion dollar bank)," "ERISA bonds," "VEBA plan administrator," and "Financial professionals." In reality, as will be discussed in more detail below:

- The trustee was, at various times, either a directed trustee with absolutely no independence, or an entity owned and controlled by Koresko;

- Mr. Koresko in other litigation insists that his arrangement is not governed by ERISA;

- No bonding company has ever been identified; and

- The "VEBA plan administrator" is PennMont, an entity with no employees, and operated and controlled by Koresko.

18.    The website further states: "PennMont is comprised of attorneys, accountants, pension specialists, financial consultants and insurance practitioners.

The law firm of Koresko & Associates, P.C., provides counsel to PennMont." In fact, PennMont has no employees, and employees of the Koresko law firm perform all PennMont activity.

19.   The website misleads as to other crucial aspects of the REAL VEBA Arrangement, at least the arrangement as interpreted by Koresko. In a FAQ section, potential customers are led to believe they can access their "VEBA money" at any time through a plan amendment or plan termination as it notes:

CAN I ACCESS VEBA MONEY IN THE EVENT OF AN EMERGENCY?

**Yes. The plan can be amended or terminated at any time.**

20.   They are also told: "If termination does occur, all assets are allocated to those employees who were actively participating on the date of termination. Distribution is made pro rata, in proportion to each employee's cumulative compensation during years of participation in the plan."

21.   Customers are also given verbal assurances (like those which Boscoe gave the Kalan's and Lefkowitz' here) that they can terminate at any time and withdraw their funds, when, in reality, they cannot.

22.   The website also tells potential customers that all cash value gains within the life insurance policies will be used only for the benefit of the plan

beneficiaries. "The trustee will use all available assets to provide the benefits to eligible employees. One asset is the accumulated cash value of life insurance policies." In fact, the "trustee" is effectively Koresko, who insists on full discretion to use the assets as he sees fit.

23.     The website implies that PennMont will design a plan specifically tailored to a customer's needs. It boasts:

> [PennMont] offers turnkey design, installation and administration of qualified retirement plans and other welfare benefit trusts.
>
>         \* \* \*
>
> From design through distribution, PennMont's attorneys and financial advisors work closely with clients and their consultants to deliver quality service and solve problems.

24.     In fact, Koresko studiously avoids meeting his customers and only offers a pre-packaged arrangement that customers must accept in *toto*. In short, these are true contracts of adhesion.

25.     In addition to the website, PennMont provides potential participants with a thirty-six (36) page pamphlet entitled "The VEBA - Understanding Multi-employer Voluntary Employees' Beneficiary Associations," authored by Koresko. The pamphlet is in the form of seventy-one (71) questions and answers ("Q & As") and is a promotional pamphlet for the REAL VEBA Arrangement. It was mailed to

Plaintiffs by the Koresko Entities to induce Plaintiffs to purchase life insurance through the REAL VEBA Arrangement.

26. The pamphlet contains numerous representations that the purchase of cash value life insurance through the REAL VEBA Arrangement will benefit owner/employees and that the investment returns on the cash value will be for the owner/employee's benefit.

For example:

a. *Question 1*: "Why should a business adopt a Voluntary Employees' Beneficiary Association Health and Welfare Plan?"

*Koresko Answers*: "A VEBA is one of the last, best, legal tax shelters available. A business is allowed a current deduction for IRS contributions to the plan; in most cases, the employee pays no tax on money contributed for his or her benefit until benefits are received; cash value within the insurance policy accumulates tax free and is protected from creditors' claims; and distributions from the plan may be afforded favorable tax treatment. A VEBA is especially attractive to working owners of closely held corporations and self-employed persons. Their long-term service with their companies gives them the best opportunity to accumulate large benefits through tax-free build-up of capital. Although benefits must be provided to other employees as well, the owner usually receives a much larger benefit than other employees."

b. *Question 7:* "What are the basic tax advantages of a VEBA?"

*Koresko Answers* (in part): "Earnings of the VEBA are generally exempt – permitting tax-free accumulations of income and gains on cash value within the insurance policies," and "[i]n contrast to the

general rules barring a company from taking deductions for permanent life insurance coverage, the employer gets a deduction for insurance benefits provided by the VEBA."

    c.    *Question 20*: "How much am I obligated to contribute to the VEBA each year?"

    *Koresko Answers*: "The plan is extremely flexible. After the initial first year contribution, your business must contribute just enough to keep any insurance policies for death and other benefits in force. All contributions, however, must be made by the end of the year to be deductible for that year.

    Keep in mind that the higher the initial contributions, the faster your investment grows. Thus, it is advantageous to contribute as much as possible in the early years!"

    d.    *Question 33*: "Can the cash value in the life insurance policies be used for other VEBA benefits?"

    *Koresko Answers*: "Of course. The cash value, a.k.a. side fund functions as the source for all other benefits. In particular, the side fund will support the severance benefit, if elected."

    e.    *Question 47*: "Are account balances subject to loss for an investment risk or market fluctuations?"

    *Koresko Answers*: "To the extent life insurance policies are used in the plan, account values are guaranteed by a life insurance company. However, if you decide to use interest sensitive or mutual fund based products, investment risk and market fluctuations may affect the plan balances."

---

    f.    In answer to Question 61, the Koresko Entities describe how the cash value will be distributed primarily to the owner/employee if the employer decides to terminate.

27.    The pamphlet also makes clear that the employer is deciding with his insurance agent what type of life insurance the Arrangement should purchase. In providing an example of how the Arrangement works, the pamphlet posits a Mr. X, who owns a business and a Joe Honest, Mr. X's insurance agent/financial advisor. Joe introduces Mr. X to PennMont and after Mr. X decides to enter into the REAL VEBA Arrangement:

> "[Mr. X] asked Joe to obtain a cash value policy for himself and term insurance for the other participants. Mr. X informed Joe that he desired to shelter $100,000 in the VEBA before year end. Mr. X asked Joe to determine if that was permissible.

> Joe submitted a Proposal Request form to Penn-Mont Benefit Services. Penn-Mont produced a proposal which illustrated potential tax savings, a death benefit for employee  (A) for $450,000; (B) for $250,000 and  (C) for  $300,000, and a  $1.5 million death benefit for Mr. X, the owner/employee; and a cash value build-up which would be used to pay severance benefits or distributed to the participants upon plan termination.

> "Pleased with the result, Mr. X forwarded a check in the amount of $100,000 payable to Commerce Bank, N.A., the trustee, before December 31.  After clearance of the check, the corporation, trustee, and employees completed the life insurance applications on behalf of

Mr. X and employees A. B and C. After approval, the trustee paid the premiums."

Pamphlet, pp. 27-28.

28.    Plaintiffs relied on the aforementioned representations, including the numerous representations as to the ability to amend or terminate their VEBA Plan at any time, in deciding to purchase life insurance through the REAL VEBA Arrangement.

## The Structure of the VEBA Plan and the Illusion of Separate Entities

### *The So-Called Advisory Committee*

29.    The VEBA Plan documents give the impression that an Advisory Committee appointed by the adopting employer will control most of the crucial, discretionary aspects of the plan. For example:

    a.    "Upon proof of death, the Death Benefit will be paid to the beneficiary or beneficiaries in a lump sum or at the option of the Committee by one or more of the following methods." Summary Plan Description ("SPD"), § 7.

    b.    "The Advisory Committee shall have the right to designate beneficiaries and make determinations on payment of benefits as they become due." Plan Document, § 5.06.

c.      "The Advisory Committee has the right to enforce the Plan in accordance with its terms, and has responsibility to, *inter alia*, determine questions of employee eligibility, authorize disbursements by Trustee, and determine applicability of benefits."

d.      "The Advisory Committee shall direct the Trustee to take actions on behalf of the Trust." Trust Agreement, § 5.03.

e.      "[N]amed Fiduciaries" (defined in Plan Document, § 1.04 (r) as the Trustee, Administrator and the members of the Advisory Committee) shall meet no less than annually to "formulate policies, practices and procedures to carry out the funding of the Plan." Plan Document, § 6.09.

30.     The Summary Plan Document is particularly misleading in this area. It tells participants:

> The Plan Committee is a group of three persons who oversee benefits administration and determine day to day disputes which may arise under the Plan. One member is appointed by your Employer, another member is legal counsel to the Plan, and the third member is an independent party.

SPD, § 1; See also Id. § 13 ("your Employer carefully administers the Plan.").

31.    In fact, no Advisory or Plan Committee for any Koresko-sponsored plan has ever met after execution of the Adoption Agreement. Koresko justifies this through two stratagems.

32.    First, he includes the following language in the Plan Document:

> If an Administrator has been named in the Adoption Agreement, it shall assume and perform all and each and every duty and responsibility to (sic) the Committee.
>
> * * *
>
> The term "Committee" as used herein shall include the "Administrator" unless the context of the instrument indicates a contrary intent.

Plan Document, § 6.03.

33.    But the pre-printed portion of the Adoption Agreement every employer must execute, and which Mr. Kalan and Mr. Lefkowitz executed, names an Administrator, PennMont. Adoption Agreement, § 2(c). Thus, the SPD intentionally misleads participants as to who is in control of the Plan.

34.    Second, every Adoption Agreement designates Koresko as a member of the Advisory/Plan Committee and is stamped with his signature accepting the appointment. Adoption Agreement, § 9. This section further provides, in Koresko's standard small print, that: "This election by the Employer is irrevocable and

supersedes Article 6, Section 6.01 of the Plan." Adoption Agreement, § 9(b). Section 6.01 of the Plan purports to give the Employer the authority to appoint Advisory Committee members. See Plan Document, § 6.01. However, Adoption Agreement, § 9(b) states in its pre-printed portion that: "John J. Koresko, V is appointed as secretary of the Committee and the Committee and the Trustee are authorized to act upon the signature of the Secretary alone in matters pertaining to the Trust and the Plan." See Adoption Agreement, § 9(b).

35.     When an employer that is a member of the Advisory Committee attempts to be involved in any manner regarding payments of benefits to beneficiaries, or questions Koresko's authority, they are quickly admonished. In other words, all of the elaborate language about an Advisory/Plan Committee, how its members are appointed, and its varied functions is a complete nullity.

### *All Other Illusory Separate Entities Similarly Ruled by Koresko*

36.     The Advisory Committee is just one example of Koresko's scheme to create a world of seemingly independent entities, so that the participant is deceived into believing that its investment is protected by multiple layers of checks and balances. On paper, the REAL VEBA Arrangement functioned through a multitude of entities, including (i) a League, (ii) a Trust, (iii) a Trustee, (iv) an Administrator, (v) Counsel, (vi) a "plan," (vii) a VEBA, and (viii) an Advisory/Plan Committee. In

reality, Koresko and his minions are at the helm of each and every one of these entities, eviscerating any semblance of independence.

### Phantom Trust and Trustee

37.    According to the WPLG Adoption Agreement, the "Trust Name" to be inserted in Section 1.04(aa) of the Plan Document is "The Regional Employers Assurance League, Region 5, Chapter B, Voluntary Employees' Beneficiary Association Trust"; for the HK, M.D. Plan, it is the Harvey A. Klan, M.D., Inc. Health and Welfare Benefit Plan Trust, as amended. *See* Adoption Agreement, §2(b). However, no documentation evidencing the actual creation of such trusts exist. The Trust Agreement is referred to as a "Master Trust Agreement," and Trust Agreement, § 4.1a, envisions the Trust being divided into separate Trust accounts, but there is no evidence indicating any such separate trusts were actually established.

38.    Regardless of whether separate trusts ever existed, the Trusts were a phantom, for the supposedly independent trustee of the Trusts entered into an agreement delegating control and operation of the Trusts to Koresko's law firm. According to Koresko, these custodial powers delegated to him include: "the right not only to surrender, to rename, to sell, to do anything at all with those [insurance] policies." He claims the delegated powers also include:

"[A]uthority to sign and execute any and all necessary documents and forms to transact business involved in the insurance policies, the insurance policies or any policies that were delivered pursuant to the arrangements to effectuate the terms of the trust, including but not limited to surrender of, change of   beneficiary of, application of payment premium to, change of ownership of, withdrawal of, cash value from and/or borrowing from any policy."

39.   In making this claim, Koresko relies on a custodial agreement between him and the bogus trustee. Adopting employers, employees and beneficiaries are not privy to this custodial agreement and are unaware of its existence until Koresko drags it out to justify his use or movement of funds.

40.   The powers the Trustee delegates to Koresko, per the alleged custodial agreement, are not powers the Trust Agreement gave to the Trustee in the first place and, thus, were not the Trustee's to delegate. Article V of the Trust Agreement enumerates the Trustee's powers and nothing therein even hints at the right to sell the policies, change policy beneficiaries, change policy ownership, withdraw cash value or borrow from life insurance policies. *See* Trust Agreement, Art. 5.  So, in another drafting sleight of hand, Koresko, *qua* trustee, delegates to himself, *qua* law firm and delegatee, powers the trustee never had.

41.   Not only, according to Koresko, has the trustee delegated its authority to him, but it also has ceded the right to any information concerning the trust for which it supposedly is trustee.

---

42.    The authority to delegate Trustee functions to Koresko appears to be obscurely and dubiously sanctioned in the last sentence of § 2.05 of the Plan Document, which provides that: "Any reference in the Plan and Trust to 'Trustee' shall also mean 'Plan Administrator' when a duty, privilege or immunity has been delegated."

43.    According to the Plan Document, this delegated authority may include "the right to involuntarily terminate the Employer's participation in this Plan . . . for any . . . action attributable to the Employer or its Employees which the Trustee, in its sole and absolute discretion, determines to be conduct detrimental to the League, this Plan, or the Trust, . . ." Plan Document, § 9.04.

44.    In practice, Koresko deems any challenge to any of his decisions, including benefit determinations, as such detrimental conduct and, according to Koresko, as a basis to deprive a beneficiary of any benefits.

45.    Penn Public Trust, the trustee for much of the relevant time period, did not even have phantom separation from Koresko. It is owned and controlled by him.

### *Koresko Acts As Administrator and Counsel, Too*

46.    PennMont, the Administrator, is owned and controlled by Koresko and has no employees.  Additionally, PennMont's so-called "counsel" is the Koresko

Law Firm and its staff. Thus, all actions taken by the Administrator, including the determination of whether a beneficiary is entitled to benefit, are taken by Koresko and his employees.

### *The Fictional League*

47.    The Lefkowitz Plaintiffs' Adoption Agreement states the "Employer is a member of the Regional Employers' Assurance Leagues (hereinafter "League"), Region 09" and particular Chapter, e.g., "Chapter D" in the case of the WPLG WBT. However, Plaintiff employers were never asked to execute an application for League membership, nor were they given any documents that purported to outline League rules or by-laws, let alone documents relating to the employer's region or chapter.

48.    Despite the complete lack of documentation concerning the League, the Plan Document states that:

> Termination of League Membership  - An  Employee who otherwise meets the requirements for eligibility and participation contained herein shall be a participant in this plan only during the period the Employer is a member of the League. Upon termination of the Employer's League membership, whether voluntary or involuntary, the Employee shall have no further right to the benefits hereunder, including without limitation, those benefits for which claims have been made but not yet paid on the date League membership terminates.

Plan Document, §3.01 (e); and,

> The League shall have the right to amend this Plan, in its sole discretion, from time to time and to amend or cancel any such amendments.  Without limiting the scope of the foregoing, such

amendments may include modification of the status of this plan for
federal income tax purposes if future developments in the law indicate
the utility of such change.

*Id.*, § 9.03 (a).

49.    As to the League's governance and where the crucial powers of

involuntary termination and amendment actually rest, the only information is

contained in the Trust Agreement, which describes the League as a non-profit

Pennsylvania corporation. *See* Trust Agreement, Introduction. However, a search of

the Pennsylvania Department of State on-line records turns up no such corporation.

50.    According to the Trust Agreement, the Secretary or Assistant Secretary

of the League is to certify to the Trustee the names of those authorized to act in

various capacities. *See* Trust Agreement, § 11.2.  But no such corporate officers are

otherwise identified and, since the corporation does not appear to have actually been

created, records which might reveal the identities of the officers are non-existent.

51.    As the Regional Employers' Assurance Leagues is the purported settlor

of the Trust, and it does not exist as an entity that can own property, the entire Trust

is itself a fiction.

52.   As in the case of the Advisory Committee, the League's function as even a sham separate entity is done away with by another provision of the Koresko documents. Section 11.3 of the Trust Agreement provides that: "Unless otherwise specifically stated in the notice or direction, notice or direction from the Plan Administrator shall be deemed to be notice or direction from the League." *See* Trust Agreement, § 11.3.  In other words, Penn-Mont  -- a/k/a Koresko -- speaks for the League unless Koresko himself says it doesn't.

53.   Moreover, the 2002 Trust Agreement's signature page indicates that Mr. Koresko signed on behalf of the League as Attorney in Fact.

54.   In addition, the VEBA is never defined in the documents, and the basic term "plan" is subject to confusion with alternate definitions employed as circumstances require. The Adoption Agreements define the "Plan" differently from the Plan Document, which describes the "Plan" differently from the Trust Agreement. The Plan Document includes statements indicating that each employer has no separate plan – particularly strange given that, at least up to 2002, employer

contributions were made for the benefit of individual, employer specific, welfare benefit plans.

55.    Thus, within the Koresko Entities' alternative universe, the League is an unincorporated corporation (i.e., a nullity), the Plan may or may not be the employer's own VEBA, separate trusts for each alleged chapter of the non-existent League may or may not exist, Advisory committee means Plan Administrator, the independent trustee is not independent, Trustee may mean Plan Administrator, Plan Administrator means PennMont and PennMont means the employees of Koresko's law firm.

56.    The documents contain what amounts to a prospective release of Koresko and his various entities.  Section 10.11 of the Plan Document.  Koresko keeps the power to insist upon a release before paying even undisputed benefits, it, in effect, forces the beneficiary to make a Hobson's choice.

57.    Koresko's documents contain clauses that purport to give him irrevocable powers of attorney. *See, e.g.*, Adoption Agreement §9(b); Plan

Document, §10.21, and Participation Agreement. Koresko interprets these powers of attorney as granting him the right to take whatever actions he pleases regarding the life insurance policy proceeds upon the participant's death, as well as immunity for whatever he does. Koresko interprets the power of attorney as allowing him to make payment out of trust assets for whatever "fees' or "trust related services" he deems appropriate, including whatever legal fees he chooses to have paid to the Koresko Law Firm and administrative fees he chooses to have paid to PennMont.

58.    The plan contains several references to the Employee Retirement Income Security Act ("ERISA") and the SPD informs participants that "The Plan is covered by the Employee Retirement Income Security Act 0f 1974 which was designed to protect employees' rights under benefit plans." SPD, §13. The Plan Document also contains numerous references to ERIS. Plan Document, §§1.03, 10.05.

59.    Koresko, however, flip-flops regarding the applicability of ERISA to the plan at his convenience.

## Koresko's Personal Bankruptcy Not Disclosed Prior to Participation

60.    A "red flag" indicating the dubious and fraudulent nature of the Arrangement was that Koresko had filed for personal bankruptcy prior to setting up his VEBA scheme. Defendants never disclosed this "red flag" to Plaintiffs prior to their participation in the VEBA Plan. Many participants, including Plaintiffs, would not have bought a Plan run by someone who had proven so incapable of managing his own finances that he had become insolvent and was forced to file for bankruptcy.

## The Arrangement's Real Purpose Was Lining Defendants' Pockets With Exorbitant Commissions, Fees and Outright Conversions

61.    Defendants also failed to disclose to Plaintiffs that the Koresko Entities' real purpose in setting up the REAL VEBA Arrangement was to use it for their own benefit. This was accomplished in numerous ways to the detriment of the plaintiffs.

62.    First, the Koresko entities, Boscoe and CIBC and their co-conspirators, by selling cash value life policies to participants like the Plaintiffs, and persuading them that they should "front-load" the premiums, i.e. pay a huge initial premium that would supposedly earn investment income and more than cover future insurance costs while still creating a large cash value nest-egg, diverted the lion's share of the first year premiums to themselves as commissions, unbeknownst to Plaintiffs.

63.    Defendants also failed to disclose that the Koresko Entities would be enriching themselves with exorbitant "administrative" fees.  For instance, the Plan documents contain clauses that purport to bestow upon Koresko irrevocable powers of attorney.  Koresko interprets these power of attorney clauses as allowing him to, among other things, make payment out of trust assets for whatever "fees" or "trust related services" he deemed appropriate, including whatever legal fees he chose to have paid to the Koresko Law Firm and administrative fees he chose to have paid to PennMont.

64.    Also undisclosed to participants is that Koresko reads his Plan documents as granting him the sole discretion to declare Trust and Plan assets as "surplus." Such a declaration, according to Koresko, frees him from any fiduciary responsibilities or constraints on how these supposedly surplus assets are used.

65.    This "surplus" was primarily generated by refusing to pay collected life insurance proceeds to the beneficiaries of plan participants upon the participant's death, either through a determination of ineligibility or through coercing acceptance of the present value of a 10-year payout of the proceeds.

66.    Koresko utilized a number of pretexts to deny benefits. For example, Koresko claimed the documents contain a "bad boy clause," and he interpreted that

clause as permitting him to deny benefits - and turn the insurance proceeds into surplus - for technical and/or encouraged errors, such as an incorrect census form.

67.    The "bad boy" clause states:

> General Limitation on Benefit Payment-Notwithstanding any provision of this Plan and Trust, a Participant who has less than ten (10) years of participation shall forfeit any benefit payable hereunder if it is determined by the Plan Administrator that he has engaged in a disqualifying act with respect to the Employer, Employees, or to the League. A Participant shall be deemed to have engaged in a disqualifying act if he is determined by the Plan Administrator to have: (1) been guilty of committing theft, fraud or embezzlement with respect to the Employer; or (2) committed any criminal act or malicious act [not rising to the level of a crime] which damages the person or property of the Employer, Employees or the League. The judgment of the Plan Administrator as to whether a Participant has committed a disqualifying act shall be final, unless made without evidence to support such judgment.

Plan Document, § 5.10 (Ex. B).


68.    Koresko interpreted this clause as giving him discretion to assert a violation of the "bad boy" clause and disqualify a participant from their entitlement to a benefit.  Koresko also used the "bad boy" clause as a means to intimidate employers who challenged an offer of reduced death benefits to one of their employees. If an employer or beneficiary challenged a benefit determination, the

Koresko Parties accused them of violating the clause and risking forfeiture of benefits.

69.   Koresko also interpreted the documents as:

a.   Permitting him to treat as "surplus," i.e. isolate from the potential claims of any beneficiary or participant, amounts realized when insurance companies who have issued policies on the participants' lives demutualize;

b.   Permitting him to sue any participant who disagreed with him and to use that participant's VEBA funds to finance the litigation;

c.   Authorizing him to coerce the beneficiaries of the insurance policies to accept roughly 20% less than the face value of the policies, the difference effectively going into his pockets as "surplus"; and

d.   Permitting him to pay benefits in such a manner as to effectively pay nothing for ten years. He claims that since his documents don't say when benefit payments are supposed to start, the inception date is for him to decide and that when they finally do start, he can pay a dollar a year for the first nine years.

70.   Any financial gain to the Trust resulting from these various ways of denying or limiting benefits are, to Koresko, "experience gains" that are "surplus" for the benefit of Mr. Koresko.

71.    Perhaps one of the most outrageous ways Koresko deprived beneficiaries of insurance proceeds and funneled those proceeds into "surplus" is by telling the heirs of owners who experienced bad economic years preceding their deaths that they were entitled to nothing for that reason.

72.    Documents produced in a related case brought by the Department of Labor, *Solis v. Koresko*, No. 09-0988 (E.D. Pa.), show that from 2002 to 2008 employers paid approximately $158 Million in contributions of which approximately $104 Million was used for premium dollars that went through the Koresko-controlled trust account and was used to purchase life insurance policies.

73.    Conservatively, this amount of premium dollars purchased at least $500 Million in insurance coverage on the lives of plan participants.  The vast majority of the participants are still alive and, therefore, their beneficiaries have yet to realize that if Koresko regains control of the Arrangement,[1] upon the participants' death, the insurance proceeds will either be skimmed or completely converted for Koresko's personal benefit.  Even if the policy proceeds are only skimmed based on Koresko's "present value" scam, approximately $100 Million will be converted from the rightful beneficiaries to Koresko.

---

[1] Koresko was temporarily removed from any position of authority concerning the Arrangement by order of this Court dated September 18, 2013.  A trial to determine whether that removal should be made permanent was held in June 2014. A decision has yet to be rendered.

## Lobbying Expenses

74.     Defendants also failed to disclose that, during the relevant time period, Koresko, signing as chair of PennMont, entered into an agreement with a lobbying firm in Washington, D.C., and obligated the REAL VEBA Trust to pay a retainer and other expenses for the services of the lobbying firm.  At the direction of PennMont, Community Trust Company, a directed trustee handpicked by Koresko, paid the lobbying firm with money from the Trusts.  The Trusts paid for lobbying activities that included enhancing PennMont's ability to market the plans by seeking favorable tax treatment for the employers who purchased the plans sold by PennMont, and similar issues related to tax deductions.  This lobbying also included contacting Department of Labor officials concerning the Department of Labor investigation underlying their lawsuit against the Koresko Entities.

75.     These lobbying activities were not reasonable or necessary administrative expenses for the Plans.  This lobbying sought to benefit PennMont and the other Koresko Entities who were selling the VEBA Plan and/or the employers as taxpayers, but not the Plans.

## Role of The Defendants

76.    The REAL VEBA scheme depended upon the false assurance to participants that contributions to the cash value life insurance policies were safe and available to participants at any time should they choose to terminate.  Various parties had roles in providing this assurance, including a network of salespeople and agents, like Barry Boscoe and CIBC representatives, who lured participants into the REAL VEBA Arrangement.

77.    The Koresko Parties and their agents, such as Defendants Boscoe and CIBC (with regard to the Lefkowitz Plaintiffs) and Defendant Boscoe (with regard to the Kalan Plaintiffs), misrepresented and omitted material facts regarding the REAL VEBA Arrangement.  They did so verbally, both directly, in sales pitches to potential participants, and indirectly, in sales pitches intended to reach potential participants.    They also did so in writing, through the marketing materials disseminated to potential participants, including Plaintiffs, which Boscoe vouched for.  Boscoe, with CIBC, assured the Lefkowitz Plaintiffs and Boscoe assured the Kalan Plaintiffs, that they had thoroughly evaluated and verified the viability and safety of the Arrangement and that Plaintiffs could terminate their participation in the plans at any time and collect the cash surrender value of their policies.

78.    These Defendants directly benefited from their participation in the scheme. In many cases, agents who sold these life insurance policies received close

to or exceeding 100% of the first year's premium! Upon information, Boscoe and CIBC were paid such commissions which they agreed to share with the Koresko Parties. In other words, they formed a partnership or joint venture for the purpose of marketing the Arrangement and sharing the commissions the insurance sales generated.

79.    The Insurance Company Defendants also benefited from participating in and permitting its insurance policies to be sold through the Arrangement. Insurance companies, generally, and the Insurance Company Defendants, in particular, have seized on the "419A(f)(6) exception" as a means of selling significant amounts of life insurance as investment vehicles with purportedly favorable tax treatment, sales that would not have been made but for the false advantages and misrepresentations conveyed by the Insurance Company Defendants' agents, such as Boscoe and Larry Koresko, to potential participants. The Insurance Company Defendants were fully aware of the details of the Arrangement, including its flaws, and deceitful and unsuitable nature, before authorizing its agents to use the Arrangement as a marketing tool.

80.    Upon information and belief, "elite" sales agents of the Insurance Company Defendants were invited to meet the Koresko Parties and similar 419 plan promoters, and various sales agents attended sales training seminars to learn how to

make people believe they are saving money for their future in a tax advantaged way that has been reviewed and approved by some of the largest insurance companies in the world.

81.    Further, upon information and belief, the Insurance Company Defendants each had actual and/or constructive knowledge of material aspects of the REAL VEBA Arrangement.  More specifically, each had actual and/or constructive knowledge that:

a.    The Arrangement was designed as a pass through to allow the owners of closely held companies to purchase cash value/permanent life insurance and claim the premiums as business expenses;

b.    The Arrangement was designed to allow owners to access the accumulated cash value in the life insurance policies by terminating their participation and that the owners were the equitable and beneficial owners of the policies;

c.    The Arrangement had been structured so that Participants and beneficiaries of it could not make a recovery if the insurance policies purchased on their behalf were not available to fund payment, and all

participants were led to believe that the policies were theirs' and that the trust functioned as a straw party;

d.    In the absence of the business owner's ability to access the cash value of the policies it made no sense for the business owner to pay the substantially higher premiums associated with the cash value policies being purchased through the Arrangement;

e.    The Arrangement required the business owners to contribute amounts equivalent to the premiums being charged for the cash value policies and that the business owners were the actual payors of the premiums received by the Insurance Company Defendants; and despite this knowledge

82.    The Insurance Company Defendants permitted and encouraged its agents to sell its policies via the REAL VEBA Arrangement.

## The Lefkowitz Plaintiffs Are Solicited to Joining the Arrangement
## The WPLG Welfare Benefit Plan

83.    Plaintiffs David and Norma Lefkowitz are employees of Plaintiff Wilshire Palisades Law Group.  In 2001, they decided to look into purchasing life insurance policies.  They turned to a trusted friend, who at the time was a registered representative with Defendant CIBC.  The CIBC representative recommended that

Plaintiffs meet with Defendant Barry Boscoe, a Certified Financial Planner at Brighton Advisory Group.

84.   Plaintiffs met with Boscoe at CIBC's California offices.  A team of CIBC representatives, whom Boscoe described as retirement planning/tax specialists, was also present at the meeting.  Plaintiffs were first introduced to the VEBA concept during this meeting. Boscoe highlighted the alleged virtues of participating in the REAL VEBA Arrangement, including telling Mr. Lefkowitz that he could terminate his involvement at any time, collect the cash surrender value of the policies, and pay the taxes owed on the money, or they could pass along the money as a death benefit through the life insurance policies.

85.   During this meeting, Boscoe and the CIBC representatives recommended that Plaintiffs participate in the Koresko REAL VEBA Arrangement. They did not recommend any other type of VEBA, nor did they offer Plaintiffs any alternatives to the REAL VEBA Arrangement.  Plaintiffs' trusted broker/friend at CIBC vouched for Mr. Boscoe's expertise in the field and confirmed the virtues of the REAL VEBA Arrangement.

86.   During the meeting, Boscoe and CIBC misrepresented and omitted material facts about the REAL VEBA arrangement, including, among other things, that:

a.      Misrepresenting that the Arrangement could be terminated at any time and in the discretion of the Lefkowitz';

b.      Failing to disclose that the Arrangement was a sham, in that, by way of example only, termination was completely controlled by Koresko;

c.      The fees and commissions paid to Boscoe, CIBC, and Koresko and his affiliates were grotesquely large, excessive, and not disclosed to Plaintiffs; and

d.      Koresko had filed for bankruptcy before the VEBA was sold to the Plaintiffs, which was not disclosed.

### The WPLG VEBA Plan Is Established

87.    In December 2001, Plaintiff WPLG formed a Health and Welfare Benefit Plan under Koresko's Regional Employers' Assurance Leagues, Region 09, Chapter D, and Voluntary Employees' Beneficiary Association.    Participants included David and Norma Lefkowitz and WPLG employee Brenda Walsh. Subsequently, upon the recommendation of financial advisor Boscoe, flexible premium variable life insurance policies from Penn Mutual were purchased on behalf of WPLG's employees, including David I. Lefkowitz and Norma M. Lefkowitz.  Plaintiff WPLG initially paid over $520,000 in premium payments for

the life insurance policies.    In 2003, Plaintiff WPLG paid another $196,000 in premium payments on the life insurance policies. In 2004 and 2005, WPLG paid an additional total of $26,000.

## The Kalan Plaintiffs Are Solicited to Join the Arrangement

88.    In 2003, defendant Boscoe, who had provided financial advisor services to Dr. Kalan for about six years and in whom Dr. Kalan vested great trust and confidence, solicited Dr. Kalan to establish a Plan under the Koresko Arrangement.

89.    To that end, Boscoe recommended to Dr. Kalan that he cash out of his then-existing life insurance policy with Canada Life (policy #2632104) and purchase new life insurance policies through a new Plan established with Koresko and his affiliates. He also recommended that Dr. Kalan buy an additional life insurance policy with Long-Term Care Benefits.

90.    Kalan, on the advice of financial advisor Boscoe, accepted Boscoe's recommendations and, in December 2004, executed the paperwork which Boscoe provided him to establish the HK, M.D. WBP.

91.    Thereafter, Boscoe recommended that Dr. Kalan use the proceeds of the surrender of the Canada Life policy to purchase, through the new HK, M.D.

VEBA, two new insurance policies on behalf and for the benefit of Dr. Kalan and his wife Deborah Kalan, one with Lincoln National and one with Jefferson-Pilot. The initial specified amount on the former policy was $3.5 million and on the latter, $2 million.

92.    The premium payments for the policies came from withdrawal from the existing Canada Life policies, from which approximately $1 million was withdrawn and used to fund the Lincoln National policy, in the amount of about $500,000, and the Jefferson Pilot policy, in the amount of about $500,000. In addition, Boscoe recommended to Dr. Kalan that he pay $150,000 for an additional life insurance policy with Long-Term Care Benefits with Golden Rule Insurance Company.  This policy provided an initial long-term care benefit of $8,522 per month and an initial specified death benefit of $426,124. The VEBA also covered a non-owner employee of the HK, M.D., Inc.

93.    In soliciting Dr. Kalan to establish a VEBA under the Koresko Arrangement, Boscoe misrepresented and omitted material facts about the REAL VEBA arrangement, including, among other things, that:

       a.    Misrepresenting that the Arrangement could be terminated at any time and in the discretion of Kalan;

b.      Failing to disclose that the Arrangement was a sham, in that, for example, termination was completely controlled by Koresko;

c.      The fees and commissions paid to Boscoe and Koresko and his affiliates were grotesquely large, excessive, and not disclosed to Plaintiffs; and

d.      Koresko had filed for bankruptcy before the VEBA was sold to the Plaintiffs, which was not disclosed.

## Plaintiffs Are Kept in the Dark About the Arrangement

94.      After joining the Arrangement, Plaintiffs rarely, if ever, received updates on the health of the REAL VEBA Trust.  At one point, they stopped receiving regular statements on their life insurance policies.  Neither Koresko, nor any of his agents or employees, ever communicated any possible issues or concerns with the REAL VEBA Trust. Mr. Lefkowitz had a two-hour telephone call with Koresko in late July 2013 concerning, among other things, the status of the Arrangement. At no time during that call did Koresko inform Mr. Lefkowitz about existing or impending bankruptcy filings of various Koresko entities, or about any other financial problems facing the Trust. Nor did he suggest in any way that he had misappropriated assets from the Trust. In fact, in the conversation, Koresko stated

that he had not received any money for work he and his affiliates had performed for the Trust and Arrangement participants, despite his having diverted millions of dollars of Trust assets to himself for his own personal use (as further specified below). Koresko's intentional misrepresentations and omissions continued until the end.

95.    In reality, and hidden from Plaintiffs, in 2009, the Koresko Entities unilaterally amended terms of the documents purportedly governing the plan so as to prevent plan participants from obtaining information concerning the insurance policies on their lives. The Koresko Entities then utilized the amendments and other concocted documents to approach insurance companies and remove the maximum amount of cash value from many insurance policies held for the benefit of employer established WBPs via loans.    Approximately $34,000,000 in plan assets was removed in this fashion between August 24, 2009 and September 28, 2009 and deposited by the Koresko Entities in an account in John Koresko's name at TD Bank.

96.    The Insurance Company Defendants permitted the Koresko Parties to remove the cash value without obtaining plaintiffs' permission and without even notifying plaintiffs despite, on information and belief, their (i) actual and/or constructive knowledge that the funds were being held for the benefit of the Plaintiffs

and that the loans served no purpose that could possibly benefit the Plaintiffs; and (ii) no valid reason to believe that Plaintiffs were unaware of what was being done and that the loans were illegitimate.

97.     As of the date of the filing of this complaint, to the best of plaintiffs' knowledge the cash value loans have not been repaid.

## The Department of Labor Action

98.     Also in 2009, and unbeknownst to Plaintiffs, the U.S. Department of Labor ('DOL") brought an action against the Koresko Entities in the aforementioned case, *Solis v. Koresko*, alleging that Koresko Entities were fiduciaries to ERISA-covered employer-level plans.  The DOL's most recent Complaint alleges, among other things, that the Koresko Entities, having unlawfully transferred death benefits, unlawfully transferred interest income, unlawfully transferred plan assets, unlawfully failed to credit stock and dividends, unlawfully used plan assets to pay lobbying expenses, and unlawfully requested loans and unlawfully transferred loan proceeds.  In February 2012, unbeknownst to Plaintiffs, the federal district court granted in part the DOL's motion for partial summary judgment, holding that Koresko, Bonney and PennMont had violated ERISA.

99.    In July 2013, Koresko filed bankruptcy petitions on behalf of the Koresko Entities.  The bankruptcy judge subsequently dismissed the bankruptcies for failure to comply with the bankruptcy court's orders.

## Koresko Actively Diverting Assets

100.    In the face of a multitude of lawsuits, the Koresko Entities' appetite for greed and theft seems only to have grown.  According to the Department of Labor's Application for a Temporary Restraining Order and Preliminary Injunction, the Koresko Entities have dissipated and misappropriated over $6.8 million in loan proceeds and death benefits proceeds, including $3,372,000 to purchase Caribbean condominiums in Koresko's name and for his personal benefit, $1,290,619 to the Koresko Law Firm Operating Account, $1,680,000 to an account called "John Koresko Client Escrow," $250,000 to an account called "Koresko Law Firm IOLTA," $238,769 to purchase real property in the name of a corporation whose sole officer is John Koresko, $35,000 to a personal checking account in the name of John and Bonnie Jean Koresko, $15,000 to an Anguilla law firm, and $4,000 to John J, Koresko's personal checking account.

101.    On July 9, 2013, the court in *Solis v. Koresko* found that the Department of Labor had "established a substantial likelihood of success on the merits of their

claim that the Koresko Parties have breached their fiduciary obligations to the ERISA plans being administered by the Koresko Parties." The court also found that the government had a substantial likelihood of showing that "the Koresko Parties engaged in a pattern of moving plan assets in the form of death benefit and insurance policy loan proceeds through at least 28 different bank accounts, held in the name of at least 19 different entities, at no less than four banks, commingled plan assets with other funds, and misappropriated funds from those commingled accounts for their own benefit." Finally, the court found that the government had a substantial likelihood of showing that "the Koresko Parties used plan assets to pay Koresko and his law firm for services to the Trust and that by acting as both the fiduciary to the Trust and as a service provider to the Trust, who incidentally also appeared to set his own rates for his services, Koresko placed himself in the precise position of dual loyalties that ERISA prohibits."

102. On September 17, 2013, the same court appointed an independent fiduciary to administer the REAL VEBA Arrangement.

### Plaintiffs' Delayed Discovery

103. Plaintiffs, despite due diligence, did not learn that the Koresko Entities were engaged in their nefarious scheme until August 2013 as a result of active

concealment by the Defendants, including Koresko and Boscoe. Defendants fraudulently concealed their wrongdoing from Plaintiffs by making misrepresentations, and hiding critical facts from Plaintiffs. The facts hidden included that: (1) under the Arrangement, Plaintiffs could not terminate their Plan and surrender their policies for cash value; (2) The Arrangement was a sham, as, for example, termination was completely controlled by Koresko; (3) the fees and commissions paid to Boscoe and Koresko and his affiliates were grotesquely large, excessive, and not disclosed to Plaintiffs; (4) Koresko had filed for bankruptcy before the VEBA was sold to the Plaintiffs, which was not disclosed; (5) the bankruptcy filings of the Koresko Entities; and (6) the misappropriation of assets by Koresko.

104.   During the period August 1, 2013 through at least the end of 2013, in numerous conversations between Boscoe and Dr. Kalan, and Boscoe and Mr. Lefkowitz, Boscoe repeatedly and continuously stated that he believed that Koresko had done nothing wrong in the solicitation of the Plan and in its supervision, management, and operation. In addition, Koresko, in his two-hour telephone call with Mr. Lefkowitz at the end of July 2013, failed to reveal the existing and impending bankruptcy filings of the Koresko Entities and the facts concerning his misappropriation of assets.

105.    Plaintiffs reasonably relied on these misrepresentations and/or silence to their detriment, and upon learning the truth about Koresko's misappropriations and the sham nature of his arrangements, promptly filed this action.

## COUNT 1—ERISA, 29 U.S.C. §1132(a)(3)

### (All Plaintiffs (With the Exception of HAK, M.D. and WPLG)

### Against All Defendants)

106.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1through 105, above, as though set forth at length herein.

107.    The WP WBP and HK, M.D. WBP are Employer Welfare Benefit Plans within the meaning of ERISA, 29 U.S.C. § 1002(1).

108.    The participants in the WP WBP included David and Norma Lefkowitz and Brenda Walsh and in the HK, M.D. WBP included Harvey Kalan, M.D., Deborah Kalan, and Sonja Teles  (the "Fiduciary and Participant Plaintiffs")

109.    John J. Koresko, V, Lawrence Koresko, Jeanne Bonney, Barry Boscoe, and Penn Mutual (the "WP WBP Fiduciary Defendants") are fiduciaries of the WP WBP and John J. Koresko, V, Lawrence Koresko, Jeanne Bonney, Barry Boscoe, Lincoln National, and Jefferson Pilot (the "HAK, M.D. WBP Fiduciary Defendants," and collectively with the WP WBP Fiduciary Defendants, the

"Fiduciary Defendants") are fiduciaries of the HAK, M.D. WBP within the meaning of ERISA, 29 U.S.C. § 1002(21).

110.   The Fiduciary Defendants breached their fiduciary duties by misleading co-fiduciaries, participants, and beneficiaries as to the Plan's benefits and structure and ownership of plan assets, converting or permitting conversion of plan assets, and performing their duties in their own self-interest and to the detriment of participants and future beneficiaries.   The conversions and self-dealing were also prohibited transactions violative of §§ 406(a) and 406(b) of the Act.

111.   The defendants, whether deemed fiduciaries or not:

a.   Knowingly participated in actions violative of ERISA and violative of the terms of the WP and HAK, M.D. WBPs; and

b.   Knowingly participated in prohibited transactions violative of §§ 406(a) and 406(b) of the Act.

**WHEREFORE**, Plaintiffs request that:

1.   The defendants be ordered to:

a.   Make full restitution of all funds converted from the cash value of the insurance policies on the lives of the WP and HAK, M.D. WBP participants;

b.    Disgorge or make restitution of all fees, commissions or any

other form of compensation paid or profits made in violation of § 406 of the

Act; and

c.    Make full restitution of all profits that the WP and HAK, M.D.

WBPs would have earned on the converted funds.

2.    Plaintiffs be awarded attorney fees and cost

3.    The Court award such other equitable relief as it deems appropriate.

## COUNT II – ERISA, 29 U.S.C., § 1132(a)(2)

### Plaintiffs (with the exception of WPLG and HAK, M.D.) Against The

### Fiduciary Defendants

112.    Plaintiffs hereby incorporate by reference the averments contained in

paragraphs 1 through 111 above as though set forth at length herein.

113.    The Fiduciary Defendants breached their fiduciary duties by converting

or permitting conversion of plan assets and performing their duties in their own self-

interest and to the detriment of the WP and HAK, M.D. WBPs.

**WHEREFORE**, Plaintiffs request that:

1.    The Fiduciary Defendants be ordered to:

a.    Make full restitution of all funds converted from the cash value

of the insurance policies on the lives of the WP and HAK, M.D. WBP

participants;

b.    Disgorge or make restitution of all fees, commissions or any

other form of compensation paid or profits made in violation of § 406 of the

Act; and

c.    Make full restitution of all profits that the WP and HAK, M.D.

WBPs would have earned on the converted funds.

2.    Plaintiffs be awarded attorney's fees and cost

3.    The Court award such other relief as it deems appropriate.

## COUNT III--COMMON LAW MISREPRESENTATION FOR CONDUCT PRIOR TO THE ESTABLISHMENT OF THE WPLG AND HAK, M.D. WBPS

(All Plaintiffs Against All Defendants)

114.    Plaintiffs hereby incorporate by reference the averments contained in

paragraphs 1through 113 above as though set forth at length herein.

115.    Prior to the establishment of the Plaintiffs' WBPs, Defendants,

including Penn Mutual, Lincoln National, and Jefferson-Pilot, through its agents,

including Boscoe and Larry Koresko, made the numerous intentionally false

representations described above in order to induce the Employer Plaintiffs to join the Arrangement and purchase cash value life insurance policies, including the Penn Mutual policy (as to the Lefkowitz Plaintiffs), and the Lincoln National, Jefferson-Pilot, and Golden Rule policies (as to the Kalan Plaintiffs), through the REAL VEBA Arrangement. Defendants also misrepresented and omitted material facts in connection with the selling of the REAL VEBA arrangement to the Employer Plaintiffs.

116.    The misrepresentations and omissions were known or should have been known to the Defendants to be false or misleading when made, were material in nature, and were made with the intent to deceive, defraud and/or induce the Plaintiffs, and in fact, induced the Plaintiffs to purchase the Penn Mutual, Lincoln National, Jefferson-Pilot, and Golden Rule policies through the REAL VEBA Arrangement. Defendants further intentionally concealed from Plaintiffs key facts, which facts made the representations made to the Plaintiffs false and misleading.

117.    Alternatively, the misrepresentations were made in negligent and reckless disregard as to their truth or falsity.

118.    In reasonable reliance on the fraudulent representations, Plaintiffs were induced to join the Arrangement and to purchase the Penn Mutual, Lincoln National,

Jefferson-Pilot, and Golden Rule policies through the REAL VEBA Arrangement, to their substantial harm and financial injury.

119.    Despite reasonable diligence and because of active concealment by the Defendants, Employer Plaintiffs could not discover the fraud until 2013.

120.    Plaintiffs were harmed as a direct and proximate result of their reliance on the misrepresentations and omissions of material fact, and suffered compensatory and consequential damages.

121.    Defendants' misconduct was so reckless, outrageous, willful, wanton and malicious as to give rise to a claim for punitive damages.

**WHEREFORE**, Plaintiffs request judgment against defendants and compensatory and punitive damages in amounts to be determined.

## COUNT IV—RICO

### (All Plaintiffs Against All Defendants (Except CIBC))

122.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 121 above as though set forth at length herein.

123.    The Koresko Entities (The Penn Public Trust, PennMont, the Koresko Law Firm, Koresko Financial LP, Penn-Mont Benefits, Inc. and John Doe

Companies 1-50) and the Insurance Company Defendants are, singly and collectively, enterprises within the meaning of 18 U.S.C. § 1961 *et seq.* and are engaged in interstate commerce.

124.    Defendants John Koresko, Lawrence Koresko, and Boscoe are persons within the meaning of 18 U.S.C. § 1962 who have conspired and conducted the affairs of the enterprises through a pattern of racketeering activity including but not limited to numerous acts of mail fraud, wire fraud and conversion of assets of employee welfare benefit plans, in violation of 18 U.S.C. §§ 664, 1341 and 1343.

125.    The Insurance Company Defendants are liable for John Koresko's, Lawrence Koresko's, Boscoe's and CIBC's agents' actions under principles of *respondeat superior*.

126.    As a consequence, Defendants John Koresko, Lawrence Koresko, Boscoe, CIBC, and the Insurance Company Defendants are in violation of 18 U.S.C. § 1962(c) and (d).

127.    Plaintiffs have been injured in their property by reason of these violations.

**WHEREFORE**, Plaintiffs request judgment against defendants John Koresko, Lawrence Koresko, Boscoe, and the Insurance Company Defendants for

damages sustained as a result of the violations of 18 U.S.C. § 1962(c) and (d) including costs, attorneys' fees, treble damages and any further relief deemed proper by this Court.

## COUNT V – COMMON LAW FRAUD FOR CONDUCT AFTER THE ESTABLISHMENT OF THE WP AND HAK, M.D. WBPs

### (All Plaintiffs Against All Defendants)

128.   Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 127 above as though set forth at length herein.

129.   Should it be determined that ERISA does not control this lawsuit, plaintiffs seek relief, in the alternative, under common law principles for the fraud and misrepresentations described above.

130.   The misrepresentations and omissions were known or should have been known to the defendants to be false when made, were material in nature, and were made with the intent to deceive, defraud and/or induce plaintiffs, and in fact, induced plaintiffs to purchase the Plan.

131.   Plaintiffs reasonably relied on the defendants' misrepresentations.

132.  As a consequence of such reliance, plaintiffs have suffered and will in the future suffer both monetary damages and other harm for which there is no adequate remedy at law.

133.  Defendants' misconduct was so reckless, outrageous, willful, wanton and malicious as to give rise to a claim for punitive damages.

**WHEREFORE**, plaintiffs request judgment in their favor and against defendants for compensatory damages in an amount to be determined but in excess of $75,000.00 and exemplary damages.  Plaintiffs also request such equitable relief as the Court shall consider appropriate.

### COUNT VI – COMMON LAW BREACH OF FIDUCIARY DUTY

#### (All Plaintiffs Against The Fiduciary Defendants)

134.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 133 above as though set forth at length herein.

135.  Should it be determined that ERISA does not control this lawsuit, plaintiffs seek relief, in the alternative, for common law breach of fiduciary duty.

136.  The Fiduciary Defendants stand in a fiduciary relationship to WPLG and HAK, M.D. and the Participant Plaintiffs.

137. The Fiduciary Defendants breached their fiduciary duties by misleading co- fiduciaries, participants, and beneficiaries as to the Plan's benefits and structure and instead performing their duties in their own self-interest and to the detriment of participants and future beneficiaries.

138. The Fiduciary Defendants' misconduct was so reckless, outrageous, willful, wanton and malicious as to give rise to a claim for punitive damages.

WHEREFORE, Plaintiffs request that:

1.  The defendants be ordered to:

    a.  Make full restitution of all funds converted from the cash value of the insurance policies on the lives of the WP and HAK, M.D. WBP participants;

    b.  Disgorge or make restitution of all fees, commissions or any other form of compensation paid or profits made in violation of § 406 of the Act; and

    c.  Make full restitution of all profits that the WP and HAK, M.D. WBPs would have earned on the converted funds.

2.    Plaintiffs be awarded compensatory and exemplary damages in amounts to be determined together with attorney' fees, costs and such other relief as the Court deems appropriate.

## COUNT VII – COMMON LAW KNOWING PARTICIPATION IN AND AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY
### (All Plaintiffs Against All Defendants)

139.    128. Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 138 above as though set forth at length herein.

140.    Should it be determined that ERISA does not control this lawsuit, plaintiffs seek relief, in the alternative, for common law knowing participation in and aiding and abetting breaches of fiduciary duty.

141.    Any of the defendants deemed not to be common law fiduciaries knowingly participated in and aided and abetted fiduciary breaches by PennMont, the Koresko Law Firm and Penn Public Trust.

142.    These breaches included misleading co-fiduciaries, participants, and beneficiaries as to the Plan's benefits and structure and instead performing their duties in their own self-interest and to the detriment of participants and future beneficiaries.

143.   The misconduct was so reckless, outrageous, willful, wanton and malicious as to give rise to a claim for punitive damages.

**WHEREFORE**, Plaintiffs request that:

1.   The defendants be ordered to:

a.   Make full restitution of all funds converted from the cash value of the insurance policies on the lives of the WP and HAK, M.D. WBP participants;

b.   Disgorge or make restitution of all fees, commissions or any other form of compensation paid or profits made in violation of § 406 of the Act; and

c.   Make full restitution of all profits that the WP and HAK, M.D. WBPs would have earned on the converted funds.

2.   Plaintiffs be awarded compensatory and exemplary damages in amounts to be determined together with attorney's fees, costs and such other relief as the Court deems appropriate.

## COUNT VIII– Negligence and Bad Faith

### (All Plaintiffs Against the Insurance Company Defendants)

144.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 143 above as though set forth at length herein.

145.    Should it be determined that ERISA does not control this lawsuit or that the Insurance Company Defendants, or any of them, is not a fiduciary within the meaning of ERISA, in permitting the Koresko Parties:

146.    To change the owners and beneficiaries of the policies without notifying or obtaining plaintiffs' consent;

a.      To borrow cash value in plaintiffs' policies without notifying or obtaining plaintiffs' consent, and

b.      Refusing to inform plaintiffs of the status of their insurance policies, the Insurance Company Defendants acted with gross negligence and breached its obligations of good faith owed to plaintiffs and to the WP and HAK, M.D. WBPs.

**WHEREFORE,** plaintiffs request judgment in their favor and against Ins. Co. for compensatory and exemplary damages in an amount to be determined but in excess of $75,000.00.

## COUNT IX– PROFESSIONAL MALPRACTICE

**(All Plaintiffs Against Boscoe, CIBC, and Larry Koresko)**

147.    Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 146 above as though set forth at length herein.

148.    In connection with plaintiffs' decision to enter into the Arrangement and in connection with plaintiffs' continued participation in the Arrangement, Boscoe (as to the Lefkowitz' and Kalans), CIBC (as to the Lefkowitz'), and Larry Koresko undertook an obligation to function as plaintiffs' insurance agents and financial advisors.

149.    Boscoe, CIBC, and Larry Koresko failed to exercise the standard of care applicable to their profession in representing plaintiffs' interests. This failure included:

   a.    Failing to conduct adequate due diligence as to the Arrangement;

   b.    Failing to provide Plaintiffs material facts regarding, for example, the termination prohibition and access to the cash surrender of the Penn Mutual, Lincoln National, Jefferson Pilot, and Golden Rule insurance policies.

   c.    Failing to disclose their financial interests in having plaintiffs enter the Arrangement;

     d.     Failing to adequately monitor the performance of the Arrangement or the performance of the Koresko Parties;

     e.     Such other negligent conduct as may be uncovered through discovery.

150.    Plaintiffs have suffered severe financial harm as a consequence of Boscoe's, CIBC's, and Larry Koresko's malpractice.

**WHEREFORE**, plaintiffs request judgment in their favor and against Boscoe, CIBC, and Larry Koresko for compensatory and exemplary damages in an amount to be determined but in excess of $75,000.00.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and all of them as follows:

1.    General damages in a sum in excess of the jurisdictional minimum of this Court;

2.    All actual, consequential and incidental financial losses, including but not limited to,

     a.     Contributions paid to the VEBA Plan by the Plaintiffs,

        b.      Administrative Fees and Transfer Fees paid to the VEBA Plan by the Plaintiffs;

        c.      Back Taxes, Penalties, and Interest owed to the IRS resulting from Plaintiffs' contributions to the VEBA Plan;

        d.      6707A Penalties assessed and in reasonably likelihood to be assessed by the IRS resulting from Plaintiffs' contributions to the VEBA Plan;

    3.      Rescission and Rescissionary Damages;

    4.      Punitive or Exemplary Damages as allowed by law;

    5.      Treble Damages as allowed by law;

    6.      Prejudgment and post-judgment interest as allowed by law;

    7.      Costs of Court;

    8.      Attorney's Fees as allowed by law;

    9.      Such other and further items of damages as may be supplemented as a result of the discovery performed in this suit.

....

Respectfully submitted,

/s/ Ira B. Silverstein
Ira B. Silverstein, Esq.

Feldman Morgado, PA
140 Broadway
46th Floor, Suite 4624
New York, NY 10005
*Attorney for Plaintiffs*

Dated:     Philadelphia, Pennsylvania

August 29, 2014