**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HARVEY KALAN, in his individual capacity and in his capacity as a participant in and fiduciary of the HARVEY A. KALAN, M.D., INC. HEALTH AND WELFARE BENEFIT PLAN;** | **CIVIL ACTION NO: 2:14-CV-5216--WB** <br><br> **JURY TRIAL DEMANDED AS TO ALL NON-ERISA CLAIMS** |
| **HARVEY A. KALAN, M.D., INC. HEALTH AND WELFARE BENEFIT PLAN;** | |
| **HARVEY A. KALAN, M.D., INC.;** | |
| **DEBORAH KALAN;** | |
| **DAVID I. LEFKOWITZ, in his individual capacity and in his capacity as a participant in and fiduciary of the WILSHIRE PALISADES LAW GROUP, P.C. HEALTH AND WELFARE BENEFIT PLAN;** | |
| **WILSHIRE PALISADES LAW GROUP, P.C. HEALTH AND WELFARE BENEFIT PLAN;** | |
| **WILSHIRE PALISADES LAW GROUP, P.C.** | |
| **and NORMA LEFKOWITZ,** | |
| **Plaintiffs,** | |
| **v.** | |
| **BARRY BOSCOE; THE LINCOLN NATIONAL LIFE INSURANCE COMPANY; JEFFERSON-PILOT LIFE INSURANCE COMPANY; CIBC WORLD MARKETS CORP.;** | |

| PENN MUTUAL LIFE INSURANCE COMPANY; and DOES 1-50,  **Defendants.** | |

## FIRST AMENDED COMPLAINT

Plaintiffs Harvey Kalan, in his individual capacity and in his capacity as a participant in and fiduciary of the Harvey A. Kalan, M.D., Inc. Health And Welfare Benefit Plan,  Harvey A. Kalan, M.D., Inc. Health And Welfare Benefit Plan,  Harvey A. Kalan, M.D., Inc.,  Deborah Kalan, David I. Lefkowitz, in his individual capacity and in his capacity as a participant in and fiduciary of the Wilshire Palisades Law Group, P.C. Health And Welfare Benefit Plan, Wilshire Palisades Law Group, P.C. Health And Welfare Benefit Plan, Wilshire Palisades Law Group, P.C. and Norma Lefkowitz, hereby bring this First Amended Complaint against defendants Barry Boscoe, The Lincoln National Life Insurance Company, Jefferson-Pilot Life Insurance Company, CIBC World Markets Corp., and Penn Mutual Life Insurance Company.

## PRELIMINARY STATEMENT

1. Between 2002 and the end of 2013, John Koresko and affiliated individuals and entities ("Koresko *et al.*), while operating a multiple employer welfare arrangement known commercially as the REAL VEBA ("the Arrangement"), systematically converted and misused the assets of the welfare benefit plans ("WBPs") that participated in the Arrangement and the assets of the two trusts, the REAL VEBA Trust and the Single Employer Welfare Benefit Plan Trust ("the SEWBPT") (collectively "the Trusts"), created to hold assets of the WBPs.

2. Much of the defalcation consisted of using the Trusts' assets to pay for services rendered for Mr. Koresko's personal benefit, for the benefit of companies he owned and controlled,

and for the benefit of certain participating employers who had claimed tax deductions related to the Arrangement.  These expenditures are set forth in detail in the Memorandum Opinion issued in *Acosta v. Koresko et al.*, 2:09-cv- 00988-WB, E.D. PA. Docket No. 1134, *Perez v. Koresko*, 86 F. Supp. 3d 293 (E.D. Pa. 2015), *aff'd by Sec'y United States DOL v. Koresko*, 646 F. App'x 230 (3d Cir. 2016) (hereinafter "*Perez*"), which is incorporated herein by reference.

3.  In addition, Koresko *et al.* converted (i) over $5 million in interest earned on employer contributions before they were paid over to insurance companies as premiums and (ii) over $35 million of the Trusts' assets through unauthorized and improper loans that effectively stripped the Trusts of cash value accumulated in life insurance policies.  The policies were owned by the Trusts for the benefit of the WBPs that each participating employer established. As *Perez* explains, these expenditures, conversions, and loans were in breach of numerous provisions of the Employee Retirement Income Security Act of 1974 as amended ("ERISA") and breached fiduciary duties owed by Mr. Koresko and others pursuant to ERISA and common law.

4.  The defendant life insurance companies:

   a.  Sold their products through the Arrangement, encouraged their agents, including Lawrence Koresko, John Koresko's brother and one of the key operators of the Arrangement, to recommend use of the Arrangement to facilitate sale of their products, and, through their agents, knowingly or with reckless disregard for the truth misrepresented the nature of the Arrangement;

   b.  Were, along with other insurance companies, an integral part of the Arrangement as is detailed below;

    c.   Permitted Koresko to change the owners and beneficiaries of the policies purchased through the Arrangement;

    d.   Participated in the conversion of the Kalan and Lefkowitz WBP's assets and the assets of other WBPs by authorizing loans secured by the cash value of policies owned through the Arrangement; and

    e.   At the behest of Koresko, concealed the conversions from plan participants, beneficiaries, and plan fiduciaries.

5.  Defendant Boscoe, who, serving as financial advisor and certified financial planner ("CFP") for the plaintiffs, advised and consulted with plaintiffs regarding, among other things, estate planning, retirement planning, investment advising, and insurance matters:

    a.   Solicited and recommended (with CIBC, for the Lefkowitz plaintiffs) plaintiffs' participation in the Arrangement with knowing falsehoods, both verbally and with fraudulent written material and information;

    b.   Acted as agent of the insurance company defendants in Los Angeles, California (with CIBC, for the Lefkowitz plaintiffs) on the insurance policies purchased by plaintiffs and several other participants, and was an integral part of the Arrangement, as is detailed below;

    c.   Assumed the role of monitor of the Arrangement for the plaintiffs (with CIBC, for the Lefkowitz plaintiffs), including regarding the insurance policies and their cash and surrender values, and the investments made with their cash value life insurance premiums, and as liaison with Koresko *et al.*, but repeatedly misrepresented the nature and status of the Arrangement and plaintiffs' assets to plaintiffs from 2002 through 2013; and

      d.   Took exorbitant, illegal secret commissions on the sale of insurance policies to plaintiffs.

6. Defendant CIBC, through its registered representatives including Mitchell Pindus (the "CIBC Rep" or "Pindus") and other registered representatives (brought into the meeting by Boscoe and Pindus, but whose names are currently unknown to plaintiffs), in the capacity of financial and investment advisor to the Lefkowitz plaintiffs in connection with their retirement planning, estate planning, and other investing and financial planning, worked with Boscoe, by, among other things:

      a.   Soliciting and recommending the Lefkowitz plaintiffs' participation in the Arrangement with material misrepresentations and omissions of fact, including regarding Boscoe himself and the Arrangement – both of which it endorsed wholeheartedly in inducing the Lefkowitz plaintiffs to participate – and the Penn Mutual insurance policies the Lefkowitz' purchased on its recommendation;

      b.   Monitoring the Lefkowitz plaintiffs' investments of the assets of the insurance policies (but failed to prudently or competently monitor them); and

      c.   Taking an exorbitant commission on the sale of insurance policies to the Lefkowitz plaintiffs (with no disclosure of the fact or exorbitant amount of them to Lefkowitz plaintiffs).

7. Defendants' actions give rise to liability under:

      a.   The Employee Retirement Income Security Act of 1974 ("ERISA" or "the Act"), 29 U.S.C. § 1001 *et seq.*;

      b.   The Racketeer Influenced and Corrupt Organizations Act ("RICO"); and

      c.   Common law.

## PARTIES

8.  Plaintiffs are:

   a.  Harvey A. Kalan, M.D., Inc. ("HAK, M.D."), a California corporation organized and existing under the laws of California.  HAK, M.D. is the sponsoring employer of the Harvey A. Kalan, M.D., Inc. Health and Welfare Benefit Plan ("HAK WBP"). HAK, M.D. contributed over $1 million to the HAK WBP.

   b.  Harvey A. Kalan ("Dr. Kalan"), a participant in and fiduciary of the HAK WBP. He is a citizen of California.

   c.  Deborah Kalan ("Mrs. Kalan," and collectively, with HAK, M.D., HAK WBP, and Dr. Kalan, the "Kalan plaintiffs"), a participant in the HAK WBP.  She is a citizen of California.

   d.  Wilshire Palisades Law Group, P.C. ("WPLG"), a California professional corporation organized and existing under the laws of California, with its principal place of business in Santa Monica, California. WPLG is the sponsoring employer of the Wilshire Palisades Law Group Health and Welfare Benefit Plan ("WP WBP" and collectively with the HAK WBP, the "Plaintiff WBPs"). WPLG made over $716,000 in contributions to the WP WBP.

   e.  David I. Lefkowitz, a participant in and fiduciary of the WP WBP.  Mr. Lefkowitz is a citizen of California; and

   f.  Norma M. Lefkowitz (Mrs. Lefkowitz, and collectively with WPLG, WP WBP, and Mr. Lefkowitz, the "Lefkowitz plaintiffs"), a participant in WP WBP.  Mrs. Lefkowitz is a citizen of California.

9. The defendants are:

    a. Penn Mutual Life Insurance Company ("Penn Mutual"), a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. At relevant times, Penn Mutual was a fiduciary of the WP WBP and authorized Koresko, Koresko Financial, and co-defendants Boscoe and CIBC to act as its agent in selling insurance policies.  At all relevant times, Penn Mutual had actual, constructive or imputed knowledge of the nature of the Arrangement and exercised discretionary control over assets of the WP WBP and at least 20 other WBPs of other employers who participated in the Arrangement, including, but not limited to, the cash value of the insurance policies insuring the lives of the participants in the WP WBPs. Its discretionary control over the assets was demonstrated by their making of loans to John Koresko in his personal capacity, including from the WP WBP, which were never properly authorized by the documents which governed the Arrangement, including the Plan documents and the agreements pertaining to the operation and management of the Arrangement.

    b. The Lincoln National Life Insurance Company ("Lincoln National"), a Connecticut corporation with its principal place of business in Hartford, Connecticut. At relevant times, Lincoln National was a fiduciary of the HAK WBP and authorized Koresko, Koresko Financial, and co-defendant Boscoe to act as its agent in selling insurance policies.  At all relevant times, Lincoln National had actual, constructive or imputed knowledge of the nature of the Arrangement and exercised discretionary control over assets of the HAK WBP including, but not limited to, the cash value of the insurance policies insuring the lives of the participants in the HAK WBP. Its

7

discretionary control over the assets was demonstrated by their making of loans to John Koresko in his personal capacity, including from the HAK WBP, which were never properly authorized by the documents which governed the Arrangement, including the Plan documents and the agreements pertaining to the operation and management of the Arrangement.

c.   The Jefferson-Pilot Life Insurance Company ("Jefferson-Pilot" or "Jefferson," and collectively with Lincoln National, "Lincoln"), a North Carolina corporation with its principal place of business in Greensboro, North Carolina. At relevant times, Jefferson-Pilot was a fiduciary of the HAK WBP and authorized Koresko, Koresko Financial, and Boscoe to act as its agent in selling insurance policies. At all relevant times, Jefferson-Pilot had actual, constructive or imputed knowledge of the nature of the Arrangement and exercised discretionary control over assets of the HAK WBP including, but not limited to, the cash value of the insurance policies insuring the lives of the participants in the HAK WBP. Its discretionary control over the assets was demonstrated by their making of loans to John Koresko in his personal capacity, including from the HAK WBP, which were never properly authorized by the documents which governed the Arrangement, including the Plan documents and the agreements pertaining to the operation and management of the Arrangement. Jefferson, Lincoln National, and Penn Mutual will be referred to in this complaint as the "Insurance Company Defendants."

d.   Barry Boscoe ("Boscoe" and collectively with the Insurance Company Defendants, the "Fiduciary Defendants"), a California citizen, and a CFP at Brighton Advisory Group and Plan Corp. of America. Boscoe acted as an agent

of the Koresko Entities and the Insurance Company Defendants in marketing the Arrangement to the Plaintiffs.  He also acted as a CFP and financial and insurance advisor to the plaintiffs, including regarding their retirement planning, estate planning, and other financial planning, and specifically regarding the transactions at issue here. Boscoe was a fiduciary of the plaintiff welfare benefit plans and exercised discretionary control over the assets of the plans, including but not limited to, the cash value of the insurance policies on the lives of the plan participants. At all relevant times, he was an agent of and producer of the Insurance Company Defendants and Koresko *et al.*  He was a primary producer for Koresko, *et al.* in marketing and selling the Arrangement.  He had direct, constructive, or imputed knowledge of the nature and details of the Arrangement.

e.  CIBC World Markets Corp., an investment bank and investment firm organized in Canada, headquartered in Toronto, Ontario, with offices in California.  CIBC acted as an agent and/or co-conspirator of the Koresko Entities, Boscoe, and/or the Insurance Company Defendants in marketing the Arrangement to the Plaintiffs. Its representatives worked with co-defendant Boscoe in meeting with Mr. Lefkowitz and soliciting the Lefkowitz plaintiffs' participation in the Arrangement. Through Pindus, it: served  as soliciting agent for the insurance policies purchased by the Lefkowitz' pursuant to the Arrangement; reviewed the insurance policies, its related prospectuses, and the Arrangement documents in recommending the Arrangement and the purchase of the Penn Mutual life insurance policies to them; recommended and purportedly monitored the investments purchased with the Penn

Mutual policy premiums; and pocketed exorbitant, undisclosed commissions in the transaction.

10. At all relevant times, the Insurance Company Defendants authorized the relevant parties identified below to act as its agent in selling life insurance policies:

    a.  John J. Koresko, V ("Koresko"), a Pennsylvania citizen and a former attorney disbarred from the practice of law in Pennsylvania. Koresko was a fiduciary of the Plaintiffs' WBPs. He and his brother Lawrence were controlling parties of numerous entities used to operate the Arrangement ("the Koresko Entities"). At all relevant times, John and Lawrence Koresko, as well as entities they owned and controlled, were agents of the Insurance Company Defendants.

    b.  Lawrence Koresko, a Pennsylvania citizen, and one of the principals of the Koresko Entities. At all times relevant to this complaint, Lawrence Koresko was an agent of the Insurance Company Defendants;

    c.  Koresko Financial LP ("Koresko Financial"), a Pennsylvania limited partnership with its principal place of business in Bridgeport, Pennsylvania. Koresko Financial was a vehicle through which the Insurance Company Defendants paid John and Lawrence Koresko commissions to induce them to sell the Insurance Company Defendants' products through the Arrangement. Upon information and belief, it was also utilized to hide converted assets;

    d.  PennMont Benefits, PC ("PMB"), a Delaware corporation with its principal place of business at the same address as Koresko Financial. PMB is the general partner of Koresko Financial and its officers are John and Lawrence Koresko.

e.  Freedom Brokers, LLC ("Freedom Brokers"), a Pennsylvania limited liability company with its principal place of business in Bridgeport, Pennsylvania. Freedom Brokers was another vehicle through which the Insurance Company Defendants paid John and Lawrence Koresko commissions to induce them to sell the Insurance Company Defendants' products through the Arrangement. Upon information and belief, it was also utilized to hide converted assets;

f.  The Regional Employers Assurance Leagues ("REAL"), a fictitious business association consisting of John Koresko and Lawrence Koresko.

g.  The Regional Employers' Assurance Leagues Voluntary Employees' Beneficiary Association Trust (the "REAL VEBA"), an entity created by the Koreskos to serve as a trust for the purposes of the Arrangement;

h.  The Single Employer Welfare Benefit Plan Trust (the "SEWBPT"), another entity created by the Koreskos to serve as a trust for the purposes of the Arrangement;

i.  Penn Public Trust ("PPT"), a Pennsylvania corporation with its principal place of business in Bridgeport, Pennsylvania.  PPT was the trustee of the REAL VEBA and the SEWBPT from January 2010 until September 2013, when the U.S. District Court for the Eastern District of Pennsylvania appointed an Independent Fiduciary to administer the REAL VEBA and SEWBPT;

j.  PennMont Benefit Services, PC ("PennMont"), a Pennsylvania corporation with its principal place of business at the same address as Koresko Financial.  PennMont was the Plan Administrator of the Plaintiff WBPs;

k.  Koresko & Associates, P.C. and its successor, the Koresko Law Firm (collectively, "The Koresko Law Firm"), a Pennsylvania professional corporation with its

11

principal place of business at the same address as Koresko Financial.  The Koresko Law Firm provided plan administration services to the Plaintiff WBPs through PennMont, as PennMont had no employees;

11. The relevant parties identified in paragraph 10 above were all part of the Arrangement and constituted an association-in-fact (the "Association-in-Fact") that qualified as an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4). The following entities and individuals were additional members of the Association-in-Fact:

    a.  Farmers & Merchants Trust Company ("F&M"), successor by merger to Community Trust Company ("CTC").  From April 15, 2002 until January 2010, CTC served as the trustee of the WBPs that participated in the Arrangement and of the Trusts

    b.  Numerous other employer-created employee welfare benefit plans;

    c.  Numerous other insurance salesmen and financial advisors who sold participations in the Arrangement, such as Boscoe; and

    d.  Numerous other insurance companies, which sold life insurance on the lives of the beneficiaries of the participating welfare benefit plans as part of the Arrangement.

12. The REAL VEBA and SEWBPT Trusts also constituted enterprises within the meaning of RICO, 18 U.S.C. § 1961(4).

13. At all relevant times, each of the relevant parties listed in paragraph 10 above and the defendants:

    a.  Were the agents, partners, servants, employees, representatives, subsidiaries, members, alter egos, aider and abettors, and/or co-conspirators of the others in connection with the acts described below;

b.  We're acting within the course and scope of such relationship, and with the knowing assistance and active participation of each other; and/or

c.  Ratified each act, omission, or activity done by each other.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to § 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1).  Alternatively, this Court has jurisdiction pursuant to 18 U.S.C. § 1964(c) ("RICO"). The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 as they form part of the same case or controversy as the federal claims.

15. Venue is appropriate in the Eastern District of Pennsylvania as the  Plaintiff WBPs are administered in the district, the defendant conducts business within the district, a substantial part of the events or omissions giving rise to the claim occurred in the  a substantial part of property that is the subject of the action is situated in the district.

## OPERATIVE ALLEGATIONS

### Background of The Association-in- Fact

16. The REAL VEBA and the SEWBPT are currently under the control of an Independent Fiduciary ("IF") appointed by this Court in *Perez*.  The allegations that follow describe the state of affairs prior to the IF's appointment in September 2013.

17. The relevant parties described in paragraph 10 above include a group of interrelated entities together with their principals.  The entities (hereinafter referred to as "the Koresko Entities") were all created and established by Koresko as an entrepreneurial vehicle designed to take advantage of § 419(A)(f)(6) of the Internal Revenue Code ("IRC" or "Code").

13

18. Prior to the passage of §§ 419 and 419A of the IRC in 1984, expenditures for employee benefits were deductible under IRC § 162. *See Greensboro Pathology Associates, P.A. v. United States*, 698 F.2d 1196 (Fed. Cir. 1982).  Sections 419 and 419A placed substantial limitations on the deductibility of these expenses; however, Congress saw fit to carve out an exception for "10 or more employer plans."  For "10 or more employer plans," the newly adopted limitations did not apply. IRC, § 419A(f)(6).

19. Though the language of § 419A(f)(6) is deceptively simple, the scope and applicability of the § 419A(f)(6) exception had long been a subject of dispute. The Code itself states only that to come under the § 419A(f)(6) more than one employer must contribute to the plan, no employer may normally contribute more than 10% of the total, and the plan may not maintain "experience-rating arrangements with respect to individual employers." IRC, § 419A(f)(6).

20. In 1995, the IRS issued Notice 95-34 to "alert taxpayers and their representatives to some of the significant tax problems that may be raised by [trust] arrangements [which claim to satisfy § 419A(f)(6)]."  The notice advised that such arrangements might not satisfy § 419A(f)(6) if they are actually providing deferred compensation, if they are in fact separate plans maintained for each employer, or if they are experience-rated.

21. The issues raised by Notice 95-34 were parsed in *Booth v. C.I.R.*, 108 T.C. 524 (U.S. Tax Ct. 1997).  The Tax Court, while disagreeing with the Commissioner's view that the plan in *Booth* was actually one of deferred compensation, found the plan did not satisfy § 419A(f)(6) because it maintained separate accounts for each employer and the employees could only look to their employer's account to pay benefits. Hence, the court reasoned, the plan was actually an amalgamation of separate plans. Moreover, the court found that the

arrangements had the effect of adjusting benefits based on prior experience and, therefore, the plan was an experience rating arrangement. As a consequence, the *Booth* plan did not satisfy § 419A(f)(6).

22. After *Booth*, John Koresko and other entrepreneurs sought to take advantage of § 419(A)(f)(6) by marketing "plans" that claimed to come under § 419(A)(f)(6). Koresko's plan claimed to offer a way to purchase cash value life insurance while deducting the premiums as business expenses.

23. As cash value life insurance is far more expensive than term insurance with an equal face value, the dilemma faced by Koresko was to market a plan that gave company owners the belief their investment was safe and that they would get the benefit of the much higher premiums they would pay for the cash value policies on their own lives, a benefit that could only be realized by making the cash value available to the plan participants. At the same time, to have any chance of qualifying under § 419(A)(f)(6), Koresko had to present a façade to the IRS that his plan did not suffer from the same flaws as the *Booth* plan, i.e. that it was not an amalgam of individual plans and not experience rated. As Koresko and the insurance companies and agents (like Boscoe) that would choose to participate in the Arrangement well knew, the two goals were incompatible.

**Background of the Insurance Companies' Involvement in the Association-in-Fact**

24. During this same time period, it was becoming increasingly apparent to consumers and financial advisors that it rarely made economic sense to purchase cash value life insurance. Almost all rational life insurance purchasers would be far better off buying term insurance and investing the savings in premium costs themselves. As a result, sales of cash value policies suffered dramatically.

15

25. From the life insurance companies' (and their agents') perspective, however, cash value life insurance was far more profitable than term insurance for several reasons. First, the primary source of profit for life insurance companies is the return they earn on the premium dollars they hold in reserve. In the case of cash value insurance, the premiums are far greater and the return they generate for the insurers far exceeds the return the policy holder is earning.

26. Second, the premiums are so high that policy holders often find they cannot continue to pay them. The policy then lapses and surrender charges reduce or even eliminate the portion of the cash value that is returned to the policy holder.

27. The extreme profitability of cash value policies for insurers is evidenced by the commissions they pay their agents for selling these policies. It is not unusual for insurance companies to pay agents commissions of 100 -150% of first year premium on cash value policies in addition to a smaller percentage of later year premiums. (First year premium on a cash value policy can run as high as $260,000, as documents endorsed and disseminated by Boscoe and the CIBC Rep to the Lefkowitz' suggest in connection with their solicitation of the Penn Mutual policies). This lucrative incentive is offered because of the huge profits insurance companies generate from cash value policies.

28. Koresko's Arrangement offered life insurance companies a way to revitalize the sale of cash value policies. If potential purchasers could be persuaded that the premiums could be deducted as business expenses, the financial calculus would change dramatically.

**The Marriage Between Koresko's Arrangement and the Insurance Companies**

29. Koresko was well aware of the marketing potential his Arrangement offered life insurance companies and their sales agents. Consequently, in order to promote his Arrangement, he

targeted his own marketing efforts, not at potential purchasers of insurance, but at these companies and the financial advisors and insurance agents who persuaded consumers to buy the insurance companies' products; but before the agents and producers (i.e., persons who generate sales for insurance companies) could utilize the Arrangement, the insurance companies had to authorize the sale of their policies through that vehicle.

30.     Before giving the necessary authorization, insurance companies, including the Insurance Company Defendants, first conducted a review of the Arrangement. This process involved some or all of the following steps:

   a.   Koresko *et al.* provided detailed explanations of the Arrangement and met with high-level insurance company executives, including, upon information and belief, executives at the Insurance Company Defendants;

   b.   The Koresko Entities provided the insurance companies, including the Insurance Company Defendants, with a "due diligence package." This package included all the basic documents that Koresko had drafted to govern the Arrangement, including a prototype plan document, a specimen adoption agreement, a specimen Summary Plan Description ("SPD"), and a copy of the master trust agreement.  Also included were marketing materials prepared by John Koresko. These documents are described in more detail below;

   c.   In-house insurance company employees who specialized in examining unusual uses of life insurance, known as the "Advanced Sales" department, reviewed the materials and made a recommendation to the insurance company as to whether it should allow its policies to be sold through the Arrangement or not.

31.     Upon information and belief, a number of insurance companies reviewed Koresko's presentation, determined the Arrangement was of questionable legality, and refused to allow their policies to be sold through it. The Insurance Company Defendants, however, as well as a number of other companies, though realizing that the Arrangement was likely an illegal tax shelter, agreed to participate and encouraged the sale of their products through the Arrangement because they also realized they would be able to dramatically increase their sales of highly profitable cash-value policies by utilizing the Arrangement.

32.     The insurance companies, including the Insurance Company Defendants, sought to insulate themselves from the Arrangement's questionable legality by making various disclaimers specifically tailored for policies sold through the Arrangement.

33.     When they agreed to participate, the Insurance Company Defendants and the other participating insurers were aware that Koresko, through companies he owned and controlled such as Koresko Financial, would receive a share of the massive commissions the insurance companies were willing to pay to generate the sale of cash value policies. They considered Koresko and his Arrangement as one of their "producers."

34.     The Insurance Company Defendants and the other participating insurers also knew that the straw parties owning the policies sold through the Arrangement would be trustees of trusts holding the assets of employee benefit plans covered by ERISA. Consequently, they also knew that the payment of commissions to Koresko and companies he owned and controlled would be payments intended to influence an administrator, officer, trustee, custodian, counsel, agent, or employee of an employee welfare benefit plan in violation of 18 USCS § 1954, i.e. payments intended to influence decisions as to whose insurance policies the

ERISA plans should purchase. Nonetheless, to stimulate the sale of cash value policies, they consented to Koresko *et al.* sharing in the commissions they paid out.

**The Marketing of the Arrangement**

35. Having obtained the consent and support of insurance companies such as the Insurance Company Defendants, Koresko *et al.* then proceeded to instruct financial advisors, insurance producers, and insurance brokers – such as Boscoe and the CIBC Rep – on how to market and sell life insurance policies through the Arrangement. The participating insurance companies, including the Insurance Company Defendants, were aware of, consented to, and ratified this marketing campaign. The participating insurance companies, including the Insurance Company Defendants, were aware of, consented to, and ratified this marketing campaign. The participating insurance companies, including the Insurance Company Defendants, arranged, whether through presentations at conferences at which Koresko ran seminars or through dissemination of written materials prepared by Koresko, for Koresko to coach their producers on the virtues of the Arrangement and on how to persuade potential purchasers to utilize the Arrangement to shelter otherwise taxable income.

36. The Koresko Entities sometimes referred to their seminars as "continuing education" courses to instruct financial and insurance advisors such as Boscoe and the CIBC Rep on the mechanics of the Arrangement and how to market and sell it to customers.  They conducted the seminars across the country, including in Los Angeles County, commencing in the beginning years of the Arrangement.  At the seminars, Koresko disseminated extensive marketing literature, including, but not limited to, the documents described in paragraphs 44-56 below. Boscoe attended at least one such seminar.

37. The marketing materials, which the Insurance Company Defendants and the other participating insurers were aware of, consented to, and ratified, whether explicitly or by failing to repudiate them, made clear that the Arrangement's purpose was to act as a vehicle for individuals to purchase cash value policies and that the trusts who would nominally own the policies and be the beneficiaries of any death benefits were acting as straw parties on behalf of the individuals whose lives were insured.

38. The documents Koresko drafted to implement the Arrangement were complex to the point of unintelligibility and contained numerous internal contradictions that made key provisions meaningless. The Insurance Company Defendants were aware of this, having conducted a due diligence review before authorizing the sale of policies through the Arrangement. Boscoe had knowledge of this, having received, read, and disseminated the documents to clients other than the Lefkowitz' and the Kalans before disseminating the materials to them.  CIBC had knowledge of this, having received and purportedly read the documents before soliciting and recommending the Arrangement to the Lefkowitz'. Nevertheless, the defendants eagerly promoted the sale of cash value policies through an Arrangement sold with false and deceptive marketing.

39. Financial advisors and insurance salesmen like Boscoe and CIBC, including as agents of the Insurance Company Defendants, performed critical functions in the operation of the Koresko enterprise, including soliciting, managing, and advising the participants whose interests they pretended to represent. Among other things, in connection with the plaintiffs' participation in the Arrangement, Boscoe, in soliciting participants including the Lefkowitz' and Kalans:

    a.  Selected the specific marketing literature to provide them concerning the Arrangement, and disseminated the fraudulent written marketing materials to them with knowledge or reckless disregard of their false and misleading nature;

    b.  Made verbal sales presentations concerning the Arrangement – with knowing false and/or misleading representations;

    c.  Advised participants as to what insurance policies to buy from what insurance companies (and, in the case of the Kalan plaintiffs, what insurance policies sell, as well), in what amounts, and on how to deal with the investment of policy premiums, all as part of general retirement planning services;

    d.  Served on the Advisory Committee of the Plaintiff WBPs and performed many of its assigned duties;

    e.  Served as a conduit and liaison between the participants and the Koresko Entities;

    f.  Discussed with and monitored the investment allocations within the insurance policies Boscoe told them to purchase;

    g.  Made the investment decisions regarding the premiums paid in by participants;

    h.  Periodically called and met with participants to assure them that their investments (e.g., the policies and their surrender values) were performing well; indeed, participants, including the plaintiffs, owing to undisclosed events described below, were completely dependent on Boscoe for information about their policies.

40. Boscoe engaged in these activities without direction and control from Koresko or his entities. As to these activities, he acted within his own discretionary and fiduciary control.

41. CIBC, through its representatives including Pindus, worked with Boscoe in soliciting the Lefkowitz plaintiffs' participation in the Arrangement, including:

   a.   Meeting with Mr. Lefkowitz with Boscoe to introduce him to the Arrangement;

   b.   Selecting the insurance policy for the Lefkowitz' WBP;

   c.   Reviewing the plan-related literature before the Lefkowitz' entered into the transaction;

   d.   Recommending participation in the Arrangement to Mr. Lefkowitz;

   e.   Giving investment advice and establishing the investment allocation plan for investment of the cash assets of the insurance policies; and

   f.   Monitoring and re-balancing these investment allocations.

42. The Insurance Company Defendants and the other participating insurers, and Boscoe, CIBC, and other financial/insurance advisors, agreed to participate in the Arrangement because of the revenue, profits, and/or commissions it would generate for them. They benefitted from the Arrangement and, hence, benefitted from assisting Koresko in preventing disclosures that would lead participants to question the *bona fides* of the Arrangement.

43. The basic structure of the Arrangement as portrayed to potential participating employers was relatively straightforward and is best described in the words of one of Koresko's marketing pamphlets that Boscoe, CIBC, and the other participating advisors disseminated and ratified and the Insurance Company Defendants and the other participating insurers were aware of and ratified.

44. In providing an example of how the Arrangement worked, the pamphlet posited a "Mr. X," who owned a business and a "Joe Honest," Mr. X's insurance agent/financial advisor.

"Joe" introduced Mr. X to PennMont, the company utilized to nominally run the

Arrangement, and, after Mr. X decided to enter the Arrangement:

> [Mr. X] asked Joe to obtain a cash value policy for himself and term insurance for the other participants. Mr. X informed Joe that he desired to shelter $100,000 in the VEBA before year end. Mr. X asked Joe to determine if that was permissible.

> Joe submitted a Proposal Request form to Penn-Mont Benefit Services. Penn-Mont produced a proposal which illustrated potential tax savings, a death benefit for employee (A) for $450,000; (B) for $250,000; and (C) for $300,000, and a $1.5 million death benefit for Mr. X, the owner/employee; and a cash value build-up which would be used to pay severance benefits or distributed to the participants upon plan termination.

> Pleased with the result, Mr. X forwarded a check in the amount of $100,000 payable to Commerce Bank, N.A., the trustee [before December 31, 2000]. After clearance of the check, the corporation, trustee, and employees completed the life insurance applications on behalf of Mr. X and employees A, B and C. After approval, the trustee paid the premiums.

45. The Insurance Company Defendants  and the other participating insurers, and Boscoe,

CIBC, and other advisors, acting as "Joe Honest" in the scheme, were aware from the

outset that a key purpose of the Arrangement was that the trustee was acting as a straw

party for the particular Mr. X, who wanted to "obtain a cash value policy for himself."

46. The purpose of the Arrangement was also made clear on PennMont's website and

PennMont's marketing was directed primarily at "insurance agents, financial planners,

attorneys and accountants" such as Boscoe and CIBC.

47. The website explained "why life insurance products fit a VEBA," claimed that "life

insurance products may be the only choice for MEWAs,"[1] and described the Arrangement

as a way to "acquire tax-deductible life insurance." It included graphic diagrams showing

how a VEBA acts as a pass through for life insurance premiums paid by company owners

---

[1] Multiple Employer Welfare Arrangements.

to a life insurance company and a return pass through for the death benefits paid by the life insurance company to the owners. The Insurance Company Defendants and the other participating insurers were aware of the contents of this marketing website and failed to take any steps to disabuse the insurance applicants of the representations made therein, thereby benefitting from and ratifying the representations. Boscoe was also aware contents of this marketing website, referred his participant clients to it, and failed to take any steps to disabuse participant clients, including plaintiffs, of these representations, thus enabling him to benefit from the representations, and ratifying them.

48. In addition to the website, Koresko marketed his Arrangement to financial professionals, including Boscoe, through "continuing education" and other seminars at which Koresko promised to teach the attendees to "show your client how to: . . .Turn life insurance premiums into tax deductions." Before giving one of these seminars, PennMont representatives would contact the insurance companies and suggest that they have their producers in the geographic vicinity of the seminar attend. The insurance companies, including the Insurance Company Defendants, would then contact the local producers and tell them to attend the marketing seminar. Occasionally, the insurance companies would organize the seminars.

49. PennMont also provided potential participants with a thirty-six (36) page pamphlet, titled "The VEBA – Understanding Multi-employer Voluntary Employees' Beneficiary Associations," authored by John Koresko.  The pamphlet was in the form of seventy-one (71) questions and answers ("Q&As") and was a promotional pamphlet for the Arrangement.  At all relevant times, the Insurance Company Defendants and the other participating insurers were aware of the contents of this pamphlet, which was part of the due diligence package they had been given by Koresko *et al.*, and failed to take any steps to

disabuse the insurance applicants of the representations made therein, thereby benefitting from and ratifying the representations. Boscoe was also aware of the contents of this pamphlet, disseminated it to their participant clients, and failed to take any steps to disabuse clients, including plaintiffs, of these representations, thus enabling him to benefit from the representations, and ratifying them.

50. The pamphlet contained numerous representations that the purchase of cash value life insurance through the Arrangement would benefit owner/employees and that the investment returns on the cash value would be for the owner/employee's benefit.

51. For example:

    a. In answer to Question 1, "Why should a business adopt a Voluntary Employees' Beneficiary Association Health and Welfare Plan?," the Koresko Entities state:

> A VEBA is one of the last, best, legal tax shelters available. A business is allowed a current deduction for IRS contributions to the plan; in most cases, the employee pays no tax on money contributed for his or her benefit until benefits are received; cash value within the insurance policy accumulates tax free and is protected from creditors' claims; and distributions from the plan may be afforded favorable tax treatment.

> A VEBA is especially attractive to working owners of closely held corporations and self-employed persons. Their long-term service with their companies gives them the best opportunity to accumulate large benefits through tax-free build-up of capital. Although benefits must be provided to other employees as well, the owner usually receives a much larger benefit than other employees.

    b. In answer to Question 7, "What are the basic tax advantages of a VEBA?," the Koresko Entities state, in part: "Earnings of the VEBA are generally exempt - permitting tax-free accumulations of income and gains on cash value within the insurance policies" and "In contrast to the general rules barring a company from taking deductions for permanent life insurance coverage, the employer gets a deduction for insurance benefits provided by the VEBA."

    c. In answer to Question 20, "How much am I obligated to contribute to the VEBA each year?," the Koresko Entities state:

The plan is extremely flexible. After the initial first year contribution, your business must contribute just enough to keep any insurance policies for death and other benefits in force. All contributions, however, must be made by the end of the year to be deductible for that year. **Keep in mind that the higher the initial contributions, the faster your investment grows. Thus, it is advantageous to contribute as much as possible in the early years**! (emphasis added).

d.   In answer to Question 32, "What happens to the cash value in the life insurance policies upon plan termination?," the Koresko Entities state:

The cash value is paid out to current plan participants in the proportion that their total compensation while participating in the plan bears to the total compensation paid to all of the participants in the VEBA at the time of termination.

Obviously, the participating employees who have earned a higher percentage of income would receive a higher percentage of plan assets upon termination. Upon plan termination, benefits distributed are taxable to the participants at ordinary rates.

e.   In answer to Question 33, "Can the cash value in the life insurance policies be used for other VEBA benefits?" the Koresko Entities answer: "Of course. The cash value, a.k.a. side fund functions as the source for all other benefits. In particular, the side fund will support the severance benefit, if elected."

f.   In answer to Question 47, "Are account balances subject to loss for an investment risk or market fluctuations?," the Koresko Entities state:

To the extent life insurance policies are used in the plan, account values are guaranteed by a life insurance company. However, if you decide to use interest sensitive or mutual fund based products, investment risk and market fluctuations may affect the plan balances.

g.   In answer to Question 61, the Koresko Parties describe how the cash value will be distributed primarily to the owner/employee if the employer decides to terminate.

52.   The pamphlet also made clear that the owner of the company would decide what type of life insurance the Arrangement should purchase.

53.   Potential customers were also provided with a printout of a 1996 article Koresko published in a journal called "Taxation For Accountants."  The article is a thinly-disguised promotion

of the Arrangement. At all relevant times, the Insurance Company Defendants and the other

participating insurers were aware of the contents of this article, which was included in the

due diligence package, and failed to take any steps to disabuse the insurance applicants of

the representations made therein, thereby benefitting from and ratifying the representations.

Boscoe was also aware of the contents of this article, disseminated it to participating

clients, and failed to take any steps to disabuse clients, including plaintiffs, of these

representations, thus enabling Boscoe to benefit from the representations, and ratifying

them.

54. The article informed prospective participants that purchasing cash value life insurance

through the REAL VEBA Arrangement had the following benefits:

> Aside from assuring current and long-term protection, cash-value insurance
> serves the secondary purpose of providing a source for future benefits that
> are funded with today's deductible dollars. This tax-deductible benefit is
> then integrated into the client's estate plan for maximum effectiveness. It is
> important to understand that the death benefit is probably more than most
> people would purchase for themselves using after-tax dollars.

Taxation For Accountants, December 1996, p. 336.

55. The article also represented that an employer could withdraw from the Arrangement at any

time and obtain the accumulated cash value, *id.* at 337, and that "a plan can be designed to

make all assets available [for all claims], while still effectively minimizing the probability of

invasion by other employers in the plan." *Id.* at 338.

56. The Insurance Company Defendants and the other participating insurers authorized the

marketing of their products in the above fashion and had actual or constructive knowledge

of and benefitted from the representations being made to induce participation.

57. The Insurance Company Defendants and the other participating insurers, and Boscoe and

CIBC, were aware of or recklessly indifferent to the fact that the confusing and obscure

documents governing the Arrangement were inconsistent with the marketing materials and with the representations being made by the Insurance Company Defendants producers.

58. The Insurance Company Defendants and the other participating insurers were also aware of or recklessly indifferent to the fact that the confusing and obscure documents governing the Arrangement were so inconsistent that they could easily be misinterpreted by potential purchasers of their policies. Despite this knowledge, the Insurance Company Defendants and the other participating insurers failed to accurately portray or clarify the documents to potential insurance purchasers and intentionally relied on the likely misinterpretations.

**The Mechanics of the Arrangement**

59. To take advantage of the Arrangement's superficially attractive proposition, a participating employer made "contributions" in an amount equal to the premiums required for the policies being purchased.

60. The trustee then functioned as a pass-through vehicle, receiving the insurance premiums paid by the employer and forwarding them to the insurance companies.

61. The trustee was named as the owner and beneficiary of the policies f/b/o the employer's individual WBP. When benefits were to be paid, typically upon the death of a participant, the insurance company would pay the death benefit to the trustee who, in turn, was supposed to pay the benefit to the participant's designated beneficiary.

62. Alternatively, an employer supposedly could terminate the plan whenever it wanted and the accumulated cash value of the insurance policies would be distributed to the plan participants pursuant to a formula that resulted in the owner/employees receiving virtually all the cash value.

63. An employer who fell into the Koresko trap executed The Regional Employers' Assurance Leagues Voluntary Employees' Beneficiary Association Health and Welfare Benefit Plan Adoption Agreement (the "Adoption Agreement"). By doing so, the employer created his own "plan" based on the terms of the Koresko-prepared prototype Regional Employers' Assurance Leagues Voluntary Employees' Beneficiary Association Health and Welfare Benefit Plan Document (the "Plan Document") and "that certain Trust Agreement known as The Regional Employers Assurance League Voluntary Employees' Beneficiary Association Trust" (the "Trust Agreement") created by Koresko.

64. The Adoption Agreement provided various types of supplemental plan characteristics to be plugged into the Plan Document.

65. The Arrangement's plan documents (like its marketing literature) indicated that the plans and the trust were to be managed for the exclusive benefit of the insureds and that contributions made to the plans would be used to pay life insurance premiums.

66. The various plan documents contained numerous references to the insurance policies, which were the plans' *raison d'être*. Section 4.04 of the Plan Document provides that contributions and earnings from the contributions shall be used to pay life insurance premiums.

67. In choosing to have an insurance policy purchased – though it wasn't really a choice – the adopting employer designated a funding policy in the Adoption Agreement, and the triggering designation was "fully insured."  That this was not a real choice is manifest from the Trust Agreement that all employers had to adopt. It provided that no investments can be made "which would cause the Plan not to be considered 'fully insured' within the meaning of ERISA Section 514." Trust Agreement, §5.5. By its terms, the Trust Agreement controlled over any conflicting terms in an employer's plan.

68. Section 7.05(g) of the Plan Document incorporated the terms of the purchased insurance policy into the terms of the plan and provided that:

> [N]o benefit which is funded or intended to be funded by a policy or Contract shall be payable to any Participant or Beneficiary unless or until amount the (sic) payable under such policy or contract is received by the Trust. For purposes of this Plan and Trust, all benefits shall be deemed to be funded by a policy or contract unless the Employer shall notify the Administrator and Trustee in writing of its election to the contrary.

69. Since every benefit was to be funded by a life insurance policy, this meant no benefits would be paid unless the life insurance proceeds were received. Consequently, the "availability" of other assets to fund benefits was a mirage as no benefits were payable if you would need to tap those other assets.

70. The Summary Plan Description ("SPD") further demonstrated the vital nature of insurance policies to the plans. It incorporated the policy terms as terms of the plan itself, stating: "In all cases, life insurance will be purchased to enable the Plan to provide your Death Benefit. However, the Plan must follow restrictions placed on it by the issuing insurance company, as well as other limitations."  The section goes on to list "restrictions on life insurance policies [that] are typical of those placed by an issuing insurance company."

71. Subsequently, participating employers such as HAK, M.D., Inc. and WPLG were provided yearly mailings, described as "Census Data Forms," identifying the employees and the face value of the policies taken out on their lives.

72. The SPD also indicated that all applications for benefits under the Plan should be made to the employer, suggesting that the employer controlled the determination of whether benefits will be paid out.

73. Thus, plan sponsors, participants and beneficiaries were led to believe that benefits would be paid according to the terms of the policy and the face value of that policy would be received

by a beneficiary as soon as paid by the carrier. Indeed, Boscoe repeatedly made such representations to plaintiffs, (including in the presence and with the concurrence of the CIBC Rep in conversations with Mr. Lefkowitz), to induce them to participate, and subsequently again in the ensuing years.

74. Plan sponsors, participants and beneficiaries such as the plaintiffs were also informed the plan they established was covered by ERISA. The SPD informed participants that "The Plan is covered by the Employee Retirement Income Security Act of 1974 ("ERISA") which was designed to protect employees' rights under benefit plans." Further, the Plan Document contains numerous references to ERISA, indicating that terms within the Plan shall have the meaning as given by ERISA and that the plan "shall be construed as intending compliance with same."

75. At all relevant times, the Insurance Company Defendants and the other participating insurers and financial advisors like Boscoe and CIBC were aware of all the above representations being made to potential customers to induce them to purchase their products but failed to take any steps to disabuse the insurance applicants of the truth of the representations. Instead, the Insurance Company Defendants and the other participating insurers, and Boscoe, CIBC and other advisors, counted on the representations inducing potential customers to buy the products.

76. At all relevant times, the Insurance Company Defendants and the other participating insurers were aware that:

    a.  Participants believed the insurance policies were theirs and only nominally owned by the trustee;

b. Section 5.3(c) of the Trust Agreement specifically required that any transaction be based on a representation the Adopting Employer had reviewed "any contract, agency, joinder, adoption, participation or partnership agreement, deed, assignment or other document of any kind" required to execute the transaction;

c. Section 6.2 of the Trust Agreement specifically required the trustee to "keep accurate and detailed accounts at its principal place of business of all investments, receipts, disbursements and other transactions in the Trust and all accounts, books and records relating thereto shall be open to inspection and audit at all reasonable times during normal business hours by the Adopting Employer or Plan Administrator's certified public accountants"; and

d. All of these provisions, taken together with the marketing materials, indicated that the Adopting Employer was the beneficial owner of policies purchased through the Arrangement and had the right to control any change in ownership or in beneficiary, control how the cash value was invested, control when to liquidate the policies and terminate their participation in the Arrangement, and had the right to review all material information concerning the policy.

**Access to Assets in Circumstances Other Than Death**

77. As mentioned above, the Arrangement was advertised as giving the participant access to his "VEBA money" at any time through plan amendment or termination. Many provisions of the documents also led a reader to believe that the funds the employer was contributing and earnings on those funds could only be used for the participants' exclusive benefit and could be removed from the Trust for the employee's benefit even before the employee's death. Indeed, Boscoe repeatedly made such representations to plaintiffs (including to Mr.

Lefkowitz in the presence of CIBC), to induce them to participate, and subsequently again in the ensuing years.

78. The SPD advised participants that:

> If you terminate employment with your Employer, you may elect to continue coverage. If you elect to continue coverage, you must assume responsibility for all subsequent premium payments due on your policy. The policy will then be transferred into your name and you will become the owner of the policy. This may be a taxable event.

79. Since the insurance policies being purchased on the lives of highly compensated employees were cash value life policies, customers believed this transfer upon termination of employment would include not just the death benefit potential but also the accumulated cash value in the policy.

80. The SPD also informed participants that they would receive the assets if the plan terminates. In describing instances in which funds will be invested in assets other than life insurance, the SPD states: "This may also occur during the period after termination of the Plan while awaiting distribution of benefits to Plan Participants."

81. The Plan Document contained still additional provisions that led the reader to believe the plans assets would eventually be distributed to them.

- "The Plan and Trust shall be created in the United States for the **exclusive Benefit of Employees and their Beneficiaries**."

- "**It shall be impossible** at any time prior to the satisfaction of all liabilities under the Trust, with respect to the Employees of the Employer and their Beneficiaries, for any part of the corpus, or income of the Trust **to be used for, or diverted to, purposes other than for the exclusive Benefit of such Employees or their Beneficiaries**."

- "Any and all . . . contributions to this Plan by the Employer [other than an initial contribution attributable to a mistake in fact] shall be irrevocable and neither such contribution **nor any income thereon shall be used for or diverted to purposes other than for the exclusive Benefit of participating Beneficiaries of the adopting Employer**."

33

- "Upon a Participant's death, Disability ~~or other termination of participation in the Plan~~: (a) The Committee shall determine a Beneficiary to whom payment shall be made."

- "Conversion of Policies – Any Policies in effect pursuant to this Plan may contain a provision which shall permit, upon payment of an additional conversion premium, the conversion (without medical examination) of the Policy to provide individual coverage upon termination of Eligibility for coverage under this Plan."

- "Fund Recovery – **it shall be impossible** for any part of the contributions under this Plan to be used for, or diverted to, purposes **other than the exclusive Benefit of the Participants or their Beneficiaries**.

    (a) Upon dissolution of the Plan and/or termination of the Employee's association from the League by virtue of an Employer's voluntary or involuntary termination of membership in the League, any assets remaining in the Plan after satisfaction of all liabilities to existing Beneficiaries shall be applied in one or a combination of the following, as selected by the Trustee or Plan Administrator in its discretion.

        (1) Such remaining assets shall be used to provide (either directly or through the purchase of insurance), life, sick, accident or other benefits within the meaning of Regulation Section 1.501(c)(9), pursuant to criteria that do not provide for disproportionate benefits to officers, shareholders or highly compensated employees of the Employer; or

        (2) Such remaining assets shall be distributed to members pro-rata based on the total benefits payable to which such Member and his beneficiaries would be entitled to pursuant to ARTICLE 5 compared to the total benefits payable to which all Members and their beneficiaries would be entitled pursuant ARTICLE 5; or

        (3) Distributions shall be based on objective and reasonable standards which do not result in either unequal payments to similarly situated Participants or in disproportionate payments to officers, shareholders or highly compensated employees of the Employer.

    (b) In the event an Employer terminates it membership in the League, either voluntarily or involuntarily, any distribution to Employees of such Employer pursuant to Section 9.02(a) shall be made only from the aggregate assets of the Trust constituting the Participant Account(s) attributable to such Employer's Employees.

34

> Without limiting the generality of the foregoing, distributions to a particular Participant may be based upon a formula, the numerator of which is all compensation of the Employee during years of participation in this Plan, and the denominator of which is all such compensation for all Employees of the Employer earned during their years of participation.

- "[N]o amendment shall: (1) Cause any of the assets of the Trust to be used for or diverted to purposes **other than for the exclusive Benefit of Participants and their Beneficiaries**."

82. When they agreed to participate in the Arrangement, the Insurance Company Defendants and the other participating insurers, were aware of these aspects of the Arrangement, and consented to and benefitted from potential customers being made aware of these provisions to induce them to purchase their insurance products.

83. The Trust Agreement contained similar language providing that beneficiaries will receive the full benefit of assets and insurance policies. *See* Trust Agreement, Eighth Whereas (Trustee holds funds in a fiduciary capacity for the benefit of covered employees); § 1.11 (Plan Administrator the "Named Fiduciary"); § 2.1 (Assets and earnings may not inure to the benefit of anyone except an employee or beneficiary of an adopting employer.); § 2.3 (Trust assets exclusively for the benefit of employees.); § 4.4 (Assets to be divided into separate accounts allocable to employees of each employer.); § 4.5 (If employer becomes ineligible, its allocable assets are to be segregated.); § 4.6 (Earnings may not be used except to pay benefits or permissible compensation.); § 9.1(a) (Amendment may not permit use of assets for any purpose other than the exclusive benefit of covered employees).

84. When they agreed to participate in the Arrangement, the Insurance Company Defendants and the other participating insurers were aware of these aspects of the Arrangement and consented to and benefitted from potential customers being made aware of these provisions to induce them to purchase their insurance products.

85. These provisions put the Insurance Company Defendants and the other participating insurers on further notice that Adopting Employers and participants reasonably believed the insurance policies were theirs and only nominally owned by the trustee.

86. Lincoln sold at least 34 policies through the Arrangement to at least 32 WBPs, and Penn Mutual sold at least 42 policies through the Arrangement to at least 21 WBPs. Boscoe sold at least dozens of policies through the Arrangement to at least 7 WBPs. Each was, at all relevant times, fully aware of the expectations that were created by the documents. Each was fully aware, at all relevant times, that the policies they sold through the Arrangement and the cash value of those policies were intended for the participants' exclusive benefit. They each relied on, and benefitted from, these expectations as they knew they would help induce potential customers to purchase insurance products, to their great pecuniary benefit.

**Koresko *et al*. Operate the Arrangement Through A Pattern of Racketeering Activity**

87. For a period of over 10 years, John Koresko and others operated the Association-in-Fact through a pattern of racketeering activity, described in detail below.

**The Interest Conversion Agreement**

88. On or about March 22, 2002, CTC agreed to disperse all interest earned on employer contributions per Koresko *et al*.'s instructions. Since the contributions were deposited into interest earning accounts and remained there for months before the funds were paid to the insurance companies as premium, the interest earned on this "float" was substantial. Upon information and belief, in many instances, Koresko *et al*. instructed CTC to delay paying the premiums so additional interest could be earned.

89. This interest belonged, not to Koresko *et al.,* but to the WBPs or the Trusts; however, Koresko *et al.* instructed CTC to transfer the interest to Koresko owned and controlled accounts. CTC complied.

90. The illicit nature of the agreement, which was invalid on its face since it pre-dated CTC's appointment as trustee and called for the transfer of plan assets to parties other than a trustee or a beneficiary, was made explicit shortly after CTC became trustee.

91. On June 5, 2002, CTC and Koresko *et al.* modified the earlier agreement by agreeing that "Interest earned at the end of each month will be wired to Penn Public Trust." PPT was owned and controlled by Koresko and had no *de jure* connection to the Trusts or the WBPs at that time.

**The Verification of Trust and Warrant of Authority**

92. A second set of agreements set the stage for conversion of WBP assets once the premiums had been paid to the insurance companies and thereby transformed into insurance policy cash value. CTC agreed to execute a series of documents that were then provided to the insurance companies that had agreed to participate in the Arrangement, including the Insurance Company Defendants. The documents, titled "Verification of Trust and Warrant of Authority" (the "Verifications"), were signed by CTC in its purported capacity as trustee of the REAL VEBA Trust and designated Jeanne Bonney, Koresko's associate, as "Appointed Signator," with authority to sign Arrangement-related documents on behalf of CTC.

93. The "Verifications" certified that:

> The trust empowers the trustee to exercise any and all rights associated with owning life insurance policies and the trustee can exercise these rights without the consent of the insured. These rights include but are not limited to: surrendering the policy, withdrawing policy values, borrowing against the policy, transferring ownership, and changing the beneficiary.

94. In fact, contrary to the "Verifications," the trust documents, which the Insurance Company Defendants had in their possession did not give the trustee any such powers. To the contrary, the terms of the Trust explicitly *limited* the ability of the trustee to change the beneficiary of the policy.

95. The Trust Agreement further limited the way plan assets could be held and used and gave Adopting Employers the right to review any proposed transaction and access to all information concerning their financial stake in the Arrangement. Specifically:

    a. Section 1.9 provided that, trust assets could only be held in "interest bearing accounts of the trustee" or "otherwise limited to regulated investment companies made available by the Trustee."

    b. Section 2.1 provided that the purpose of the trust was "receiving contributions of Adopting Employers and their employees to provide for [health and welfare benefits] or payment of insurance premiums or making other similar payments pursuant to the terms of the Plan."

    c. Section 4.2 provided that, other than being used to pay for reasonable expenses, employer contributions to the trust could only be used to pay "premiums, benefits and services" to which plan participants and beneficiaries were entitled.

    d. Section 5.1, listing the powers and duties of the trustee, did not give the trustee permission to borrow funds. Instead it limited the trustee to transferring money to an insurance company issuing an insurance contract, i.e. paying premiums; and holding funds uninvested "while such amounts are awaiting distribution."

    e. Section 5.3(c) required that any transaction be based on a representation that the Adopting Employer had reviewed "any contract, agency, joinder, adoption,

participation or partnership agreement, deed, assignment or other document of any kind" required to execute the transaction"; and

    f.   Section 6.2 required the trustee to "keep accurate and detailed accounts at its principal place of business of all investments, receipts, disbursements and other transactions in the Trust and all accounts, books and records relating thereto shall be open to inspection and audit at all reasonable times during normal business hours by the Adopting Employer or Plan Administrator's certified public accountants."

Read as a whole and in context, no authority or reason to borrow cash value accumulating in policies can be found in the Trust Agreement or the Plan Document. None of the powers listed in the Verifications are mentioned in the Trust Agreement. Thus, the Verifications were knowingly false and Insurance Company Defendants knew they were false and invalid.

**The Custodial Agreement**

96. Yet another agreement entered into by CTC and Koresko *et al*. put the Insurance Company Defendants on notice that Koresko *et al*. intended to ignore the governing plan documents and trust agreements and convert WBP assets. This agreement was titled a "Custodial Agreement." It designated the Koresko Law Firm as CTC's agent and gave the firm possession of the 1200 insurance policies CTC was to own as trustee f/b/o the employer WBPs.

97. The Custodial Agreement:

    a.   Purported to release the Koresko Law firm from any liability other than liability arising from "willful or gross negligence" (sic), a standard directly at odds with that mandated by ERISA;

  b. Granted the law firm the same bogus powers listed in the Verifications, i.e., the authority to change ownership and beneficiaries of the insurance policies, surrender policies, and remove cash value through withdrawals or policy loans;

  c. Predated CTC's appointment as trustee;

  d. Purported to place custody of plan assets with someone other than a trustee; and

  e. Violated the terms of the Master Trust Agreement, which required that the Trustee "shall keep accurate and detailed accounts at its principal place of business of all investments, receipts, disbursements and other transactions in the Trust and all accounts, books and records relating thereto shall be open to inspection and audit at all reasonable times during normal business hours by the Adopting Employer or Plan Administrator's certified public accountants." Trust Agreement, § 6.2

98. This series of agreements effectively turned CTC into a sham trustee and removed any control or supervision of Koresko *et al*.

99. The Insurance Company Defendants were either:

  a. Aware of these agreements and that they were invalid, and incompatible with the plan documents, the trust agreements, and ERISA; or

  b. Unaware of the Custodial Agreement and had no basis to believe that the Koresko Law Firm had been given any role or authority in connection with the ownership of the policies.

**The Agreements are Used to Convert Plan Assets**

100. Koresko *et al.* took immediate advantage of the agreements. Between 2002 and 2013, when this Court removed Koresko from any position of authority, there were over 250 separate

instances of conversion of WBP assets, not including the loan conversions discussed below. *Perez*, Doc. 1134-1. The conversions totaled approximately $40 million.

101.  In addition, in or about September 2002, Koresko *et al.* wrote or emailed insurance companies that had agreed to participate in the Arrangement, including the Insurance Company Defendants, and, based on the purported authority of the Verifications, instructed them to "change the name of the owner/beneficiary from [employer] WBP to REAL VEBA TRUST DATED 3/20/95." (Brackets in original). Approximately 1200 insurance policies issued by some 46 separate carriers, including at least 34 policies issued by Lincoln and 42 policies issued by Penn Mutual, were converted from the WBPs to the REAL VEBA Trust in this fashion, setting the stage for future conversions, concealment of fiduciary breaches, and illegal loans.

102.  As stated above, the trust documents did not give the trustee authority to change the beneficiary and the agreements Koresko *et al.* were relying on were invalid for numerous reasons, as explained in detail above; however, the Insurance Company Defendants changed the owners and beneficiaries of the 76 policies despite knowing Koresko lacked the authority to make the changes and that he had not – and could not honestly - represent and warrant that the Adopting Employer was aware of the change, let alone that the Adopting Employer had reviewed or approved it.

103.  Moreover, despite the explicit language in the trust agreement giving the Adopting Employer the right to inspect all records, commencing in or about 2007-2008, the Insurance Company Defendants and Boscoe agreed to assist Koresko *et al.* in fraudulently concealing past and future conversions from WBP participants and beneficiaries by refusing to provide any information to the adopting employers, plan participants and plan beneficiaries.

104.    The Insurance Company Defendants agreed to deny the plaintiffs and other adopting employers any information, despite having reviewed the Trust Agreement and despite having actual or constructive knowledge that Koresko *et al.* intended to deprive the participants and beneficiaries, including Plaintiffs, of any information concerning the insurance policies if the Insurance Company Defendants and other insurance companies agreed to cooperate in the fraudulent concealment.

105.    Boscoe was complicit in this concealment, by depriving his client participants and beneficiaries, including Plaintiffs, any truthful information concerning the insurance policies, despite having knowledge of the Trust Agreement, knowing that the Insurance Company Defendants and Koresko *et al.* intended to and did deprive the participants and beneficiaries including Plaintiffs of any information concerning the insurance policies, and knowing (as of August 2009) that Koresko was misappropriating monies from a Kalan  policy through an illegal loan.

106.    This conspiratorial agreement set the stage for massive additional conversions through illegitimate loans. Between August and November 2009, the Koresko Parties withdrew more than $35 million in loans from insurance policies owned by the Trusts for the benefit of plaintiffs and other Arrangement participants.

107.    Penn Mutual participated in these conversions by making at least 7 separate loans to Koresko *et al.* totaling approximately $612,000, and Lincoln participated in these conversions by making at least 14 separate loans to Koresko *et al.* totaling approximately $1,345,000. The loans were secured by the cash value in policies owned by WBPs.

108.   The loans the Insurance Company Defendants agreed to make, which were all requested within weeks, if not days of each other, were not requested by the owner/trustee, i.e. F&M,

or anyone with authority to sign for the owner/trustee. Instead, the loan requests came from Koresko, who, in his individual capacity, signed the applications under such alleged individual capacity as "Pres. of Administrator."

109.   Although Koresko provided the Insurance Company Defendants with a document entitled "Custodial Agreement," which purportedly designated John Koresko's law firm as CTC's agent and gave the firm possession of the policies, as stated earlier, this agreement was invalid and illegal, as it purported to give custody of and ownership authority over plan assets to an entity that was neither a trust nor a trustee. No document or communication from the actual, nominal owner, F&M, or its predecessor, CTC, gave Koresko authority to act on their behalf or in their name and the Insurance Company Defendants were aware that Koresko had no authority to request loans.

110.   Though the Custodial Agreement, described above, purported to give the Koresko Law Firm custody of the policies, that agreement was invalid for the reasons set forth above. Moreover, even if it were not invalid, the loan requests were not made by the Koresko *law firm*. Rather, the requests were made by and signed by Koresko *the individual*, and they were accompanied by an affidavit signed by Koresko that asserted that: (i) CTC no longer existed as the result of a merger into F&M, and (ii)  F&M was subsequently removed in favor of Penn Public Trust as Trustee. Koresko asserted he had the right to request the loan as the "sole Director of Penn Public Trust." In fact, at all relevant times, F&M remained the sole trustee. *Perez*, 86 F. Supp. 3d at 316.

111.    The loan requests were accompanied by an affidavit signed by Koresko that asserted that CTC no longer existed as the result of a merger into F&M, that F&M was subsequently removed in favor of Penn Public Trust as Trustee, and that Koresko, personally, had

"irrevocable powers of attorney over all polices owned by the nominal trustees." In fact, at all relevant times, F&M remained the sole trustee, *Perez*, 86 F. Supp. 3d at 316, and Koresko's claim was obviously in violation of ERISA, as only trustees may have control over plan assets.

112.    The loans were illegal, as the Insurance Company Defendants transferred the loan proceeds, not to the trustee or to plan participants, but to some unauthorized and unknown entity or person. F&M, the trustee, never received the loan proceeds and was unaware the loan requests had been made. The trust and plan documents specifically prohibited any such transfer. *Perez*, 86 F. Supp. 3d at 340. The transfers also violated ERISA, as plan assets must always be held in a trust.

113.    The loans by Penn Mutual constituted 7 separate but related violations of 18 U.S.C. § 664, predicate acts under RICO. The loans by Lincoln constituted 14 separate but related violations of 18 U.S.C. § 664, predicate acts under RICO.

114.    The Insurance Company Defendants made the loans despite having actual and constructive knowledge that the funds were being held for the participants' and beneficiaries' benefit and that the loans served no purpose that could possibly benefit either class of stakeholders.

115.    After making the loans, the Insurance Company Defendants continued to conspire with Koresko *et al.* by refusing to provide WBP participants and beneficiaries with any information concerning the status of the insurance policies, despite having an obligation to do so, thereby fraudulently concealing the conversions.

116.    On November 4, 2009, F&M wrote to the Insurance Company Defendants putting them on further notice that Koresko lacked any authority and that Koresko was refusing to provide them with information concerning the Arrangement policies.

117.    Despite this notice, the Insurance Company Defendants continued to conceal the fact that it had made the loans, failing to advise F&M of the status of the policies it had issued. Boscoe also had knowledge of the loans made on the policies purchased by the Kalan plaintiffs but he concealed the fact that Koresko *et al.* had taken illegal loans from the Kalan and Lefkowitz plaintiffs (and his other participant clients).

118.    Between 2009 and the present, the Insurance Company Defendants charged annual interest on each of the loans, thereby converting additional plan assets. Each year, Penn Mutual and Lincoln committed at least 7 and 14 acts of plan asset conversion in this fashion, respectively, for a total of at least 63 and 189 respective, separate violations of 18 U.S.C. § 664 over a 9-year period.

119.    The loans constituted 20 separate but related violations of 18 U.S.C. § 664, predicate acts under RICO.

120.    The Insurance Company Defendants made the loans despite having actual and constructive knowledge that the funds were being held for the participants' and beneficiaries' benefit and that the loans served no purpose that could possibly benefit either class of stakeholders.

**The Plaintiffs' Involvement with the Koresko Arrangement**

**The Lefkowitz Plaintiffs**

121.    Plaintiffs David and Norma Lefkowitz are employees of Plaintiff Wilshire Palisades Law Group.  In 2001, they decided to investigate purchasing life insurance policies and do retirement and other financial planning.  They turned to a trusted advisor, Mitchell Pindus, who, at the time, was an experienced registered representative with Defendant CIBC.  The Lefkowitz' knew him and his family through their membership in the same synagogue, and through their children, who were friends and went to the same small elementary school

together.   He previously worked with the Lefkowitz' regarding their college planning, including forming a "529" college savings plan for them.

122. Pindus, in consulting Mr. Lefkowitz about retirement and college planning and life insurance, recommended that the Lefkowitz' meet with Boscoe, a CFP at Brighton Advisory Group, whom, he stated, was a successful, sophisticated CFP with extensive experience with retirement and estate planning and life insurance matters.

123. Thereafter, in or about late November 2001, Mr. Lefkowitz met with Boscoe at CIBC's offices in Westwood in a building known as the Oppenheimer Tower, at 10880 Wilshire Boulevard.  A team of CIBC representatives, including Pindus, attended the meeting, and were described by Boscoe and Pindus as retirement planning/tax specialists.  Boscoe and the CIBC reps introduced Mr. Lefkowitz to the Koresko Arrangement at the meeting.

124. Boscoe and the CIBC reps, at the Oppenheimer Tower meeting, and in phone calls and meetings with Mr. Lefkowitz in the ensuing weeks, touted the merits of participating in the Arrangement.

125. Boscoe also specifically consulted with Mr. Lefkowitz regarding estate planning, including living trusts, wills, and asset protection, financial planning, and retirement planning. He did an extensive review of the Lefkowitz' financial situation. He advised the Lefkowitz' on the formation of living trusts and insurance trusts, steering the Lefkowitz' to certain estate planning attorneys with whom he worked in the creation of the insurance trusts. He also selected and hired for the Lefkowitz' a benefits planning administrator for the WP WBP.

126. Boscoe – who sold insurance policies through the Arrangement to about 7 other small business owners – emphasized several "features" of the Arrangement, each of which was false.

127. Specifically, Boscoe, with CIBC, at the Oppenheimer Tower meeting, and on his own in follow-up conversations with Mr. Lefkowitz, at Mr. Lefkowitz' office and on the telephone, within weeks after that meeting (with Pindus in attendance):

  a. Touted the total control that participants (e.g., Lefkowitz' and WPLG) would have over their participation in the Arrangement and the insurance policies purchased through the Arrangement.  Boscoe informed Mr. Lefkowitz that participants would have  the free, unfettered right and choice to: (i) terminate their WBP at any time and to retain any life insurance policies, intact, with their entire cash surrender value, or (ii) maintain the WBP, so that, upon the death of a participant, their beneficiaries would obtain the face amount of the policies. Boscoe told Mr. Lefkowitz that, whatever his or any other participants' decision was in this regard, he merely had to call Boscoe, and he would make sure the policy was transferred or the cash surrender value was paid to the participant, or, upon death, to the beneficiary;

  b. Highlighted that the Arrangement functioned through a network of large, independent financial institutions which, according to Boscoe, lent stability, security, and checks and balances to the Arrangement. The network – as portrayed by Boscoe to Mr. Lefkowitz, in person, including at the meeting at Oppenheimer Tower with CIBC and at Mr. Lefkowitz' office, and over the phone -- included: (i) an employers' association, called a "League," (ii) Trusts which were overseen

by a large, well-funded independent Trustee, like Community Trust Corporation ("CTC") (iii) an Administrator, Penn Mont Benefits, Inc., (iv) multiple legal counsel separate and independent from John Koresko, (v) a Voluntary Employees' Benefit Association ("VEBA"), (vi) a Plan, and (vii) an Advisory Committee. He informed Mr. Lefkowitz that the assets were protected by ERISA-mandated fiduciary bonds; and

c. Boasted that he was a conscientious financial advisor and insurance professional who had undertaken extensive due diligence regarding the Arrangement, including vetting John Koresko's background and experience, investigating the structure and mechanics of the Arrangement, the experience of others with the Arrangement, and working with the insurance companies to verify their acceptance and approval of the Arrangement. He assured plaintiffs that he was recommending and selling the Arrangement to them as in their best interests.

128. During the Oppenheimer Tower meeting and in the follow-up discussions at Mr. Lefkowitz' office, the CIBC representatives, including Pindus, endorsed the statements which Boscoe made to Mr. Lefkowitz, including those set forth in paragraph 127, above, and they and Boscoe recommended that Plaintiffs participate in the Koresko Arrangement. They did not recommend any other VEBA arrangement, nor did they offer the Lefkowitz plaintiffs any alternatives to the Koresko Arrangement. The CIBC Rep vouched for Boscoe's expertise and "enormous reputation" in the field.

129. Boscoe and the CIBC Rep assured Mr. Lefkowitz they would gather and prepare all the necessary documents, promising that Mr. and Mrs. Lefkowitz simply had to sign them to complete the steps necessary to participate in the Arrangement.

48

130.   Boscoe provided Mr. and Mrs. Lefkowitz the Adoption Agreements for their signature, and the CIBC Rep provided the Lefkowitz' sale literature for the Penn Mutual insurance policy, insurance applications, and forms for investment allocations of the premiums, for which he made recommendations and filled out for Mr. Lefkowitz.

131.   Boscoe's and CIBC's representations to Mr. Lefkowitz were false and misleading. Among other things:

   a.   Plaintiffs did not, in fact, have control or a free, and unfettered right to exit the Arrangement and take their insurance policies or liquidate them. Only John Koresko, and not Plaintiffs, was authorized under the Plan to determine if, and when, a WBP could be terminated, whether the WBP could keep their insurance policies and on what terms, and whether they could liquidate a policy and obtain its cash surrender value. And, unbeknownst to plaintiffs, Koresko routinely interfered with and refused to permit a participant's termination absent a forfeiture of monies invested. Indeed, in mid-2013, when Mr. Lefkowitz inquired of Boscoe about termination of the Lefkowitz WBP, Boscoe informed him that he would be *unable* to terminate the Plan or obtain the policy or its cash value, and that Koresko had been refusing to permit participant plan terminations for years.

   b.   Koresko had control over the supposedly "independent" entities which purportedly lent stability and security to the Arrangement, thus eviscerating any semblance of independence and checks and balances within the Arrangement. In fact, the assemblance of entities – far from protecting participants in the Arrangement from the whims of its mastermind, John Koresko -- was a house of mirrors, the reflection from each revealing only one visage, that of Koresko. Thus:

49

(i) The "League" was nothing more than an unincorporated corporation, i.e., a nullity as an organization, (ii) the "Plan," defined differently in different documents and marketing materials, either was or was not the employer's own Welfare Benefit Plan, depending on the document; (iii) separate trusts for each alleged chapter of the non-existent League may or may not have existed, (iv) the "independent" Trustee was not independent – it was controlled by Koresko and was sometimes, in reality, Koresko himself, and (v) no fiduciary bonds had ever been purchased.

   c.  Boscoe failed to perform the comprehensive due diligence he assured Mr. Lefkowitz he had undertaken regarding the Arrangement, including failing to vet the Arrangement with true experts, prior participants, and key players in the field.

132.  In addition to the outright misrepresentations set forth in paragraph 127, above, Boscoe and the CIBC Rep failed to disclose numerous material facts about the Arrangement to the Lefkowitz plaintiffs. These facts include the following:

- Koresko had a prior criminal record, and had filed a Chapter 13 personal bankruptcy and obtained a discharge as of 1994, not long before he started aggressively marketing and selling the Arrangement;

- Advisor salespeople such as Boscoe and CIBC earned extraordinary commissions on the sale of participations in the Arrangement. Not only was this a form of self-dealing explicitly forbidden by ERISA, it explains why Boscoe (and CIBC, as to the Lefkowitz' plaintiffs) persuaded plaintiffs to front-load the premiums, i.e., pay large amounts in the early years;

- The dubious financial validity of cash value life insurance policies like that purchased by plaintiffs, as discussed above in paragraphs 23-28 and below in paragraph 136(b);

- Koresko could enrich himself by charging the Trusts exorbitant "administrative" and "legal" fees – yet another instance of ERISA-prohibited self-dealing, and there was no check on this self-dealing; and

- Koresko had granted himself the sole discretion to declare Trust and Plan assets as "surplus," which he could then claim were no longer plan assets protected by ERISA. Once designated as "surplus," he could spend or distribute these assets as he saw fit.  This meant that Koresko had a direct financial interest in denying benefits and distributions. This conflict of interest proved not merely theoretical.  Over the years, upon the death of an insured, Koresko consistently invented grounds to either skim off large chunks of the insurance proceeds or deny death benefits altogether. By so doing, he converted the insurance proceeds to "surplus."

**The WPLG VEBA Plan Is Established**

133.  In or about December 2001, after the meetings and discussions with Boscoe and the CIBC representatives described above, and in reliance on Boscoe's and CIBC's misrepresentations and in ignorance of their omissions, Mr. Lefkowitz and the other Lefkowitz plaintiffs agreed to participate in the Koresko Arrangement and to form a Health and Welfare Benefit Plan under Koresko's Regional Employers' Assurance Leagues, Region 09, Chapter D, and Voluntary Employees' Beneficiary Association.  Participants included David and Norma

Lefkowitz and WPLG employee Brenda Walsh, each of whom executed the documents and entered into the Arrangement.

134.   Subsequently, upon the recommendation of financial advisor Boscoe and the CIBC Rep, flexible premium variable life insurance policies from Penn Mutual were purchased on behalf of WPLG's employees, including David I. Lefkowitz and Norma M. Lefkowitz.  The policies were purchased by the WP WBP and owned by a trustee f/b/o the WBP.  The trustee f/b/o the WP WBP was also the beneficiary of the policy.

135.   Boscoe and the CIBC Rep were the designated "soliciting agents" of the Penn Mutual policies.   They solicited the Lefkowitz' with illustrations regarding the prospective performance of the life insurance policy investments, which they signed.  The CIBC Rep designed a recommended plan for the investment allocations of the investments of the policy, suggesting different percentages for different asset classes, and Boscoe, as a member of the Advisory Committee of the Lefkowitz WBP, reviewed and approved the allocations.  About a year after the Lefkowitz' joined the Arrangement, the CIBC Rep recommended a re-allocation of the investment, and Boscoe again reviewed and approved the allocations.

136.   Penn Mutual had actual and/or constructive knowledge of all the material aspects of the Arrangement as described more fully above.  In addition:

    a.      Penn Mutual had actual and/or constructive knowledge that, despite the Koresko Parties assertion that "all assets were available to satisfy all claims," in fact the Arrangement had been structured so that participants and beneficiaries could not make a recovery if the insurance policies purchased on their behalf were not available to fund payment even though all participants were led to believe that the policies were theirs and that the trust functioned as a straw party;

b.      Penn Mutual had actual and/or constructive knowledge that in the absence of the business owner's ability to access the cash value of the policies it made absolutely no sense for the business owner to pay the substantially higher premiums associated with the cash value policies being purchased through the REAL VEBA Arrangement; and

c.      Penn Mutual had actual and/or constructive knowledge that the REAL VEBA Arrangement required the business owners to contribute amounts equivalent to the premiums being charged for the cash value policies and that the business owners were the actual payors of the premiums Penn Mutual received.

137.    Despite this knowledge, Penn Mutual permitted and encouraged its agents to sell Penn Mutual cash value policies via the Arrangement and encouraged Boscoe, CIBC and the Koresko Parties to promote Penn Mutual as an insurance company of choice when marketing the Arrangement.

138.    Penn Mutual paid Boscoe, CIBC, and the Koresko Parties substantial commissions in exchange for promoting and selling Penn Mutual policies through the Arrangement.

139.    In reasonable reliance on the representations of Penn Mutual, Boscoe, CIBC, and the Koresko entities, the Lefkowitz' signed the Adoption Agreement, applied for and purchased term policies for WPLG employees through the Arrangement and purchased the Penn Mutual cash value life insurance policies described above.

140.    Plaintiff WPLG initially paid over $520,000 in premium payments for the life insurance policies.   In 2003, Plaintiff WPLG paid another $196,000 in premium payments on the life insurance policies. In 2004 and 2005, WPLG paid an additional total of $26,000.

**Boscoe's Solicitation of the Kalans**

141. Dr. Kalan was introduced to Boscoe by his ex-accountant and starting in 1996, Boscoe began providing financial advisor services to Dr. and Mrs. Kalan. The Kalans consulted with Boscoe regarding retirement and estate planning, including participation in a VEBA and life insurance and long-term care insurance counseling.

142. At the outset of their relationship, Boscoe met with Dr. and Mrs. Kalan in Boscoe's office in Encino, where Boscoe consulted with the Kalans regarding their estate planning documents, conducting a slide presentation regarding estate planning, "first to die" and "second to die" arrangements, Clifford Trust arrangements, and other vehicles for estate planning.

143. From 1996 and in the ensuing several years, Boscoe continued to provide retirement and estate planning to the Kalans, speaking with Dr. Kalan annually in detail about those matters.

144. By 2003, Boscoe had engendered great trust and confidence in the Kalans, and he solicited Dr. Kalan to establish a Plan under the Koresko Arrangement. Dr. and Mrs. Kalan went to a meeting with Boscoe in his office in Encino in about 2003, where Boscoe solicited them to join the Koresko Arrangement.

145. In the meeting, Boscoe told the Kalans, among other things, that the Kalans could join the Koresko Arrangement by liquidating their existing whole life insurance policies, which they owned, and that no additional cash funds would be required to purchase life insurance policies in the Koresko Arrangement. As part of his pitch to the Kalans in 2003 and 2004 to join the Koresko Arrangement, Boscoe recommended to Dr. Kalan that he cash out of his then-existing life insurance policy with Canada Life (policy #2632104) and purchase new life insurance policies through a new Plan established with Koresko and his affiliates. He

also recommended that Dr. Kalan buy an additional life insurance policy with Long-Term Care Benefits.

146. Boscoe, in the meeting and subsequent phone calls with Dr. Kalan, made the same misrepresentations to the Kalans that he made to Mr. Lefkowitz, including those set forth in paragraph 127, above, regarding: (a) The Kalans' control and unfettered rights to exit the Arrangement and keep their policies with their cash value or liquidate them; (b) the many prominent, separate and independent institutions which served as checks and balances protecting participants; and (c) Boscoe's extensive due diligence of the Arrangement, all as discussed in more detail above.

147. Each of these representations were false, for the reasons set forth in paragraph 131, above. Moreover, Boscoe omitted several critical facts pertinent to the Arrangement in soliciting the Kalans to participate, including, for example, those listed above in paragraph 132.

**The Kalan WBP is Established**

148. The Kalans, on the advice of Boscoe, accepted his recommendations and, in December 2004, they executed the paperwork which Boscoe provided them to establish the HAK WBP.

149. Thereafter, Boscoe recommended that Dr. Kalan use the proceeds of the surrender of the Canada Life policy to purchase, through the new HAK WBP, two new insurance policies on behalf and for the benefit of Dr. Kalan and his wife Deborah Kalan, one with Lincoln National and one with Jefferson-Pilot. The initial specified amount on the former policy was $3.5 million and, on the latter, $2 million.

150. The premium payments for the policies came from withdrawal from the existing Canada Life policies, from which approximately $1 million was withdrawn and used to fund the Lincoln National policy, in the amount of about $500,000, and the Jefferson Pilot policy, in

the amount of about $500,000. In addition, Boscoe recommended to Dr. Kalan that he pay $150,000 for an additional life insurance policy with Long-Term Care Benefits with Golden Rule Insurance Company.  This policy provided an initial long-term care benefit of $8,522 per month and an initial specified death benefit of $426,124. The VEBA also covered a non-owner employee of the HK, M.D., Inc.

151.    Lincoln had actual and/or constructive knowledge of all the material aspects of the Arrangement as described more fully above.  In addition:

    a.  Lincoln had actual and/or constructive knowledge that, despite the Koresko Parties assertion that "all assets were available to satisfy all claims," in fact the Arrangement had been structured so that participants and beneficiaries could not make a recovery if the insurance policies purchased on their behalf were not available to fund payment even though all participants were led to believe that the policies were theirs and that the trust functioned as a straw party;

    b.  Lincoln had actual and/or constructive knowledge that in the absence of the business owner's ability to access the cash value of the policies it made absolutely no sense for the business owner to pay the substantially higher premiums associated with the cash value policies being purchased through the REAL VEBA Arrangement; and

    c.  Lincoln had actual and/or constructive knowledge that the REAL VEBA Arrangement required the business owners to contribute amounts equivalent to the premiums being charged for the cash value policies and that the business owners were the actual payors of the premiums Lincoln received.

152. Despite this knowledge, Lincoln permitted and encouraged its agents to sell Lincoln policies via the Arrangement and encouraged Boscoe and the Koresko Parties to promote Lincoln as an insurance company of choice when marketing the Arrangement.

153. Lincoln paid Boscoe and the Koresko Parties substantial commissions in exchange for promoting and selling Penn Mutual policies through the Arrangement.

154. In reasonable reliance on the representations of Lincoln Boscoe, and the Koresko entities, the Kalans signed the Adoption Agreement, applied for and purchased term policies for WPLG employees through the Arrangement and purchased the Penn Mutual life insurance policies described above.

155. The policies were purchased by the HAK WBP and owned by a trustee f/b/o the WBP. The trustee f/b/o the WBP was also the beneficiary of the policy.

**Change of Ownership and Loan Conversions**

156. In or about 2002, as part of the mass conversion from WBP ownership to REAL VEBA ownership described above, the Insurance Company Defendants allowed Koresko *et al.* to change the owner and beneficiary of the policy to a trustee f/b/o the REAL VEBA.

157. The Insurance Company Defendants, Boscoe, and CIBC failed to inform the Lefkowitz plaintiffs of this change and its ramifications, nor did they seek their consent. Neither the Insurance Company Defendants nor Boscoe informed the Kalan plaintiffs of this change, nor did they seek their consent.

158. On or about August 26, 2009, as part of the loan conversions described above, the Insurance Company Defendants loaned Koresko *et al.* millions of dollars collateralized by various insurance policies purchased as part of the Arrangement.  Lincoln specifically loaned Koresko *et al.* approximately $530,000 collateralized by the cash value that had accumulated in the Kalan policies. Penn Mutual also made a loan in a smaller amount (approximately

$5,000) to Koresko from the Lefkowitz policies. The Insurance Company Defendants failed to notify or obtain the consent of the plaintiff or any other participants in the Arrangement. The loans were never re-paid.

159.  Since the loans were made, they have accrued interest which has depleted the assets of the Arrangement.

160.  Specifically, as to the loan collateralized by the Kalan Plaintiff policies, the loan has accrued interest in the amount of $152,924.73 through April 30, 2017.  The accrued interest is also collateralized by the policy's cash value. The loan and the accrued interest have never been repaid.

**Defendants' Fraudulently Conceal the Theft**

161.  Boscoe was soliciting agent and agent of record on the insurance policies of the Kalan plaintiffs and, with CIBC's Pindus, on the policies of the Lefkowitz plaintiffs. As such, they had access to information pertaining to the insurance policies on the lives of their clients, including plaintiffs. They also had possession of the Koresko plan documents and marketing literature. They knew that Koresko had changed the beneficiary on the insurance policies of their participant clients, including plaintiffs.

162.  After joining the Arrangement, plaintiffs relied on Boscoe and Pindus to monitor the status of the Arrangement, the policies, and the investments.

163.  Boscoe spoke to Mr. Lefkowitz and Dr. Kalan, and Pindus, as a rep of CIBC, spoke to Mr. Lefkowitz, regarding the status of the Arrangement in the years after they joined the Arrangement.  Boscoe followed up with Mr. Lefkowitz and Dr. Kalan regarding important administrative items, such as the Census Data Forms and billing information presented by Koresko *et al.*; the insurance policies, including regarding plaintiffs' maximizing the death

benefit on their respective policies; and the policy investments.  Pindus also followed up with

Mr. Lefkowitz regarding the status of the investments and investment allocation, including

from 2002 through at least 2012.

164.  After making the loans, the Insurance Company Defendants continued to conspire with

Koresko *et al.* by refusing to provide WBP participants and beneficiaries with any

information concerning the status of the insurance policies, despite having an obligation to

do so, thereby fraudulently concealing the conversions. At one point, plaintiffs stopped

receiving statements on their life insurance policies from Koresko *et al.*, the Insurance

Company Defendants, Boscoe, and/or the CIBC Rep.

165.  Boscoe (along with CIBC, regarding the Lefkowitz plaintiffs, only) came to be the only

person assuming the monitoring function of the policies for the plaintiffs. He (along with

the CIBC Rep, regarding the Lefkowitz plaintiffs only) was the only person in a position to

monitor the investments of the plaintiff WBPs.  With the Insurance Company Defendants

refusing to provide plaintiffs any information about their policies, the plaintiffs were

wholly dependent on Boscoe and, in the case of the WP WBP, the CIBC Rep, to inform

them on the status of the policies and the investments made with their cash value.

166. From 2002 on, Boscoe repeatedly advised the plaintiffs (including in conversations with

Mr. Lefkowitz, in the presence and with the concurrence of CIBC) that the policies were

safe, available to them at any time, and their investments were performing well. At no time

did he tell plaintiffs that the insurance policies in the Arrangement were in jeopardy of

being plundered by Koresko, which eventually occurred. Even while Plaintiffs' policies

were being raided and premium interest was being stolen, Boscoe advised plaintiffs,

including in the presence of CIBC, that their policies were safe, available to participants at

any time should they choose to liquidate them and terminate their WBP, and their investments were performing well. Moreover, he repeatedly sung the praises of Koresko, describing him as a brilliant tax lawyer and businessman, and his Arrangement.

167. From time to time between 2002 and July 2013, the Lefkowitz plaintiffs (directly or indirectly) made requests of Koresko *et al.*, Boscoe, CIBC, and Penn Mutual to provide information as to the status of their policies, their investments, and their participation in the Arrangement. Similarly, during that same period, the Kalan plaintiffs made requests of the Koresko *et al.*, Boscoe, Lincoln and Jefferson to provide information as to the status of their policies, their investments, and their participation in the Arrangement.

168. During that time period, neither Koresko, nor any of his agents or employees, nor Boscoe, nor CIBC, nor any of the Insurance Company Defendants, nor any other advisor ever communicated any possible issues or concerns with the Arrangement, including regarding the illegal loans and other conversions. The Insurance Company Defendants agreed with Koresko *et al.* to withhold all information from participants and beneficiaries, even while they knew that Koresko had been personally requesting and subsequently taking out the illegal loans.

169. Moreover, during that time period, as a common policy, practice, and scheme perpetrated by Koresko *et al.*, Koresko *et al.*, Boscoe, and CIBC routinely provided plaintiffs here, as well as many other participants and beneficiaries, false reassurances that the Arrangement was functioning properly, nothing was amiss, their insurance policies and contributions were intact, and Koresko was a brilliant tax lawyer with an excellent reputation. They provided these false reassurances even when plaintiffs here (and other participants and beneficiaries) contacted them regarding the status of their WBPs.

170. The false reassurances coming from Koresko *et al.* usually were made by Larry Townsend, a KAPC employee and PMB agent, Jeanne Bonney, or Larry Koresko, interacting with plaintiffs and other participants and beneficiaries. The CIBC Rep participated by referring Mr. Lefkowitz over to Boscoe, and then participating in meetings and conversations where Boscoe provided the reassurances regarding the Arrangement.

171. At no time did the Koresko Parties or the Insurance Company Defendants (or anyone else) advise plaintiffs that, for instance, Koresko improperly removed approximately cash value from the Lefkowitz and Kalan plaintiffs' insurance policies via illegitimate, unauthorized loan, and that plaintiffs' assets were being plundered and diminished.

172. At the time Boscoe provided his fraudulent updates to plaintiffs (including in the presence of CIBC), Boscoe was aware of, but fraudulently concealed, his knowledge of the unstable nature of the Arrangement, Koresko's power and control over the insurance policies, his power and control over  participants exiting the Arrangement, the self-dealing within the Arrangement, and Koresko's taking out of illegal loans, about which he was specifically informed in writing in August 2009. At the time plaintiffs requested status updates during the period 2001 to 2013, the Insurance Company Defendants and Boscoe were fiduciaries of the Plaintiff WBPs, Boscoe was a fiduciary of each of the other plaintiffs, and CIBC was a fiduciary of the Lefkowitz plaintiffs. As such, they had duties to advise Plaintiffs about the truth concerning the Arrangement and that Koresko was raiding the policies in the Arrangement; however, the Insurance Company Defendants, Boscoe, CIBC, and Koresko *et al.*  provided no meaningful information.

173. Had Penn Mutual contacted any of the Lefkowitz plaintiffs, or the trustee of the Trusts (CTC or F&M), they would have learned that F&M was the trustee and that the loans made were unauthorized.

174. Had Lincoln contacted any of the Kalan plaintiffs, or the trustee of the Trusts -- i.e., CTC or F&M, they would have learned that F&M was the trustee and that the loans made were unauthorized.

175. Had the Insurance Company Defendants or Boscoe contacted either CTC, or F&M, they would have learned of the allegations by the DOL concerning Koresko, that the Penn Public Trust was not the trustee as of the date of the loans, and that the loans were unauthorized.

**Boscoe Aids and Abets Koresko's Thievery Until the End**

176. In 2013, seeking to undermine the looming injunction in *Perez*, Koresko filed bankruptcy petitions for several of the entities. When the bankruptcies – filed in the Eastern District of Pennsylvania – were dismissed, Koresko conspired with others to have sham involuntary bankruptcies filed in Florida for the same entities.

177. Boscoe actively assisted Koresko in this gambit, trying to persuade his clients, including the plaintiffs, to support Koresko's efforts. He even solicited participants – including the plaintiffs -- to donate funds to subsidize the sham filings, even going so far as to describe dire consequences if his clients, including plaintiffs, did not join in.

178. That the involuntary bankruptcy filings were a sham is not subject to dispute. Both the Florida bankruptcy court and the Eastern District of Pennsylvania so held. As Judge McLaughlin explained when dismissing the bankruptcies with prejudice:

> On December 6, 2013, the cases were transferred by order out of the

Middle District of Florida to the Eastern District of Pennsylvania. In his decision to transfer the bankruptcies, Judge Funk [of Florida] stated that 'the Debtors are the primary, if not the sole, beneficiaries of the involuntary petitions filed in this Court to side-step the rulings in both the Pennsylvania District Court and the Pennsylvania Bankruptcy Court. . . . [T]his Court cannot sanction such apparent abuse of the bankruptcy process.' Findings of Fact and Conclusions of Law and Order Transferring Venue of Cases at 15, In re: Koresko & Associates, P.C., No. 13-bk-5991 (Bankr. M.D. Fla. Dec. 6, 2013) (Docket No. 63). See also Perez v. Koresko, No. 09-cv-988, 2015 WL 505471 (E.D. Pa. Feb. 6, 2015) judgment entered, No. 09-cv-988, 2015 WL 1182846 (E.D. Pa. Mar. 13, 2015). The Florida court further noted that Koresko Law Firm and Koresko & Associates, P.C., both "represent that [Penn-Mont Benefit Services, Inc.] has no assets and that [Penn Public Trust] has no assets beyond holding legal title of trust assets." Findings of Fact and Conclusions of Law and Order Transferring Venue of Cases at 15, In re: Koresko & Associates, P.C., No. 13-bk-5991 (Bankr. M.D. Fla. Dec. 6, 2013) (Docket No. 63).

179. Boscoe engaged in these efforts after learning that the court in *Perez* had found a substantial likelihood the DOL would succeed on the merits of its claims against Koresko. These claims included assertions that: (1) Koresko breached his fiduciary obligations to the WBPs, (2) "the Koresko Parties engaged in a pattern of moving plan assets in the form of death benefit and insurance policy loan proceeds through at least 28 different bank accounts, held in the name of at least 19 different entities, at no less than four banks, commingled plan assets with other funds, and misappropriated funds from those commingled accounts for their own benefit"; and (3) "the Koresko Parties used plan assets to pay Koresko and his law firm for services to the Trust and that by acting as both the fiduciary to the Trust and as a service provider to the Trust, who incidentally also appeared to set his own rates for his services, Koresko placed himself in the precise position of dual loyalties that ERISA prohibits." *Perez*, ECF # 407. Boscoe, even after learning about these Court findings, still backed Koresko and the Arrangement as legitimate in conversations with Mr. Lefkowitz concerning the matter.

**Plaintiffs Do Not Discover the Wrongdoing Until After the July 2013 Bankruptcy Filings**

180.  Plaintiffs, despite due diligence, did not learn about the above-described nefarious scheme until August 2013 as a result of active concealment by the Defendants.   Defendants fraudulently concealed their wrongdoing from Plaintiffs by making misrepresentations and hiding critical facts from Plaintiffs.

181.  In addition, as a result of defendants' fraudulent concealment of the loans and the accruing interest and Koresko's other conversions:

  a.  Plaintiffs did not learn of the loans (and other conversions of plan assets) until sometime after September 2013, when the Court removed Koresko and appointed the Independent Fiduciary.

  b.  Plaintiffs only learned their policy had been impacted by one of the illegal loans (not all policies were impacted and, in some instances, the loans were repaid fully or partially prior to the appointment of the IF) when the IF sent the WBP sponsors copies of the annual statements the IF received from the insurers. These statements, which the Insurance Company Defendants withheld from everyone but Koresko *et al*., prior to the appointment of the IF, revealed outstanding loans secured by the policies' cash value. As the IF did not receive or distribute annual statements until sometime in 2014, after it had received the annual statements for the year ending December 31, 2013, Plaintiffs were unable to determine the status of their policy until mid-2014; and

  c.  Plaintiffs did not learn of the over 250 conversions listed in *Perez* until the Memorandum Opinion was issued in February of 2015.

182. During the period August 1, 2013 through at least the end of 2013, in numerous conversations between Boscoe and Dr. Kalan, and Boscoe and Mr. Lefkowitz, Boscoe repeatedly and continuously stated that that Koresko (and nobody else) had done anything wrong in the solicitation of the Plan and in its supervision, management, and operation.  In addition, John Koresko, in a two-hour telephone call with Mr. Lefkowitz at the end of July 2013 which included discussion about the status of the Arrangement, concealed the existing and impending bankruptcy filings of the Koresko Entities and all facts concerning his misappropriation of assets.

183.   Boscoe arranged the phone call and participated in it. In the conversation, Koresko stated that he had not received any money for all of his hard work that he and his affiliates had performed for the Trust and Arrangement participants.  He made these statements knowing that he had diverted millions of dollars of Trust assets to himself for his own personal use.

184.  In the conversation, Boscoe remained silent regarding any problems in the establishment, structure, performance, and status of the Arrangement.

185.  Plaintiffs reasonably relied on these misrepresentations and/or silence to their detriment, and upon learning the truth about Koresko's misappropriations and the sham nature of his Arrangements in the months after their 2013 communications with Boscoe, promptly filed this action.

186.  Consequently, plaintiffs could not have discovered, and did not, in fact, discover, the facts underlying Defendants' wrongdoing, or their injuries, regardless of their level of diligence, as all sources of sufficient information, including that necessary to satisfy the pleading standards of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), were cut off.

187. By the above-described conduct, the Insurance Company Defendants breached their fiduciary duties in numerous and egregious ways. *Inter alia,* they:

    a.  Breached their duty of undivided loyalty, failing to act in the sole interests of the Arrangement's participants and beneficiaries;

    b.  Failed to act for the exclusive purpose of providing benefits to participants and beneficiaries;

    c.  Failed to provide information to participants and beneficiaries they needed to protect their interests;

    d.  Failed to act with the care, skill, prudence and diligence that a prudent man acting in its position would use; and

    e.  Failed to act in accordance with the documents and instruments governing the Arrangement.

188. The Insurance Company Defendants permitted the Koresko Parties to improperly change the owner and beneficiary of the plaintiffs' policies and then permitted the putative new owner to remove the cash value in the plaintiffs' policies without obtaining plaintiffs' permission and without even notifying plaintiffs despite:

    a.  The Insurance Company Defendants' actual and constructive knowledge that the funds were being held for the plaintiffs' benefit and that the loan served no purpose that could possibly benefit the plaintiffs;

    b.  The request for the loan being made by someone without authority to do so, i.e. John Koresko and

    c.   Being provided with facially questionable documentation that put the Insurance Company Defendants on notice that the plaintiffs were unaware of what was being done and that the loan was unauthorized and illegitimate.

189.  After permitting the loan, the defendants refused to provide plaintiffs with any information concerning the status of the insurance policies.

190.  By the above described conduct, Boscoe breached his fiduciary duties in numerous and egregious ways. *Inter alia,* he:

    a.   Breached his duty of undivided loyalty, failing to act in the sole interests of plaintiffs and other participants and beneficiaries in the solicitation, recommendation, and sale of the Penn Mutual and Lincoln policies through the Arrangement;

    b.   Failed to act for the exclusive purpose of providing benefits to plaintiffs and other participants and beneficiaries;

    c.   Failed to provide information to plaintiffs and other participants and beneficiaries they needed to protect their interests;

    d.   Failed to act with the care, skill, prudence and diligence that a prudent man acting in his position would use;

    e.   Failed to monitor the performance of the WBPs and their cash value and investments made with it;

    f.   Misrepresented and omitted material facts in soliciting plaintiffs to join the Arrangement, purchase the life insurance policies, and make the policy investments; and,

g.   Misrepresented the status of the policies and the Arrangement after plaintiffs joined the Arrangement and purchased the policies.

191.   By the above described conduct, CIBC breached its fiduciary duties to the Lefkowitz plaintiffs in numerous and egregious ways. *Inter alia,* it:

a.   Breached its duty of undivided loyalty, failing to act in the sole interests of plaintiffs and other participants and beneficiaries in the Arrangement;

b.   Failed to provide information to plaintiffs and other participants and beneficiaries they needed to protect their interests;

c.   Failed to act with the care, skill, prudence and diligence that a prudent man acting in his position would use;

d.   Failed to monitor the performance of the WBPs and their cash value and investments made with it; and

e.   Misrepresented and omitted material facts to plaintiffs concerning their participation in the Arrangement.


### COUNT I – ERISA, 29 U.S.C., § 1132(a)(2)

### (All Plaintiffs (With the Exception of HAK, M.D. and WPLG) Against All Defendants (Except CIBC))

192.   Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 191, above, as though set forth at length herein.

193.   The WP WBP and HK, M.D. WBP are Employer Welfare Benefit Plans within the meaning of ERISA, 29 U.S.C. § 1002(1).

194.   The participants in the WP WBP included David and Norma Lefkowitz and Brenda Walsh

and in the HAK WBP included Harvey Kalan, M.D., Deborah Kalan, and Sonja Teles (the "Fiduciary and Participant Plaintiffs").

195.  Lincoln, at all material times, was a fiduciary of the HK, M.D. WBP within the meaning of ERISA, 29 U.S.C., § 1002(21) both in connection with its possession and control over the insurance policies and in connection with its processing of John Koresko's requests for loans collateralized by policy cash value.  It demonstrated its discretionary authority and control by making loans collateralized by the Kalan plaintiffs' policies.

196.  Penn Mutual, at all material times, was a fiduciary of the WPLG WBP within the meaning of ERISA, 29 U.S.C., § 1002(21), both in connection with its possession and control over the insurance policies and in connection with its processing of John Koresko's request for loans collateralized by policy cash value. It demonstrated its discretionary authority and control by making loans collateralized by the Lefkowitz plaintiffs' policies.

197.  Boscoe is a fiduciary of the plaintiff WBPs. He, along with Penn Mutual, are known herein as the WP WBP Fiduciary Defendants, and, along with Lincoln, are known as the HAK WBP Fiduciary Defendants.  Collectively, the WP WBP Fiduciary Defendants and the HAK WBP Fiduciary Defendants are known as the "Fiduciary Defendants."

198. The Fiduciary Defendants are fiduciaries within the meaning of ERISA, 29 U.S.C. § 1002(21). Boscoe was a fiduciary of the Plaintiff WBPs in that, among other things, he:

    a.  Was the sole person who solicited the Kalan plaintiffs to participate in the Arrangement and was the person who, along with CIBC, solicited the Lefkowitz plaintiffs to participate;

    b.  Decided, in his sole discretion, what information to provide plaintiffs in writing and

verbally before they participated, and to induce them to do so;

c.   Selected, by himself only, the specific insurance company to insure the Lefkowitz plaintiffs and the Kalan plaintiffs;

d.   Recommended, by himself only, the type of insurance which the Kalan and Lefkowitz plaintiffs should purchase;

e.   Responsible for monitoring the status of the insurance sold to the plaintiffs, the investments made under that, and the status of the Arrangement and reporting to plaintiffs regarding those matters;

f.   Responsible for facilitating plaintiffs' exit from the Arrangement and handling of plaintiffs' insurance policies upon termination from the Arrangement or death of a participant;

g.   Communicated, by himself only, to the Kalan plaintiffs, and with CIBC, to the Lefkowitz plaintiffs, regarding the status of their policies and their investments, and acted as a liaison for plaintiffs with Koresko regarding those matters;

h.   Solely determined the investment allocations of the premiums of the policies insuring the lives of the Kalan plaintiffs, and, along with CIBC, advised and consulted on the investment strategy and allocation for the Lefkowitz plaintiffs;

i.   Advised and consulted the plaintiffs regarding disclosure of their participation in the Arrangement on their tax returns;

j.   Was a member of the Advisory Committee of the plaintiff WBPs, and  had plan administration and investment management duties, including, but not limited to: distribution of reports and notices required by law; distribution of internal WBP

material, such as Census Data Forms, called for by the Arrangement; and reviewing and directing the investments to be made with the premiums of the WBP insurance policies.

199.  As ERISA fiduciaries, the defendants owed each plan the duties, among other things, to:

    a.  make full disclosure of material facts regarding the insurance being purchased and participation in the Arrangement;

    b.  communicate to the beneficiary material facts affecting the interest of the beneficiaries which the beneficiaries needed to know for their protection;

    c.  avoid conflicts of interest or acting with self-interest or contrary to the interests of the WBPs or its principals;

    d.  act with "care, skill, prudence and diligence" of a "prudent" person;

    e.   act in accordance with the documents governing the plan;

    f.  take action only for the exclusive benefit of the beneficiary; and

    g.  communicate with plaintiffs honestly and without misrepresentations or omissions of material facts.

200.  The Insurance Company Defendants breached their fiduciary duties by:

    a.  Changing the owner and beneficiary of the policy on the Kalans' and the Lefkowitz' lives based on the requests of unauthorized parties;

    b.  Permitting unauthorized parties to remove the cash value in the Kalans' and Lefkowitz' policies;

      c.  Failing to inform plaintiffs of the unauthorized loans (both the fact of the loans and their terms); and

      d.  Failing to respond to F&M's inquiry about the status of the policies.

201.  Insurance Company Defendants also engaged in a prohibited transaction violative of §§ 406(a) and 406(b) of the Act and violative of 18 U.S.C. § 1954 by paying commissions to Koresko *et al.* to influence their choice of insurance companies.

202.  Boscoe and CIBC breached their fiduciary duties by, among other things:

      a.  Failing to monitor the insurance policies, plaintiffs' investments, and the status of the Arrangement, starting in 2001 and even after Koresko filed his sham bankruptcies;

      b.  Misrepresenting the status of the insurance policies and the Arrangement as successful and secure, when, in fact, the Arrangement was a fraudulent enterprise;

      c.  Assisting Koresko by soliciting money from plaintiffs to aid Koresko in filing his sham bankruptcies

      d.  Engaging in prohibited transactions violative of §§ 406(a) and 406(b) of the Act and violative of 18 U.S.C. § 1954 by taking commissions to influence the WBPs' choice of insurance companies.

203.  In addition, Boscoe and the Insurance Company Defendants have co-fiduciary liability under 29 U.S.C.A. § 1105(a), which provides that a fiduciary of a plan is liable for a breach of fiduciary responsibility of *another* fiduciary with respect to the same plan:

(1) "if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

204. Boscoe has co-fiduciary liability here, and violated each section of 29 U.S.C.A. § 1105(a) by, among other things: (1) knowingly misrepresenting and concealing key facts regarding the Arrangement and the insurance policies which plaintiffs purchased through it; (2) knowingly concealing from the plaintiffs Koresko's taking of loans, knowing that such loans were illegal, enabling the illegal loans and preventing plaintiffs from protecting themselves from the misappropriation of funds from the Arrangement; (3) taking illegal commissions in violation of Sections 406(a) and 406(b) and 18 U.S.C. §1954; (4) covering up Koresko's illegal conduct with misrepresentations and concealments regarding his conduct, including soliciting plaintiffs to pay money to Koresko to assist him in filing his sham bankruptcies.

205. In addition, the Insurance Company Defendants have co-fiduciary liability here, and violated each section of 29 U.S.C.A. § 1105(a) by, among other things: (1) knowingly misrepresenting and concealing key facts regarding the Arrangement and the insurance policies which plaintiffs purchased through it; (2) knowingly concealing from the plaintiffs Koresko's taking of loans, knowing that such loans were illegal, enabling the illegal loans and preventing plaintiffs from protecting themselves from the misappropriation of funds from the Arrangement; (3) paying illegal commissions in violation of Sections 406(a) and 406(b) and 18 U.S.C. §1954; and (4) covering up Koresko's illegal conduct with misrepresentations and concealments regarding his conduct.

**WHEREFORE**, Plaintiffs request that:

    1. The defendants be ordered to:

    a.  Make full restitution of the amount of money Plaintiffs contributed to their WBPs that was either embezzled or which is being lost through the court supervised liquidation of the Trusts,

    b.  Make full restitution of all losses stemming from the conversion of the cash value of the insurance policy purchased f/b/o the Plans;

    c.  Disgorge or make restitution of all fees, commissions or any other form of compensation paid, or profits made, in violation of § 406 of the Act; and

    d.  Make full restitution of all profits that the Plans would have earned on the converted funds;

2.  The Insurance Company Defendants be ordered to treat the Insurance Policies on the lives of the Kalan and Lefkowitz plaintiffs as if loan had never been taken. More specifically, plaintiffs request that the Insurance Company Defendants:

    a.  Forgive all indebtedness related to the Max Loan;

    b.  Credit to the policy's cash value the income that would have been earned between 2009 and the present by the funds removed via the Max Loan; and

    c.  Calculate future premiums and maturity dates based on cash value credits required by the relief requested in (a) and (b) above.

3.  Plaintiffs be awarded attorney's fees and costs;

4.  Plaintiffs be awarded pre-judgment interest;

5.  Plaintiffs be awarded lost investment opportunity on the embezzled funds; and

6.  The Court award such other equitable relief as it deems appropriate.

## COUNT II – ERISA, 29 U.S.C. § 1132(a)(3)

### (All Plaintiffs (With the Exception of HAK, M.D. and WPLG) Against All Defendants (Except CIBC)

206. Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 205, above, as though set forth at length herein.

207. If any of the Insurance Company Defendants are deemed not to have been an ERISA fiduciary, then as to those defendants:

    a.  They knowingly participated in fiduciary breaches;

    b.  They knowingly participated in prohibited transactions violative of §§ 406(a) and 406(b) of the Act; and

    c.  It is or will be the beneficial recipient of the loan conversions, as the loan conversions have:

        i.  reduced the death benefit it would otherwise be required to pay;

        ii.  reduced the cash value it would otherwise have to surrender; and

        iii.  increased the premiums it would have been entitled to receive.

208. If Boscoe is deemed not to have been an ERISA fiduciary, then as to him, he:

    a.  knowingly participated in fiduciary breaches; and

    b.  knowingly participated in prohibited transactions violative of §§ 406(a) and 406(b) of the Act.

    c.  he has been the beneficial recipient of the improper commissions paid to him in connection with the WBP transactions.

**WHEREFORE**, plaintiffs request that:

    1.  The defendants be ordered to:

a.  Make full restitution of the amount of money Plaintiffs contributed to their WBPs that was either embezzled or which is being lost through the court supervised liquidation of the Trusts,

b.  Make full restitution of all losses stemming from the conversion of the cash value of the insurance policy purchased f/b/o the Plans;

c.  Disgorge or make restitution of all fees, commissions or any other form of compensation paid, or profits made, in violation of § 406 of the Act; and

d.  Make full restitution of all profits that the Plans would have earned on the converted funds;

2.  The Insurance Company Defendants be ordered to treat the Insurance Policies as if loans had never been taken.  More specifically, plaintiffs request that the Insurance Defendants:

a.  Forgive all indebtedness related to the Max Loan;

b.  Credit to the policy's cash value the income that would have been earned between 2009 and the present by the funds removed via the Max Loan; and

c.  Calculate future premiums and maturity dates based on cash value credits required by the relief requested in (a) and (b) above.

3.  Plaintiffs further request:

a.   attorney's fees and costs;

b.  pre-judgment interest;

c.  that they be awarded lost investment opportunity on the embezzled funds; and

    **d.**  that the Court award such other equitable relief as it deems appropriate.

## COUNT III – RICO (1962(c)) – DIRECT LIABILITY

### (All Plaintiffs Against the Insurance Company Defendants and Boscoe)

209.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 208 above as though set forth at length herein.

210.  The Association-in-Fact described above, including in paragraphs 10-11, qualifies as an enterprise within the meaning of RICO, 18 U.S.C. § 1961(4) and was, at all relevant times, engaged in interstate commerce or activities that affected interstate commerce. The purpose of the enterprise was to market and sell insurance policies and to operate and administer the plans and trusts that were the vehicles for purchasing the policies.

211.  This Association-in Fact enterprise had a common and shared purpose among its members, continuity of structure, and an ascertainable structure distinct from that inherent in the pattern of racketeering perpetrated herein. Each entity and individual in the Association-in-Fact played various roles under the overall guidance and orchestration of John Koresko, as follows: (a) PennMont Benefit Services and  Lawrence Koresko marketed the Arrangement, (b) the Trusts held the insurance policies the Arrangement purchased, (c) CTC acted as trustee of the Trusts, (d) Koresko Financial and other entities, including Boscoe, were the agents on the insurance policies, (e) the Regional Employers' Assurance Leagues acted as an umbrella association of employers so that the constituent plans could be considered a single Multiple Employer Welfare Association, (f) the Koresko law firms provided the staff who performed the functions of PennMont and  handled dealings with regulatory entities such as the IRS and DOL, (g) the individual employer plans established the terms under which employees could participate and designate beneficiaries of the insurance policies, and

(h) the insurance agents and financial advisors, such as Boscoe, assisted in marketing the Arrangement and in communicating with participants, (i) the insurance companies, including the Insurance Company Defendants, assisted in marketing the Arrangement, paid commissions to other marketers, and provided the insurance policies. The enterprise was formed in 1997 and continued in existence through September 2013, when it was effectively placed in a run-out/liquidation mode as a result of injunctions issued in *Perez*.

212. Though there were occasional changes in the members of the enterprise – changes in trustees, entities receiving commissions, the number and identity of the constituent plans – the basic structure remained unchanged for the 16 years of its existence.

213. The Trusts also qualify as an enterprise within the meaning of RICO, 18 U.S.C. §1961(4). They held themselves out as legal entities whose business was to handle and safeguard the assets of the employer benefit plans which participated in the Arrangement.

214. John Koresko, PennMont, PPT, Lawrence Koresko, and Koresko Financial (together, "the Koresko RICO violators"), and Boscoe are persons within the meaning of 18 U.S.C. § 1961(3). From 1997 through 2013, the Koresko RICO violators conducted and participated in the conduct of the affairs of the Trusts and the Association-in-Fact through a pattern of racketeering activity.

215. More specifically, they conducted the affairs of the enterprises as part of a scheme to generate commissions for themselves and to influence PennMont-administered benefit plans' choices of insurance companies from whom to purchase life insurance policies, in violation of 18 U.S.C. § 1954, and as part of a scheme to convert employee benefit plan assets, in violation of 18 U.S.C. § 664.

216. To effectuate the scheme, between 1997 and 2013, the Koresko RICO violators:

a. On an annual basis, solicited and received commissions on the sale of hundreds of insurance policies to employee benefit plans PennMont administered, including those sold by Boscoe and CIBC, constituting literally thousands of violations of 18 U.S.C. § 1954;

b. Each month, starting in April 2002, converted millions of dollars of interest earned on employer contributions to hundreds of employee benefit plans, as is further detailed in *Perez*, constituting literally thousands of violations of 18 U.SC. § 664;

c. Regularly caused plan assets to be used to pay fees to PennMont, the Koresko Law Firm, and to those providing services to PennMont and the Koresko Law Firm, all of which were not in the interests of the employee benefit plans. These payments constituted hundreds of additional violations of 18 U.SC. § 664; and

d. In 2009, converted over $35 million in plan assets through the Max Loans described above, constituting numerous additional violations of 18 U.SC. § 664.

217. These predicate acts were related, similar and continuous and had thousands of similar victims. These victims were the hundreds of plans that were part of the Arrangement, as well as the plans' participants and beneficiaries. As such, the predicate acts engaged in constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

218. The Insurance Company Defendants are persons within the meaning of 18 U.S.C. § 1962(3) who participated in conducting the affairs of the enterprises through a pattern of racketeering activity.

219. More specifically, the Insurance Company Defendants:

a. Participated in, and benefitted from conducting, the affairs of the enterprises to further the scheme to generate commissions to influence the decisions of employee

benefit plans by offering and paying commissions to the Koresko RICO violators, to entities owned and controlled by the Koresko RICO violators, and to financial advisors such as Boscoe, with the intent of influencing the insurance buying decisions of the PennMont-administered employee benefit plans. These acts, committed over one 70 times between 1997 and 2013, constituted related violations of 18 U.S.C. § 1954 and benefitted the Insurance Company Defendant by generating sales of its insurance products through the Arrangement;

b.   Participated in, and benefitted from, conducting the affairs of the enterprises to further the scheme to convert employee benefit plan assets by making at least 21 separate but related Max Loans in 2009 (at least 14 by Lincoln and 7 by Penn Mutual). These acts constituted violations of 18 U.S.C. § 664 and the Insurance Company Defendants  benefitted from these acts by generating interest income on the loans, reducing the death benefits it would have to pay, increasing the premiums that it would receive to keep the policies from lapsing, and, thereby increasing the likelihood that the policies would be allowed to lapse; and

c.   Participated in, and benefitted from, conducting the affairs of the enterprises to further the scheme to convert employee benefit plan assets by annually charging interest on the Max Loans commencing in 2009 and continuing through the present. These interest charges based on invalid and unauthorized loans were, themselves, unlawful and willful conversions of benefit plan assets by the Insurance Company Defendants, in violation of 18 U.S.C. § 664.  The Insurance Company Defendants have committed over 189 such violations between 2009 (at least 126 by Lincoln

and 63 by Penn Mutual) and the present and are likely to continue to convert plan assets in this manner into the indefinite future.

220. Boscoe is a person within the meaning of 18 U.S.C. § 1962(3) who participated in conducting the affairs of the enterprises through a pattern of racketeering activity.

221. More specifically, Boscoe:

a. Participated in, and benefitted from, conducting the affairs of the enterprises, to further the scheme to generate commissions to influence the decisions of employee benefit plans by receiving exorbitant commissions (further discussed above, including in paragraph 27), which motivated them to influence the insurance buying decisions of the PennMont administered employee benefit plans, including Plaintiffs. These acts, committed numerous times between 1997 and 2013, constituted related violations of 18 U.S.C. § 1954 and benefitted Boscoe by generating large commissions they received on sales of participations in at least 7 different WBPs he solicited and helped form to participate in the Arrangement.

222. The predicate acts by the Insurance Company Defendants were related, similar and continuous and had many dozens of similar victims. These victims were the 53 plans that were part of the Arrangement and purchased life insurance policies from the Insurance Company Defendants (32 from Lincoln and 21 from Penn Mutual), as well as the plans' participants and beneficiaries. As such, the predicate acts committed by the Insurance Company Defendants constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

223. The predicate acts by Boscoe were related, similar and continuous and had scores of victims. These victims were the scores of beneficiaries in approximately 7 different plans

that were part of the Arrangement and purchased life insurance policies from insurance companies participating in the Arrangement, as well as the plans' participants and beneficiaries. As such, the predicate acts committed by Boscoe and CIBC constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

224. In addition, beginning in or around 2007, the Insurance Company Defendants advised plaintiffs and others that they were not entitled to information regarding the insurance policies their WBPs purchased. The communications were made via numerous interstate phone calls, emails and via the Unites States Postal Service. These communications constituted predicate acts of mail fraud and wire fraud, all in furtherance of the scheme to convert plan assets.

225. As a consequence, the Insurance Company Defendants violated 18 U.S.C. § 1962(c).

226. Furthermore, beginning in or around 2007, Boscoe advised plaintiffs and others that their policies were safe, and investments were performing well, and nothing was amiss with the Arrangement. He advised plaintiffs that John Koresko was a tax law genius, with an outstanding background and reputation, who had organized a solid, safe, secure program. The communications were made via numerous interstate phone calls, emails and via the Unites States Postal Service, from 2001 through September 2013. These communications constituted predicate acts of mail fraud and wire fraud, all in furtherance of the scheme to convert plan assets.

227. Boscoe's actions in aid of Koresko's embezzlements persisted even up until the bitter end of the scheme. In 2013, Koresko filed bankruptcy petitions for several of the Koresko Entities. When the bankruptcies – filed in the Eastern District of Pennsylvania – were dismissed, Koresko conspired with others to have sham involuntary bankruptcies filed in

Florida for the same Entities.  Boscoe actively assisted Koresko in this gambit, trying to persuade his clients, including the Plaintiffs, to support Koresko's efforts. He even solicited participants – including the plaintiffs -- to donate funds to subsidize the sham filings and described dire consequences if his clients did not join in.

228.  He engaged in these efforts even after learning that the court in *Perez* had found a substantial likelihood that Koresko had violated his fiduciary duties to Arrangement participants by stealing and otherwise misappropriating their funds.

229.  The Lefkowitz Plaintiffs and Kalan Plaintiffs have been injured in their property by reason of these violations in an amount to be proven at trial.

WHEREFORE, plaintiffs request judgment against The Insurance Company Defendants, including costs, attorneys' fees, treble damages and any further relief deemed proper by this Court.

## COUNT IV – RICO 1962(c) – VICARIOUS LIABILITY

### (All Plaintiffs Against the Insurance Company Defendants and Boscoe)

230.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 229 above as though set forth at length herein.

231.  At all relevant times, the Koresko RICO violators and Boscoe were agents of the Insurance Company Defendants and acted as insurance producers, generating insurance sales for the Insurance Company Defendants.

232.  The Insurance Company Defendants  were  not victims of the predicate acts committed by the Koresko RICO violators; rather, they benefitted from their predicate acts by (i) generating increased sales of its insurance products, (ii) generating interest income on the Max Loans,

(iii) reducing the death benefits it would have to pay, (iv) increasing the premiums that it would receive to keep the policies from lapsing, and, (v) thereby, increasing the likelihood that the policies would be allowed to lapse. Similarly, Boscoe benefitted by obtaining exorbitant commissions on the sale of numerous insurance policies and enlarging his clientele by luring participants into the Arrangement.

233.  As a consequence, the Insurance Company Defendants and Boscoe are vicariously liable for the Koresko RICO violators' RICO violations under principles of agency and *respondeat superior*.

WHEREFORE, plaintiffs request judgment against the Insurance Company Defendants, including costs, attorneys' fees, treble damages and any further relief deemed proper by this Court.


## COUNT V– RICO (1962(d))

### (All Plaintiffs Against the Insurance Company Defendants and Boscoe)

234.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 233 above as though set forth at length herein.

235.  By the actions described above, and by numerous agreements and actions to further the scheme described therein, the Insurance Company Defendants and Boscoe conspired with Koresko *et al.* to violate 18 U.S.C. 1962(c), in violation of 18 U.S.C. § 1962(d).

236.  As described in detail above, the Koresko RICO violators, the Insurance Company Defendants, and Boscoe, both jointly and severally, violated 18 U.S.C. § 1962(c).

237.  In addition, the Insurance Company Defendants, and Boscoe, intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the Association-in-Fact

enterprise through the pattern of racketeering activity alleged above. The Insurance Company Defendants and Boscoe knew that the predicate acts described above were part of a pattern of racketeering activity and agreed to the commission of predicate acts to further the schemes described above, all in violation of § 1962(d).

238.  As a direct and proximate result of the conspiracy, the overt acts taken in furtherance of that conspiracy, and predicate acts engaged in by the Insurance Company Defendants, and Boscoe in furtherance of the conspiracy, Plaintiffs have been injured in their property by reason of these violations of § 1962(d) in an amount to be proven at trial.

**WHEREFORE**, plaintiffs request judgment against the Insurance Company Defendants, and Boscoe including costs, attorneys' fees, treble damages and any further relief deemed proper by this Court.

## COUNT VI -- COMMON LAW INTENTIONAL MISREPRESENTATION AND DECEIT FOR CONDUCT PRIOR TO THE ESTABLISHMENT OF THE PLAINTIFF WBPs

### (All Plaintiffs (Except HAK WBP and WP WBP) Against All Defendants)

239.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1through 238 above as though set forth at length herein.

240.     Prior to the establishment of the Plaintiffs' WBPs, Defendants, including Penn Mutual, Lincoln National, and Jefferson-Pilot, through its agents, including Boscoe and John and Larry Koresko, made numerous, material, intentionally false representations and omissions, including those set forth above, including in paragraphs 35-85 and 127-132, in order to induce the Kalan and Lefkowitz plaintiffs to join the Arrangement and purchase cash value life insurance policies, including the Penn Mutual policy (as to the Lefkowitz Plaintiffs), and the Lincoln National, Jefferson-Pilot, and Golden Rule policies (as to the Kalan Plaintiffs), through the Arrangement. Defendants

misrepresented and omitted material facts in connection with the selling of the REAL VEBA arrangement to the Plaintiffs.

241.     The misrepresentations were known to the Defendants to be false when made, were material in nature, and were made with the intent to deceive, defraud and/or induce the plaintiffs, and in fact, did induce the plaintiffs, to join the Arrangement and purchase the Penn Mutual, Lincoln National, Jefferson-Pilot, and Golden Rule policies through the Arrangement. Defendants further intentionally concealed from Plaintiffs key facts, which facts made the representations made to the Plaintiffs false and misleading.

242.     In reasonable and justifiable reliance on the fraudulent representations, Plaintiffs were induced to join the Arrangement and to purchase the Penn Mutual, Lincoln National, Jefferson-Pilot, and Golden Rule policies through the REAL VEBA Arrangement, to their substantial harm and financial injury.

243.     Despite reasonable diligence and because of active concealment by the Defendants, plaintiffs could not discover the fraud until 2013.

244.     Plaintiffs were harmed, and their reliance on Defendants' representations was a substantial factor in causing their harm. As a direct and proximate result of their reliance on the misrepresentations and omissions of material fact, plaintiffs suffered compensatory and consequential damages.

245.     Defendants' fraudulent representations and omissions were the legal and proximate cause of Plaintiffs' the harm described above.

246. Defendants' misconduct was so reckless, outrageous, willful, wanton and malicious, and constituted "oppression, fraud or malice" as those terms are defined in Section 3294 of the

86

California Civil Code. Plaintiffs are therefore entitled to punitive damages in an amount according to proof.

**WHEREFORE**, Plaintiffs request judgment against defendants and compensatory and punitive damages in amounts to be determined. Plaintiffs further request costs, interest, and any further relief deemed proper by this Court.

### COUNT VII -- COMMON LAW NEGLIGENT MISREPRESENTATION FOR CONDUCT PRIOR TO THE ESTABLISHMENT OF THE PLAINTIFF WBPs
#### (All Plaintiffs (Except HAK WBP and WP WBP) Against All Defendants)

247.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1through 246 above as though set forth at length herein.

248. Prior to the establishment of the Plaintiffs' WBPs, Defendants, including Penn Mutual, Lincoln National, and Jefferson-Pilot, through its agents, including Boscoe and John and Larry Koresko, made numerous, material, false representations, including those set forth above in paragraphs 35-85 and 127-132, in order to induce the Kalan and Lefkowitz plaintiffs to join the Arrangement and purchase cash value life insurance policies, including the Penn Mutual policy (as to the Lefkowitz Plaintiffs), and the Lincoln National, Jefferson-Pilot, and Golden Rule policies (as to the Kalan Plaintiffs), through the Koresko  Arrangement. Defendants misrepresented material facts in connection with the selling of the Arrangement to the Plaintiffs.

249.     Defendants made the misrepresentations, including those set forth above in paragraphs 35-85 and 127-132, with no reasonable basis to believe they were true, negligently, and in reckless disregard as to their truth or falsity. The misrepresentations should have been known to the Defendants to be false or misleading when made, were material in nature, and were made with the intent to induce the plaintiffs, and in fact, did

induce the plaintiffs, to join the Arrangement and purchase the Penn Mutual, Lincoln National, Jefferson-Pilot, and Golden Rule policies through the Arrangement.

250. In reasonable reliance on the fraudulent representations, Plaintiffs were induced to join the Arrangement and to purchase the Penn Mutual, Lincoln National, Jefferson-Pilot, and Golden Rule policies through the Arrangement, to their substantial harm and financial injury.

251. Despite reasonable diligence and because of active concealment by the Defendants, plaintiffs could not discover the fraud until 2013.

252. Plaintiffs were harmed, and their reliance on Defendants' representations was a substantial factor in causing their harm. As a direct and proximate result of their reliance on the misrepresentations and omissions of material fact, plaintiffs suffered compensatory and consequential damages.

**WHEREFORE**, Plaintiffs request judgment against defendants and compensatory and punitive damages in amounts to be determined. Plaintiffs further request costs, interest, and any further relief deemed proper by this Court.

### COUNT VIII--COMMON LAW BREACH OF FIDUCIARY DUTY FOR CONDUCT PRIOR TO THE ESTABLISHMENT OF THE PLAINTIFF WBPs

### (All Plaintiffs (Except HAK WBP and WP WBP) Against All Defendants)

253. Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 252 above as though set forth at length herein.

254. Boscoe, as the financial advisor for the Lefkowitz and Kalan plaintiffs regarding retirement planning and insurance before the WBPs were established, as described above, owed the Lefkowitz and Kalan Plaintiffs fiduciary duties before the WBPs were established.

255. CIBC, as the financial advisor for the Lefkowitz plaintiffs regarding retirement planning and insurance before the WBPs were established, as described above, owed the Lefkowitz plaintiffs fiduciary duties before the WBPs were established.

256. Boscoe and the CIBC Rep were agents of Penn Mutual in inducing the Lefkowitz plaintiffs to purchase the Penn Mutual policies through the Arrangement. Boscoe was an agent of Lincoln in inducing the Kalan plaintiffs to purchase the Lincoln policies through the Arrangement.

257. The Defendants breached their fiduciary duties by, among other things, misleading co-fiduciaries, participants, and beneficiaries as to the Plan's benefits and structure and instead, performing their duties in their own self-interest and to the detriment of participants and future beneficiaries.

258. In addition, Boscoe breached his fiduciary duties to the Lefkowitz and Kalan plaintiffs including, but not limited to, as set forth in paragraph 131-132, 146, and 191, and by failing to conduct adequate due diligence as to the flaws and illegal nature of the Arrangement, despite promising plaintiffs he had done so and his obligation to do so.

259. CIBC breached its fiduciary duties to the Lefkowitz plaintiffs including, but not limited to, as set forth in paragraph 131-132, and 192, and by failing to conduct adequate due diligence as to the flaws and illegal nature of the Arrangement, despite its obligation to do so.

260. As a direct and proximate result of defendants' breaches of fiduciary duties, plaintiffs suffered compensatory and consequential damages.   The  conduct  described  herein constitutes "oppression, fraud or malice" as those terms are defined in Section 3294 of the California Civil Code, and Plaintiff is therefore entitled to punitive damages in an amount according to proof.

**WHEREFORE**, Plaintiffs request judgment against defendants and compensatory and punitive damages in amounts to be determined.

### COUNT IX -- COMMON LAW KNOWING PARTICIPATION IN, AND AIDING AND ABETTING, BREACH OF FIDUCIARY DUTY FOR CONDUCT PRIOR TO THE ESTABLISHMENT OF THE PLAINTIFF WBPs

### (All Plaintiffs (Except HAK WBP and WP WBP) Against All Defendants)

261.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1through 260 above as though set forth at length

262.  Defendants Boscoe, CIBC, and Penn Mutual, aided and abetted each other to breach the fiduciary duties owed by each of the defendants to the Lefkowitz Plaintiffs. Each defendant had knowledge that Boscoe and CIBC owed fiduciary duties to the Lefkowitz Plaintiffs, and each knowingly and substantially assisted each other in the other's breaches of fiduciary duty to the Lefkowitz Plaintiffs.

263.  Defendants Boscoe, Lincoln Financial and Jefferson-Pilot aided and abetted each other to breach the fiduciary duties owed by each of the defendants to the Kalan Plaintiffs.  Lincoln and Jefferson had knowledge that Boscoe owed fiduciary duties to the Kalan Plaintiffs, and they knowingly and substantially assisted in the other's breaches of fiduciary duty to the Lefkowitz Plaintiffs.

264.  In addition, as promoters of the Arrangement, John Koresko, Lawrence Koresko, and PMB owed fiduciary duties to the plaintiffs to deal with them honestly, without misrepresenting and omitting material facts, and without conflicts of interest, in soliciting and selling them participations in the Arrangement and insurance policies through the Arrangement.

265.  John Koresko, Lawrence Koresko, and PMB breached their fiduciary duties to the plaintiffs in soliciting and selling them participations in the Arrangement and insurance policies through the Arrangement by misrepresenting and omitting material facts about the

Arrangement and the insurance policies they were purchasing, including, but not limited to, as described above, including in paragraphs 35-85 and 127-132, and 146, and by arranging and obtaining commissions in violation of ERISA.

266. Penn Mutual, Boscoe, and CIBC aided and abetted John Koresko, Lawrence Koresko, and PMB to breach the fiduciary duties owed by each of them to the Lefkowitz Plaintiffs. Each defendant had knowledge that John Koresko, Lawrence Koresko, and PMB owed such fiduciary duties to the Lefkowitz Plaintiffs, and each knowingly and substantially assisted them in the breach of their fiduciary duties to the Lefkowitz Plaintiffs.

267. The Insurance Company Defendants and Boscoe aided and abetted John Koresko, Lawrence Koresko, and PMB to breach the fiduciary duties owed by each of them to the Kalan Plaintiffs. Each defendant had knowledge that John Koresko, Lawrence Koresko, and PMB owed such fiduciary duties to the Kalan Plaintiffs, and each knowingly and substantially assisted them in the breach of their fiduciary duties to the Kalan Plaintiffs.

268. As a direct and proximate result of defendants' breaches of fiduciary duties, plaintiffs suffered compensatory and consequential damages. Defendants' breach of duties was a substantial factor in causing Plaintiffs' harm.

269. The conduct described herein constitutes "oppression, fraud or malice" as those terms are defined in Section 3294 of the California Civil Code, and Plaintiff is therefore entitled to punitive damages in an amount according to proof.

**WHEREFORE**, Plaintiffs request judgment against defendants and compensatory and punitive damages in amounts to be determined.

**COUNT X -- COMMON LAW KNOWING PARTICIPATION IN, AND AIDING AND
ABETTING, INTENTIONAL MISREPRESENTATION AND DECEIT FOR CONDUCT
PRIOR TO THE ESTABLISHMENT OF THE PLAINTIFF WBPs**

**(All Plaintiffs (Except HAK WBP and WP WBP) Against All Defendants)**

270.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1through
269 above as though set forth at length

271.  Defendants Boscoe, CIBC, Penn Mutual, John Koresko, Larry Koresko, and PMB made
misrepresentations and omissions of material fact to the Lefkowitz' to induce them to enter
into the Arrangement and purchase life insurance policies through it, as alleged above.

272. Defendants Boscoe, Lincoln, John Koresko, Larry Koresko, and PMB made
misrepresentations and omissions of material fact to the Kalans to induce them to enter into
the Arrangement and purchase life insurance policies through it, as alleged above.

273.  Boscoe, CIBC, Penn Mutual, John Koresko, Larry Koresko aided and abetted each other
in making the misrepresentations and omissions of material fact to the Lefkowitz' to induce
them to enter into the Arrangement and purchase life insurance policies through it, as alleged
above. Moreover, each of them had knowledge that the other was making such
misrepresentations and omissions of material fact, and each knowingly and substantially
assisted each other in doing so.

274.  Boscoe, Lincoln, John Koresko, and Larry Koresko aided and abetted each other in making
the misrepresentations and omissions of material fact to the Kalans to induce them to enter
into the Arrangement and purchase life insurance policies through it, as alleged above.
Moreover, each of them had knowledge that the other was making such misrepresentations
and omissions of material fact, and each knowingly and substantially assisted each other in
doing so.

275. As a direct and proximate result of this fraudulent conduct, plaintiffs suffered

compensatory and consequential damages. This fraud was a substantial factor in causing, and the legal and proximate cause of, Plaintiffs' harm.

276.  The conduct described herein constitutes "oppression, fraud or malice" as those terms are defined in Section 3294 of the California Civil Code, and Plaintiff is therefore entitled to punitive damages in an amount according to proof.

**WHEREFORE**, Plaintiffs request judgment against defendants and compensatory and punitive damages in amounts to be determined.

### COUNT XI – COMMON LAW FRAUD FOR CONDUCT AFTER THE ESTABLISHMENT OF THE WP AND HAK WBPs
(**All Plaintiffs Against All Defendants**)

277.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1through 276 above as though set forth at length herein.

278.  Should it be determined that ERISA does not control this lawsuit, plaintiffs seek relief, in the alternative, under common law principles for the fraud and misrepresentations described above for the period after the establishment of the plaintiff WBPs.

279.  The misrepresentations and omissions were known or should have been known to the defendants to be false when made, were material in nature, and were made with the intent to deceive, defraud and/or induce plaintiffs, and in fact, induced plaintiffs to participate in the Arrangement and purchase insurance policies through it.

280.  Plaintiffs justifiably and reasonably relied on the defendants' misrepresentations.

281.  As a consequence of such reliance, plaintiffs have suffered and will in the future suffer both monetary damages and other harm for which there is no adequate remedy at law.

282. Defendants' misconduct was so reckless, outrageous, willful, wanton and malicious as to give rise to a claim for punitive damages.

**WHEREFORE**, plaintiffs request judgment in their favor and against defendants for compensatory damages in an amount to be determined but in excess of $75,000.00 and exemplary damages. Plaintiffs also request such equitable relief as the Court shall consider appropriate.

## COUNT XII – COMMON LAW BREACH OF FIDUCIARY DUTY AFTER THE ESTABLISHMENT OF THE PLAINTIFF WBPs

### (All Plaintiffs Against All Defendants)

283. Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1through 282 above as though set forth at length herein.

284. Should it be determined that ERISA does not control this lawsuit, plaintiffs seek relief, in the alternative, for common law breach of fiduciary duty.

285. The Fiduciary Defendants stood in a fiduciary relationship to WPLG (along with CIBC) and HAK, M.D. and the participant plaintiffs.

286. The Fiduciary Defendants and CIBC breached their fiduciary duties by misleading co-fiduciaries, participants, and beneficiaries as to the Plan's benefits and structure and instead performing their duties in their own self-interest and to the detriment of participants and future beneficiaries, as described above, and by failing to:

a.      provide Plaintiffs material facts concerning the status of the Arrangement;

b.      Failing to disclose their financial interests in having plaintiffs enter the Arrangement; and

    c.      Failing to adequately monitor the performance of the Arrangement or the performance of the Koresko Parties.

287. The Fiduciary Defendants' and CIBC's misconduct was so reckless, outrageous, willful, wanton and malicious as to give rise to a claim for punitive damages.

    WHEREFORE, Plaintiffs request that:

    1.      The defendants be ordered to:

    a.  Make full restitution of all funds converted from the cash value of the insurance policies on the lives of the WBPs' participants;

    b.  Disgorge or make restitution of all fees, commissions or any other form of compensation paid or profits made in violation of § 406 of the Act; and

    c.  Make full restitution of all profits that the WP and HAK, M.D. WBPs would have earned on the converted funds.

2.  Plaintiffs be awarded compensatory and exemplary damages in amounts to be determined together with attorney' fees, costs and such other relief as the Court deems appropriate.

### COUNT XIII – COMMON LAW KNOWING PARTICIPATION IN, AND AIDING AND ABETTING, BREACHES OF FIDUCIARY DUTY AFTER THE ESTABLISHMENT OF THE PLAINTIFF WBPs

**(All Plaintiffs Against All Defendants)**

288.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1through 287 above as though set forth at length herein.

289.  Should it be determined that ERISA does not control this lawsuit, plaintiffs seek relief, in the alternative, for common law knowing participation in and aiding and abetting breaches of fiduciary duty.

290.  Any of the defendants deemed not to be common law fiduciaries knowingly participated in and aided and abetted fiduciary breaches by John and Larry Koresko and the Koresko Entities, including PMB, the Koresko Law Firm and Penn Public Trust.

291.  These breaches included misleading co-fiduciaries, participants, and beneficiaries as to the Plan's benefits and structure and instead performing their duties in their own self-interest and to the detriment of participants and future beneficiaries.

292.  The misconduct was so reckless, outrageous, willful, wanton and malicious as to give rise to a claim for punitive damages.

**WHEREFORE**, Plaintiffs request that:

1.     The defendants be ordered to:

e.     Make full restitution of all funds converted from the cash value of the insurance policies on the lives of the WP and HAK, M.D. WBP participants;

f.     Disgorge or make restitution of all fees, commissions or any other form of compensation paid, or profits made in violation of § 406 of the Act; and

g.     Make full restitution of all profits that the WP and HAK, M.D. WBPs would have earned on the converted funds.

2.     Plaintiffs be awarded compensatory and exemplary damages in amounts to be determined together with attorney's fees, costs and such other relief as the Court deems appropriate.

## COUNT XIV– NEGLIGENCE AND BAD FAITH

### (All Plaintiffs Against the Insurance Company Defendants)

293.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through 292 above as though set forth at length herein.

294.  Should it be determined that ERISA does not control this lawsuit or that the Insurance

Company Defendants, or any of them, is not a fiduciary within the meaning of ERISA, the

Insurance Company Defendants acted with gross negligence and breached its obligations of

good faith owed to plaintiffs by:

    a.  Permitting the Koresko Parties to change the owners and beneficiaries of the

       policy without notifying or obtaining plaintiffs' consent;

    b.  Permitting the Koresko Parties to borrow the cash value in the policy without

       notifying or obtaining plaintiffs' consent, and

    c.  Refusing to adequately inform plaintiffs of the status of the insurance policy.

      **WHEREFORE**, plaintiffs request judgment in their favor and against Phoenix Life for

compensatory and exemplary damages in an amount to be determined but in excess of

$75,000.00.

## COUNT XV– PROFESSIONAL MALPRACTICE

### (All Plaintiffs Against Boscoe and CIBC)

295.  Plaintiffs hereby incorporate by reference the averments contained in paragraphs 1 through

294 above as though set forth at length herein.

296.  In connection with plaintiffs' decision to enter into the Arrangement and in connection

with plaintiffs' continued participation in the Arrangement, Boscoe (as to the Lefkowitz' and

Kalans) and CIBC (as to the Lefkowitz') undertook an obligation to function as plaintiffs'

insurance agents and financial advisors.

297.  Boscoe and CIBC failed to exercise the standard of care applicable to their profession in

representing plaintiffs' interests. This failure included:

    a.  Failing to conduct adequate due diligence as to the Arrangement;

b.  Failing to provide Plaintiffs material facts, including, but not limited to, as discussed above, regarding, for example, Koresko's control over their insurance policies, participation in the Arrangement, and ability to exit the Arrangement, and access to the cash surrender of the Penn Mutual, Lincoln National, Jefferson Pilot, and Golden Rule insurance policies.

c.  Failing to disclose their financial interests in having plaintiffs enter the Arrangement and the illegal nature of the commissions;

d.  Failing to adequately monitor the performance of the Arrangement or the performance of the Koresko Parties; and

e.  Such other negligent conduct as may be uncovered through discovery.

298.  Boscoe's and CIBC's malpractice caused Plaintiffs to suffer severe financial harm.

**WHEREFORE**, plaintiffs request judgment in their favor and against Boscoe, CIBC, and Larry Koresko for compensatory and exemplary damages in an amount to be determined but in excess of $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants and all of them as follows:

1.  General damages in a sum in excess of the jurisdictional minimum of this Court;

2.  All actual, consequential and incidental financial losses, including but not limited to,

    a.  Contributions paid to the VEBA Plan by the Plaintiffs,

        b.      Administrative Fees and Transfer Fees paid to the VEBA Plan by the Plaintiffs;

        c.      Back Taxes, Penalties, and Interest owed to the IRS resulting from Plaintiffs' contributions to the VEBA Plan;

        d.      6707A Penalties assessed and in reasonably likelihood to be assessed by the IRS resulting from Plaintiffs' contributions to the VEBA Plan;

3.      Rescission and Rescissionary Damages;

4.      Emotional Distress Damages as allowed by law;

4.      Punitive or Exemplary Damages as allowed by law;

5.      Treble Damages as allowed by law;

6.      Prejudgment and post-judgment interest as allowed by law;

7.      Costs of Court;

8.      Attorney's Fees as allowed by law;

9.      Such other and further items of damages as may be supplemented as a result of the discovery performed in this suit.

Respectfully submitted,

*Ira Silverstein*

s/ Ira B. Silverstein
The Silverstein Firm
By: Ira B. Silverstein
c/o Spear Wilderman, PC
230 S. Broad Street, Ste. 1400
Philadelphia, PA 19102
Phone: (215) 732-0101
Direct: (267) 457-2273
Email: irasilverstein@tsfllc.net

*Attorneys for Plaintiffs*

Dated: September 23, 2019