**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **HARVEY A. KALAN, M.D., INC.,**<br>**HARVEY KALAN, DEBORAH KALAN,**<br>**Plaintiffs,** | **CIVIL ACTION** |
| **v.** | |
| **THE LINCOLN NATIONAL LIFE**<br>**INSURANCE COMPANY and**<br>**JEFFERSON-PILOT LIFE INSURANCE**<br>**COMPANY,**<br>**Defendants.** | **NO.  14-5216** |

## MEMORANDUM OPINION

Plaintiffs Harvey and Deborah Kalan, and Harvey A. Kalan, M.D., Inc. contend that, by taking certain actions as the insurers of life insurance policies which were devalued through a larger, complex scheme to swindle funds from welfare benefit plans operated by one John Koresko, Defendants the Lincoln National Life Insurance Company ("Lincoln") and Jefferson-Pilot Life Insurance Company ("Jefferson") violated two sections of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2)-(3) and two sections of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c)-(d). Plaintiffs also assert the following common law claims against Defendants: fraud, breach of fiduciary duty, knowing participation in and aiding and abetting breach of fiduciary duty, breach of an obligation of good faith, and negligence.

Plaintiffs now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on their ERISA claims, and Defendants cross-move for summary judgment on all of Plaintiffs' claims.  For the reasons that follow, Plaintiffs' Motion shall be denied, and Defendants' Motion shall be granted in part and denied in part.

## I.      BACKGROUND

This story arises from a complex scheme run by John Koresko and his affiliates to steal tens of millions of dollars from hundreds of welfare benefit plans.  In the decade of litigation following the discovery of this scheme, the focus of these suits has shifted from Koresko to the insurers which provided life insurance policies used in the welfare benefit plans.  Plaintiffs are some of Koresko's victims and allege that Defendants were in on Koresko's scheme.  Specifically, Plaintiffs contend that Defendants were ERISA fiduciaries because they exercised undirected control by issuing a loan on a life insurance policy issued by Defendant Lincoln on Plaintiffs' Harvey and Deborah Kalan's lives, changing the owners of the Lincoln Policy and a separate policy issued by Defendant Jefferson on Harvey Kalan's life, and approving two requests for partial surrenders/withdrawals on both policies.  Plaintiffs also argue that Defendants were part of a RICO enterprise with Koresko and his cohorts and committed various violations of state common law.

To follow the narrative, one must be familiar with the myriad characters involved and the roles they played.  Plaintiff Harvey A. Kalan is the president of his medical practice, Plaintiff Harvey A. Kalan, M.D., Inc. ("HAK").  He and his wife, Deborah, are participants in the Harvey A. Kalan, M.D., Inc. Welfare Benefit Plan ("HAK Plan").  In the 1990s, the Kalans were seeking to procure life insurance on a tax-deductible basis.  On the advice of their financial and insurance advisor, Barry Boscoe, they joined Koresko's arrangement in December 2004.

Much of the work in running the HAK Plan and other plans was done by John Koresko who established several entities which he used to perpetuate his fraud.  These entities included the Regional Employers' Assurance Leagues ("REAL")—a loose, unincorporated association of unrelated employers through which Koresko offered to employers his program of employee

welfare benefit plans and benefits.  Koresko also established two trusts, the Regional Employers Assurance League Voluntary Employees' Beneficiary Association Trust ("REAL VEBA Trust") and the Single Employer Welfare Benefit Plan Trust ("Single Employer Trust").  Three different entities, Community Trust Company ("CTC"), Farmers & Merchants Trust Company ("F&M") and Penn Public Trust ("PPT"), served as the two Trusts' trustees in that order.  The last of these trustees, PPT, was established and owned by Koresko.  Koresko also founded, owned and served as the director of PennMont Benefits Services, Inc. ("Penn-Mont"), which served as the administrator for each employer's plan, including the HAK Plan.  Finally, Koresko founded and wholly owned two law firms—the Koresko Law Firm and Koresko & Associates, P.C.—which represented and acted on behalf of the other Koresko entities.

To join the arrangement, Harvey Kalan and HAK executed several interrelated documents,[1] which consolidated power into the hands of John Koresko and his affiliates, including Penn-Mont and the trustee of the REAL VEBA and Single Employer Trusts.  These documents established and named Plaintiffs' welfare benefits plan—the HAK Plan—and referenced certain entities and persons involved in the management of the plan and the Koresko arrangement.  They named Koresko a fiduciary of the HAK Plan, authorized him to complete any documents on behalf of Kalan which Penn-Mont determined to be incident to the HAK Plan, and provided that his signature alone could direct the Trustee to act in matters related to the trusts and the HAK Plan.  These documents similarly authorized Penn-Mont to: (1) complete and execute any documents on behalf of Kalan which it determined were related to the HAK Plan; (2) instruct the Trustee to act on behalf of the trusts and the HAK Plan; and, (3) exercise its sole

---

[1] These documents included: (1) an "Adoption Agreement"; (2) the "REAL VEBA Health and Welfare Plan Document"—a prototype plan document created by Koresko; (3) a "Master Trust Agreement"; and, (4) an "Employee Participation Agreement."

discretion to delegate any and all fiduciary responsibilities under the Trusts.  The Trustee, which was CTC at the time of execution, could take all manner of action on behalf of the Trusts at the direction of Penn-Mont, or Koresko.  Koresko and Penn-Mont thus held all the authority to act on behalf of the HAK Plan and the Trusts and on behalf of Kalan with respect to matters pertaining to the HAK Plan.  Further they could direct the trustee to exercise its powers to do their bidding.

Once the HAK Plan was established, life insurance policies were taken on the lives of plan participants though the trustee—then CTC.  The Trust functioned as a pass-through vehicle, receiving insurance premiums paid by the employer and paying them to the insurance company for the policies.  In this case, at the Kalans' request, two life insurance policies were obtained.  One policy was issued by Defendant Jefferson (the "Jefferson Policy") and the other was issued by Defendant Lincoln (the "Lincoln Policy").  The Jefferson Policy insured Harvey Kalan's life with a death benefit of $2,000,000, while the Lincoln Policy was a "Flexible Premium Adjustable Life Insurance Policy" on the lives of Harvey and Deborah Kalan with a death benefit of $3,500,751.  At the time the Jefferson and Lincoln Policies were issued, the owner listed for both policies was: "Harvey A. Kalan M.D., Inc., Welfare Benefit Plan dated December 23, 2004, Community Trust Company, Trustee."  For both policies, the owner's address was listed as an address in Bridgeport, Pennsylvania left to the care of Penn-Mont.  The applications for the two Policies did not specify the role or relationship of Penn-Mont to the HAK Plan, CTC, or either Policy.  In 2006, Defendant Lincoln merged with Defendant Jefferson with Lincoln succeeding Jefferson.

Aside from John Koresko and his companies, his brother, Lawrence Koresko,[2] was also

---

[2] Unless otherwise noted, "Koresko" as used in this opinion refers only to John Koresko.

key to this arrangement.  Lawrence Koresko was the Vice President and part-owner of Penn-Mont and worked *inter alia* as an independent insurance broker at Koresko Financial, an insurance wholesaler he founded and jointly owned with his brother John.

The final character in this story is the Department of Labor, which as mentioned *supra* sued the REAL VEBA Trust, the Single Employer Trust, Koresko, CTC, Koresko's law firms and Koresko's employees for violating ERISA by misusing funds from hundreds of welfare benefit plans.  Ultimately, in February 2015, the Department of Labor prevailed in its lawsuit against Koresko and the other defendants in the action—who were determined to be ERISA fiduciaries of the employers' plans and found to have violated various provisions of the law by misusing plan funds, including by taking out loans exceeding $35 million on insurance policies.[3]  As relevant here, a loan in the amount of $393,563.30 was issued by Defendant Lincoln on the Lincoln Policy, which loan has not been repaid and has continued to accrue interest in the 13 years since it was issued.

These characters, or the "who," are not the only piece to solving the puzzle of the case; the "what" and the "when" are also determinative.  Specifically, *who* or *what* entity owned the Jefferson and Lincoln Policy changed over time (at various points, Koresko and his cohorts told Defendants that the Policies were owned by—CTC, PPT, and the Single Employer Trust), as did *who* or *what* had the authority to make changes to the Policies (those who claimed authority included CTC, PPT and Koresko) and to *what* extent of authority they represented themselves to have.  Further, when Defendants learned of *who* or *what* had *what* authority with respect to the Policies is unclear from the record.

## II.    STANDARD OF REVIEW

---

[3] *See Perez v. Koresko*, 86 F. Supp.3d 293, 300, 348-49 (E.D. Pa. 2015), *aff'd sub nom. Sec'y U.S. Dep't of Labor v. Koresko*, 646 F. App'x 230 (3d Cir. 2016).

To prevail at summary judgment, "the movant must show that 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Nat'l State Bank v. Fed. Rsrv. Bank of N.Y.*, 979 F.2d 1579, 1581 (3d Cir. 1992) (quoting Fed. R. Civ. P. 56(c)). A factual dispute is material where it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a genuine issue is present "when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007).

The movant bears the initial burden of identifying those portions of the record "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Then, the non-moving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. Courts must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (internal citation omitted).

## III.   DISCUSSION

### a.   Plaintiffs' ERISA Claims

Plaintiffs raise claims under two sections of ERISA—Section 1132(a)(2), which provides for plaintiffs to obtain equitable relief and to recover damages from *fiduciaries* who breach their duties, *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3d Cir. 2007), and Section 1132(a)(3), which "authorize[s] suits against *any other person* who knowingly participates in a fiduciary's violations of her duties." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 90 (3d Cir. 2012) (internal citations, quotation marks and alterations omitted) (emphasis added).

### i.  Plaintiffs' Section 1132(a)(2) Claim

Congress enacted ERISA "to ensure the proper administration of pension and welfare plans, both during the years of the employee's active service and in his or her retirement years." *Boggs v. Boggs*, 520 U.S. 833, 839 (1997).  Crafted to bring order and accountability to a system of employee benefit plans plagued by mismanagement and abuse, *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989), ERISA is principally concerned with protecting the financial security of plan participants and beneficiaries.  29 U.S.C. § 1001(b); *Boggs*, 520 U.S. at 845; *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983).  Because of this remedial purpose, ERISA "should be liberally construed in favor of protecting the participants in employee benefit plans." *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986).

A pertinent illustration of ERISA's broad construction is that the term "fiduciary" is defined "not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan . . . thus expanding the universe of persons subject to fiduciary duties—and to damages. . . ." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993) (emphasis in original) (internal citation omitted); *see also Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 413 (3d Cir. 2013) ("The definition of a fiduciary under ERISA is to be broadly construed.").  An entity is a fiduciary for purposes of ERISA if it is either named as such in the plan, or, as relevant here, if it exercises any "authority or control respecting management [of the plan] or disposition of [the plan's] assets."  29 U.S.C. § 1002(21)(A); *Srein v. Frankford Tr. Co.*, 323 F.3d 214, 221 (3d Cir. 2003).

A party will be found to be a fiduciary for exercising authority or control if it exercised "*undirected* authority and control" over plan assets—meaning that it did not act at the direction of a person or entity authorized to give such direction.  *Srein*, 323 F.3d at 221-22 (emphasis

added) (internal quotation marks omitted).  "[M]ere custody or possession over plan assets, without more," is not enough to give rise to fiduciary status.  *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 347 (3d Cir. 2004).  In determining whether an entity is a fiduciary, it is crucial to keep in mind that it "is not an all or nothing concept. . . .  [A] court must ask whether a person is a fiduciary with respect to the *particular activity* in question."  *Srein*, 323 F.3d at 221 (emphasis added) (alteration in original) (quoting *Maniace v. Com. Bank of Kan. City, N.A.*, 40 F.3d 264, 267 (8th Cir. 1994)).  Thus, Defendants may be fiduciaries for one of the alleged acts of discretionary authority or control but lack fiduciary status for another.

Plaintiffs here contend that Defendants exercised undirected authority over the Jefferson and Lincoln Policies on three occasions: when Defendant Lincoln issued a loan on the Lincoln Policy in 2009; when Defendant Lincoln changed the owner of the Lincoln and Jefferson Policies in 2010; and, when Defendant Lincoln processed requests for partial surrenders, *i.e.*, withdrawals, of the cash value of both the Jefferson and Lincoln Policies in 2012.  On each of these occasions, Plaintiffs contend that the Defendants acted in a fiduciary capacity.  As threshold matters, Defendants argue that (1) Plaintiffs' claims are time-barred; (2) their actions were ministerial and thereby cannot give rise to fiduciary responsibility; and, (3) their actions were not the proximate cause of Plaintiffs' injuries.

### 1.  Statute of Limitations

Defendants' first argument that they contend estops any further inquiry and requires entry of summary judgment in their favor is that Plaintiffs' ERISA claims are time-barred.  ERISA's statute of limitations provides that an action pertaining to a fiduciary's breach must be brought by the earlier of: (1) six years after the "date of the last action which constituted a part of the breach," or in the case of an omission, "the latest date on which the fiduciary could have cured

the breach or violation"; or, (2) "three years after the earliest date on which the plaintiff had

actual knowledge of the breach or violation."  29 U.S.C. § 1113.  These limitations apply except

in cases of "fraud or concealment" in which case an action may be commenced not later than six

years after the discovery of the breach or violation.  *Id.*

In support of their position, Defendants maintain that Boscoe and the Koreskos were

Plaintiffs' agents under California and Pennsylvania insurance law and that their knowledge can

be imputed to Plaintiffs.  Although both Parties cite to California and Pennsylvania law, neither

has provided the Court with a choice of law analysis to determine which of the two state's laws

is applicable to the case at hand.  In that Boscoe[4] and the Koreskos, knew of the loan in 2009 or

2010 at the latest—more than three years before the instant suit was filed on September 11,

2014—Defendants argue that Plaintiffs' ERISA claims are time-barred.

Plaintiffs fiercely dispute that Boscoe and the Koreskos were their agents.  They argue

that under the common law of agency, Boscoe and the Koreskos were *Defendants'*—not

Plaintiffs'—agents.  In support of their position, Plaintiffs cite to two decisions by the Third

Circuit, one assessing agency-relationships under RICO, *Petro-Tech, Inc. v. W. Co. of N. Am.*,

824 F.2d 1349 (3d Cir. 1987), and the other assessing agency-relationships under the Lanham

Act, *Am. Tel.& Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994).

Neither Party, however, makes much effort to articulate the reasoning behind the

authorities they cite, apply such reasoning to the facts of this case, or explain why their

authorities—and not those of their opponent's—ought to control under ERISA.  Instead, each

Party argues past the other insisting—without cogent analysis—that they are right, and their

opponent is wrong.  Without some argument as to which law—be it California insurance law,

---

[4] Boscoe was named as a defendant but has since settled with Plaintiffs.

Pennsylvania insurance law, or "federal common law" regarding agency—ought to govern the determination as to whether and if so, with whom Boscoe and the Koreskos had an agency relationship under ERISA, or how cases interpreting the Lanham Act and RICO might bear on this determination, the Court cannot evaluate whether Boscoe and the Koreskos were Plaintiffs' agents, whether their knowledge ought to be imputed to Plaintiffs, and, thus, whether Plaintiffs' ERISA claims should be time-barred.  In short, "the Court's role in deciding [a] motion is not to engage in a scavenger hunt or litigate [a party's] case."  *Berridge v. Nalco Co.*, 2013 WL 3216143, at *5 (D.N.J. June 25, 2013).

But even a scan of the horizon reveals a concern that would preclude summary judgment on Defendants' agency and untimeliness argument.  Defendants did not cite any authority in support of their assertion that under ERISA, the knowledge of agents can be imputed to their principals.  Indeed, Defendants' argument appears at odds with the high standard of "actual knowledge" required to start running the clock under ERISA.  As the Third Circuit has explained, "actual knowledge of a breach or violation requires that a plaintiff have actual knowledge of all material facts necessary to understand that some claim exists, which facts could include necessary opinions of expert, knowledge of a transaction's harmful consequences, or even actual harm."  *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1177 (3d Cir. 1992) (internal citations and quotation marks omitted).  Defendants do not explain how the knowledge of a third-party— which third-party is disputedly the victim's agent but is undisputedly connected to the victim's harm—satisfies this demanding standard.

As Defendants did not argue their statute of limitations defense "in a manner that permits the court to consider its merits," they have failed to demonstrate that Plaintiffs' ERISA claims

are time-barred.  *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010) (internal citation and quotation marks omitted).

## 2.  Ministerial Acts

Defendants next argue that they cannot be ERISA fiduciaries because their processing of the loan, change of ownership and partial surrender requests were "purely ministerial" in that these actions were done at the request of another—whom Defendants argue was authorized to take these actions under the terms of the Policies.  As explained in this Court's decision in *Corman v. Nationwide Life Ins. Co.*, 2022 WL 2952219, at *5-6 (E.D. Pa. July 27, 2022), Defendants' position that the importance of the task—not whether a change was made at the direction of an authorized person—is what determines whether a non-fiduciary can be held as a fiduciary in its execution is not correct.[5]

A non-fiduciary acting at the direction of an authorized person, regardless of the importance of that act, presents a situation distinct from one where it acts for a stranger.  *See Hausknecht v. John Hancock Life Ins. Co. of N.Y.*, 334 F. Supp.3d 665, 673-74 (E.D. Pa. 2018)

---

[5] In their reply brief, Defendants also contend that mistaken reliance on Koresko's authority would not transform their ministerial acts into acts of discretionary authority or control.  In support of their argument, Defendants cite three non-binding decisions, none of which stands for a proposition as broad as Defendants would have it.  Each of these cases distinguish between "clerical errors" and other kinds of mistakes which suggest a misjudgment that transforms a non-fiduciary into a fiduciary.  Clerical errors include typing "an erroneous code onto a computer screen," *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997), making a mistake when mailing a check, *id.*, and miscalculating benefits owed to a plan participant according to a detailed formula set by the terms of the plan.  *See Morris v. Aetna Life Ins. Co.*, 2021 WL 509553, at *3 (C.D. Cal. Aug. 9, 2021).  An error of judgment which can give rise to fiduciary status, on the other hand, includes an overpayment of plan funds to an individual not entitled to those funds, because the very payment of those funds constitutes "an exercise [of] control over and dispos[al] of Plan assets."  *IT Corp.*, 107 F.3d at 1421 (internal quotation marks omitted) (quoting *Yeseta v. Baima*, 837 F.2d 380, 385-86 (9th Cir. 1988)).  Defendants' third case, *Schmelzer v. Huntington Bancshares Fin. Corp.*, is in accord with this distinction and this Court's reasoning.  2017 WL 2807469, at *6-7 (S.D. Ohio June 29, 2017).  In *Schmelzer*, the District Court for the Southern District of Ohio dismissed a complaint alleging that a bank breached its fiduciary duties under ERISA by failing to withhold amounts owed by a plan participant when the bank paid that debtor-participant's accrued benefits under the plan.  *Id.*  The *Schmelzer* court explained that the complaint "contain[ed] no allegations indicating that [the bank] distributed the funds" without the instruction of an authorized individual, and declined to write such allegations into the complaint.  *Id.* at *6.  Schmelzer then attempted to characterize "the payment of [the debtor's] claims" as an "illegal loan" but the court declined to construe the payments of benefits as such.  *Id.* at *7.  The *Schmelzer* court's reasoning, however, suggests that an "illegal loan" made at the behest of an unauthorized person could give rise to fiduciary status and liability under ERISA.

(citing *Srein*, 323 F.3d at 221).  When a non-fiduciary has no discretion under a policy or plan document and acts at the behest of a person authorized under said document, it does not become a fiduciary with respect to that authorized person's decisions.  *Id.* at 674.  In contrast, where a non-fiduciary acts at the request of a stranger to the plan's assets, it may be found to have exercised "undirected authority or control" over those assets.  *See id.*; *Corman v. Nationwide Life Ins. Co.*, 396 F. Supp.3d 530, 545 (E.D. Pa. 2019).  This is so even where the plan or policy document expressly provides that the non-fiduciary lacks discretion.  That is because the execution of the stranger's request is made "*in defiance*" of that document's strictures.  *Corman*, 396 F. Supp.3d at 545 (emphasis in original); *see also Srein*, 323 F.3d at 221 (holding that defendant was a fiduciary when it paid funds from a plan's investments to a stranger, though the plan documents provided that the defendant did not have any discretion with respect to investments); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 899 F. Supp.2d 310, 323-25 (E.D. Pa. 2012) (holding that the "performance of administrative and ministerial tasks by a mere custodian of plan assets does not amount to practical control" where the tasks "do[] not violate" the terms of the plan), *aff'd*, 725 F.3d 406 (3d Cir. 2013).

Therefore, if Defendants are found to have issued the loan on the Lincoln Policy, changed the ownership of the Policies, or partially surrendered the values of the Policies at the request of someone who did not have authority to take such acts, they will be deemed fiduciaries with respect to those actions.

### 3.  Causation

Defendants also argue that Plaintiffs' ERISA claims must fail with respect to Defendants' loan because the "issuance of the loan check to the [Lincoln] Policy's Owner did not itself cause Plaintiffs' alleged injuries.  Rather, they say, John Koresko's conversion of the loan proceeds

after the fact was the cause and 'stands between [Lincoln's] conduct and [Plaintiffs'] injuries.'"[6] While "ERISA [does] require[] a plaintiff to show that the injury was a proximate cause of the breach of duty," *Edmonson*, 725 F.3d at 424 (citing *Willett v. Blue Cross & Blue Shield of Ala.*, 953, F.2d 1335, 1343 (11th Cir. 1992)), Defendants' argument nonetheless fails as it does not address the key thrust of Plaintiffs' claim—that the loan was *not* issued to the rightful owner of the Lincoln Policy.  Plaintiffs argue that Lincoln issued a loan which was unauthorized by the owner, and then sent the proceeds to Penn-Mont—which was *not* the Policy owner.  Plaintiffs contend that absent Defendants' actions, Koresko would not have been able to convert the Lincoln Policy funds: had Lincoln not done so, Plaintiffs would not have suffered injury.  Under the standard of proximate cause under ERISA, this causal chain is enough as Plaintiffs' loss is "causal[ly] connect[ed]" and "resulted" from Defendants' unauthorized loan.  *See Willett*, 953 F.2d at 1343.

### 4.   Issuance of the Loan on the Lincoln Policy

Having dispersed with the threshold issues raised by Defendants, we turn to consideration of Plaintiffs' first theory of fiduciary responsibility, which arises from Defendant Lincoln's issuance of a loan on the Lincoln Policy in 2009.  The pertinent facts are as follows: in July 2009, Koresko requested a loan in the "maximum loan amount available" on the Lincoln Policy.  The request listed the owner of the Lincoln Policy as the "Harvey A. Kalan, M.D., Inc. Welfare Plan, CTC Trustee" and was signed by Koresko.  Accompanying Koresko's signature was a stamp which represented that he was signing "for CTC Trustee Pres-Plan Admin. & Insured's

---

[6] Notably, Defendants do not argue that their actions were not the proximate cause of Plaintiffs' ERISA claims stemming from the change of ownership of both Policies and the partial surrender of both Policies.  Accordingly, Defendant's causation argument is not considered as to these claims.  *See Shell Petrol., Inc v. United States*, 182 F.3d 212, 218 (3d Cir. 1999) (a litigant "must unequivocally put its position before the trial court at a point and in a manner that permits the court to consider its merits. . . .").

Atty in Fact Signature and Authority Guaranteed."  Koresko submitted a package of documents—the Employee Participation Agreement, an affidavit, and two trust documents—to support the loan application.  The Employee Participation Agreement appointed John Koresko, among others, as Harvey Kalan's "Limited Attorney in Fact with respect to all matters connected with and/or related to the procurement and maintenance of benefits payable to [Kalan] pursuant to the HEALTH AND WELFARE BENEFIT PLAN."  The affidavit refers only to the Single Employer and REAL VEBA Trusts—not the policy owner, the HAK Plan.  It states that "CTC is no longer the trustee" and that PPT—owned by Koresko—had been re-appointed as trustee. The affidavit represented that Koresko was the founder, director and owner of PPT.  One of the trust documents provided to Lincoln, the Amendment of Trust and Incorporated Plan documents, expanded Penn-Mont's powers over the trustee and the HAK Plan and stated that the trustee was "F&M TRUST CO., successor by merger to COMMUNITY TRUST COMPANY."  Based on these submissions, Lincoln determined Koresko was authorized to request the loan, made the loan and issued $393,564.30 to "Harvey A. Kalan MD Inc. Welfare Benefit Plan UTD 12/23/01 Community Trust Company Trustee."

Plaintiffs argue that these documents did not demonstrate that Koresko had the authority to take out the loan on the Lincoln Policy because:  (1) the Employee Participation Agreement granted Koresko limited power attorney over Kalan in an individual capacity and did not appoint him as a limited attorney in fact for the owner of record—the Single Employer Trust; and, (2) there were "facial inconsistencies in the affidavit and the requests accompan[ying] it" as to the identity of the trustee, namely, that the application was made on behalf of CTC, though the affidavit stated that CTC was no longer the trustee and PPT had replaced it, while the Amendment of Trust document stated that F&M was the Trustee.  Plaintiffs also contend that

under Lincoln's internal loan procedures, Koresko's request would have "insufficiently authorized" and should not have been processed.

In response, Defendants argue that the documents demonstrate that Koresko was an authorized representative of the owner of the Lincoln Policy—CTC, and further argue that the internal loan procedures functioned as "guidelines only," which were "substantially complied with." In so arguing, Defendants dispute the import of each of the four documents submitted accompanying the loan. For example, Defendants dispute that the Employee Participation Agreement was executed by Harvey Kalan in his individual capacity only and represent the Agreement as endowing Koresko with power of attorney over all Plaintiffs and the HAK Plan.

Defendants next recite sections of the affidavit pertaining to CTC's authority *vis a vis* Penn-Mont and Koresko's relationship to Penn-Mont, namely, that Koresko was the President of Penn-Mont and CTC was bound to act on the direction of Penn-Mont. They contend that the Amendment of Trust is "consistent" in that it gave Penn-Mont control to direct CTC. But Notably, Defendants leave unaddressed the inconsistencies in the loan paperwork raised by Plaintiffs: Defendants do not explain why the affidavit stated that "CTC is no longer the trustee," though the application stated that Koresko was signing on behalf of CTC; nor did Defendants explain how to reconcile the application with the language in the Amendment of Trust which stated that CTC had been succeeded as Trustee by F&M. Nor do Defendants acknowledge that Koresko's affidavit did not mention the owner of the Policy—the HAK Plan— and instead referenced only Single Employer and REAL VEBA Trusts.

Whether the Lincoln loan was properly authorized depends on the interpretation of these various documents—for which the Parties offer diametrically opposed readings. The interpretation of these documents presents a dispute of material fact, the resolution of which

cannot be completed at summary judgment and falls to the fact-finder. *See Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011 n.10 (3d Cir. 1980) (stating that where, as here, writings are ambiguous, they are "to be interpreted by the fact finder. . . .").

In a footnote, Defendants alternatively argue that "Koresko/Penn-Mont/CTC" had apparent authority to take out a loan on the Lincoln Policy based on the Employee Participation Agreement and "a history of dealings with the Policy." Defendants' argument, however, stumbles at every step.

Critically, Defendants have not identified the "history of dealings" which they claim provided "Koresko/Penn-Mont/CTC" with apparent authority to request the Lincoln loan. Though they suggest the existence of an extensive set of interactions beyond those related to the Lincoln loan, they reference only two in their brief: the ownership of the Lincoln Policy at its issuance, and the paperwork submitted in connection with the Lincoln loan—the transaction for which apparent authority is at issue. At summary judgment, a party must support its assertions by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A); it cannot carry its burden by leaving the court to guess at the facts or do its job of "identify[ing] with reasonable particularity the evidence upon which [the party] relies." *Bombard v. Ft. Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

 Further, Defendants have provided no citation in support of their argument that Koresko/Penn-Mont/CTC all held apparent authority, other than fleeting reference to two non-binding decisions published in 1979 and 1986, neither of which pertain to ERISA and both of which apply Pennsylvania law on agency. *Lincoln Bank v. Nat'l Life Ins. Co.*, 476 F. Supp. 1118, 1121 (E.D. Pa. 1979) (considering two creditors' competing claims to the cash surrender value of an insurance policy); *Mires v. Evans*, 1986 WL 8117, at *10-11 (E.D. Pa. July 21, 1986)

16

(considering veterinary malpractice claim).  Clouding their use of these two cases lurks the Parties' failure anywhere to analyze whether Pennsylvania or California law applies.  The Court will not—absent more—simply rely on the parties' representation that things fall out the same whichever state's law is used.

In short, Defendants have not presented their apparent authority defense "in a manner that permits the court to consider its merits," as they have neither articulated the facts, nor identified the applicable law, nor applied that law to those facts.  *Dupree*, 617 F.3d at 728 (internal citation omitted).  They have thus failed to demonstrate that "Koresko/Penn-Mont/CTC" had apparent authority to take out a loan on the Lincoln Policy.

### 5.   The Change of Ownership and the Partial Surrenders of the Policies

Plaintiffs' second theory of fiduciary breach arises from Defendants change of the ownership of the Lincoln and Jefferson Policies in 2010.  It is undisputed that on April 27, 2010, Larry Townsend of Penn-Mont requested that Lincoln change the owner of 41 policies held by Lincoln.  The request form sought to change the name of the owner from the HAK Plan to the "Single Employer Welfare Benefit Plan Trust" and its Trustee was designated as PPT.  John Koresko signed the form as "Director, CTC Trustee" on behalf of the current owner, the HAK Plan, and the new owner, the Single Employer Trust, as "Director, [PPT], Trustee."  Also appended to the ownership requests was a "Trust Asset Ownership and Privacy Notice" which explained that PPT was the trustee for the REAL VEBA and Single Employer Trusts by court order—a copy of which order was also provided—and that "PPT had obtained permission from the Commonwealth of Pennsylvania to use the trade name 'CTC Trustee.'"  The Notice further provided that a title of ownership which named "'X' Company' Welfare Benefit Plan or 'CTC' are to be retitled or renamed correctly as 'SEWBPT dated 12/30/02, Penn Public Trust, Trustee."

A month later, on May 25, 2010, Defendant changed the owner and trustee to the "Single

Employer Welfare Benefit Plan Trust" and PPT respectively.

Then, in October 2012, Koresko requested a partial surrender in the amount of

$17,579.52 from the Lincoln Policy and $39,651.55 from the Jefferson Policy. Koresko signed

both requests for partial surrenders as the Director of PPT, Trustee. Defendants processed the

requests in November 2012 and distributed the funds to the new owner—the Single Employer

Trust.

Both Parties' arguments regarding the propriety of the change of ownership and partial

surrenders cascade from their arguments regarding the propriety of the loan request. Plaintiffs

argue that Koresko did not have authority to act on behalf of CTC for the reasons they advanced

regarding the propriety of the Lincoln policy loan. Because Koresko was not authorized to act

on CTC's behalf, Plaintiffs argue that he could not submit a change of ownership form on behalf

of CTC to transfer ownership to PPT. Plaintiffs reason that because the ownership change of

both Policies was not authorized, the partial surrender of both Policies and the distribution of the

attendant funds to the new owner—the Single Employer Trust—was also inappropriate and

unauthorized. [7]

Defendants, like Plaintiffs, rely on their arguments advanced for the propriety of the loan

issuance to contend that Koresko had authority to act on behalf CTC and thus had the authority

to submit the change of ownership form. Because the transfer of ownership to PPT was proper,

Defendants reason that their processing of PPT's partial surrender requests on both the Lincoln

---

[7] It is also undisputed that Defendant received the same documentation for a policy held by a Howard Greils, and requested additional information from the "current owner," which included a copy of the plan, a statement signed and dated by the Trustee affirming the name of the plan, and a statement that John Koresko was the sole officer of PPT. Plaintiffs contend that the fact that Defendants asked for more information before changing the owner of another policy means that the changes made on the Jefferson and Lincoln Policies were insufficiently authorized.

and Jefferson Policies was also appropriate and not exercises of discretionary authority or control.

But as previously explained, it is disputed as to whether documentation supplied for the Lincoln Policy loan authorized Koresko to act on behalf of the owner of the Lincoln Policy. Because both Parties rely on a determination regarding the propriety of the Lincoln Policy loan to conclude that Koresko was or was not authorized to change the ownership or partially surrender the Policies and that issue is in dispute, summary judgment shall be denied on the Section 1132(a)(2) claim.

### 6.   Section 1132(a)(3) Claim

Turning next to Plaintiffs' claim of non-fiduciary liability pursuant to Section 1132(a)(3) of ERISA—on which both Parties have filed competing Motions for Summary Judgment—this provision authorizes a "participant, beneficiary, or fiduciary of a plan to bring a civil action" against *any person*, including non-fiduciaries, "to obtain appropriate equitable relief to redress violations of ERISA Title I."  *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000) (internal citations and quotation marks omitted) ["*Harris Trust*"].  Section 1132(a)(3) has been interpreted to be a "catchall" provision which "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § [1132] does not elsewhere adequately remedy."  *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996) (internal quotation marks omitted).

Two key elements must be met before liability is imposed on a non-fiduciary pursuant to this Section.  First, there must be a plan fiduciary who had "actual or constructive knowledge of the facts satisfying the elements of a [prohibited] transaction, [and] caused the plan to engage in the [unlawful] transaction" and, second, the non-fiduciary must have "had actual or constructive

knowledge of the circumstances that rendered the [fiduciary's] transaction unlawful." *Harris Trust*, 530 U.S. at 251.  In sum, there must be two actors, a fiduciary and a non-fiduciary, the latter of whom had constructive knowledge of the circumstances rendering the transaction unlawful before it can be held liable under Section 1132(a)(3).  In the instant case, Plaintiffs posit that Defendants are liable under Section 1132(a)(3) because Defendants "knowingly participate[d] in a prohibited transaction."  Defendants counter that Plaintiffs' Section 1132(a)(3) claim must fail because they have neither adduced evidence which demonstrate that Defendants knew of Koresko's fiduciary breaches, nor have they demonstrated that Defendants participated in any prohibited transactions by paying commissions for the sales of the Policies or by authorizing the loan on the Lincoln Policy.

Plaintiffs respond to the latter argument by stating that Defendants' position "is just a repeat of its claim that the transactions were authorized or permissible."  They otherwise make no effort to explain the prohibited transaction in which they claim Defendants participated—be it the payment of commissions, the issuance of the loan, or both—nor rebut Defendants' argument that they did not participate in said transaction.  To be clear, not every transaction is a "prohibited transaction" under ERISA; rather, these transactions are enumerated under 29 U.S.C. § 1106.  A prohibited transaction requires proof of several elements, for example: (1) a fiduciary; (2) a "party in interest"; and, (3) the act of the transaction itself, for example, the "lending of money or other extension of credit" between the fiduciary and party in interest or the "transfer to . . . a party in interest . . . of any assets of the plan."  29 U.S.C. § 1106(a)(1).

Plaintiffs failure to identify the "prohibited transaction" in which they claim Defendants engaged, the provision of Section 1106 under which it falls, or explain how the transaction satisfied the elements of that prohibited transaction does not "permit[] the court to consider [the]

merits" of their Section 1132(a)(3) claim, *Dupree*, 617 F.3d at 728 (internal citation omitted).  In short, they provide no viable response to Defendants' Motion for Summary Judgment on their Section 1132(a)(3) claim, which shall accordingly be granted.

### b.  Plaintiffs' RICO Claims

Plaintiffs raise three RICO claims—two of which are brought pursuant to Section 1962(c), 18 U.S.C. § 1962(c), and the third of which is brought under Section 1962(d). 18 U.S.C. § 1962(d).  None of these claims survives summary judgment.

Turning first to Plaintiffs' Section 1962(c) claims:  one is premised on Defendants' direct liability for a RICO violation, and the others are for vicarious liability for the actions of the two Koresko brothers and their various companies.  Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  To maintain a claim for liability under Section 1962(c), Plaintiffs must demonstrate "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (internal citations and quotation marks omitted).

The Section 1962(c) direct liability claim fails at the first element—conduct.  That is because Plaintiffs have not demonstrated that Defendants took "some part in directing the enterprise's affairs" which is necessary for a finding that they "conduct[ed] or participate[d]" in the conduct of the Koresko's enterprise under Section 1962(c).  *Reves v. Ernst & Young*, 507 U.S. 170, 178-79 (1993).  Direction can extend to the "lower rung participants" and "outsiders" in the enterprise so long as they "exert control over [the enterprise]" and "conducted or

participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Id.* at 184-85

(emphasis in original).  Services or goods provided by a third-party to the enterprise do not

satisfy this requirement, regardless of how indispensable or valuable the service may have been,

because they do not demonstrate that the defendant had "knowingly engage[d] in '*directing* the

enterprise's affairs.'"  *Univ. of Md. at Balt. v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539

(3d Cir. 1993) (emphasis in original) (internal citations omitted).  In sum, "[i]t cannot be said

that by merely performing what are generic financial and related services . . . even if they are

later found to be deficient, [a] [] firm has opened itself to liability under the federal racketeering

statute." *Id.* at 1539-40.  Indeed, there is consensus that Section 1962(c) claims against outside

professionals providing important services to a racketeering enterprise do not constitute claims

that these professions directed the affairs of the enterprise.  *See, e.g.*, *Azrielli v. Cohen L. Offs.*,

21 F.3d 512, 521-22 (2d Cir. 1994) (provision of legal services related to fraudulent real estate

transaction was not management of the RICO enterprise conducting the fraudulent transaction);

*Fidelity Fed. Sav. & Loan Ass'n v. Felicetti*, 830 F. Supp. 257, 260 (E.D. Pa. 1993) (holding that

even if appraiser's reports are "keystone" of the enterprise's perpetration of fraud, appraiser

cannot be liable under Section 1962(c)); *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994)

(accountants were not liable because their involvement in enterprise's decision did not arise to

direction because they neither made those decisions nor carried them out); *Baumer v. Pachl*, 8

F.3d 1341, 1344 (9th Cir. 1993) (providing legal services to an enterprise did not satisfy

"operation or management" test); *Stone v. Kirk*, 8 F.3d 1079, 1092 (6th Cir. 1993) (sales

representative did not participate in "operation or management" of the enterprise).

      Plaintiffs contend that Defendants were "the provider[s] of the product the enterprise was

designed to sell . . . collaborator[s] and partner[s] in the marketing scheme; in receiving

premiums, paying commissions and administering the insurance policies sold, [they] played a

substantial role in the continued administration of the enterprise; and, in approving or rejecting

loan requests, [they] played a pivotal role in the conversions. . . ."  Plaintiffs also posit that

Defendants' role went beyond merely issuing the Lincoln and Jefferson policies because the plan

documents incorporate the terms of the Policies, under which Defendants had "ultimate control

over whether and how death benefits are to be paid and the amount of the benefits."  Though

Plaintiffs use a variety of verbs to describe what the Defendants did, they do not provide

competent evidence that Defendants *directed* or exercised control regarding the *enterprise's*

affairs.  Even assuming that Defendants acted as Plaintiffs say they did—which Defendants

dispute—these actions are more akin to a service provider whose support, though integral to the

enterprise, does not provide the basis for RICO liability.  Defendants' Motion for Summary

Judgment on Plaintiffs' Section 1962(c) direct liability claim shall therefore be granted.

Plaintiffs' theory of vicarious liability under Section 1962(c)—premised on an argument

that the Koreskos and their companies were Defendants' agents in selling its insurance

products—fares no better.  Defendants argue that vicarious liability is not a viable claim under

Section 1962(c).  As this Court explained in depth in its recent decision in *Corman*, 2022 WL

2952219, at *12-13, Defendants are correct.  The text of Section 1962(c) does not support a

private civil cause of action under a theory of vicarious liability, which dooms Plaintiffs' Section

1962(c) vicarious liability claim as a matter of law.  Defendants' Motion for Summary Judgment

on this claim shall therefore be granted.

Plaintiffs' RICO Section 1962(d) claim likewise does not survive.  Defendants cite to

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993), which states that "any

claim under section 1962(d) based on a conspiracy to violate the other subsections of section

23

1962 necessarily must fail if the substantive claims are themselves deficient." Ergo, as Plaintiffs substantive Section 1962(c) claims have been dismissed, so too must their Section 1962(d) claim be dismissed.

### c.   Plaintiffs' Common Law Claims

Defendants also move for summary judgment on all of Plaintiffs' common law claims. Plaintiffs do not specify in their First Amended Complaint whether these claims are brought under California or Pennsylvania common law. Defendants' Motion for Summary Judgment notes this ambiguity and applies the laws of both states. In their opposition brief, Plaintiffs do not clarify which state's laws govern their claims, and also cite to the jurisprudence of both states. Although Defendants contend that "the Court need not decide which state's laws apply[,]" as demonstrated by the Parties' briefs, California and Pennsylvania approach these claims differently, with different statutes of limitations, different requisite elements, and separate duties and statutes which bear on many of the claims asserted by Plaintiffs. This Court cannot determine whether to enter judgment as a matter of law in Defendant's favor when it has no basis for determining which state's law applies and, thus, Defendant's Motion will be denied on each of the common law claims.

### IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion shall be granted with respect to Plaintiffs' ERISA Section 1132(a)(3) claim, and Plaintiffs' RICO claims. The Parties cross-motions shall be denied in all other respects. [8]

---

[8] Defendants also contend that they are "entitled as a matter of law to setoff [Plaintiffs'] prior recoveries" and seek an order at summary judgment setting off any damages Plaintiffs may recover for their surviving claims. Though Defendants cite several cases in support of their claim for setoff, nearly all of these decisions were reached *after* trial or in consideration of a settlement agreement. Of these cases, only one non-binding decision by the District of Utah considered whether a Defendant was entitled at summary judgment to set-off its potential damages. *See, e.g.*, *State Farm Mut. Auto. Ins. v. Lincow*, 30 F. Supp.3d 368, 372 (E.D. Pa. 2014) (post-trial motion for mark judgment satisfied); *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 428 (3d Cir. 1993) (appeal of

An appropriate order follows.

BY THE COURT:

/s/Wendy Beetlestone, J.
_____

WENDY BEETLESTONE, J.

---

post-trial entry of remittitur and judgment as a matter of law); *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 517 F.3d 1271, 1276 (11th Cir. 2007) (appeal of post-settlement Fed. R. Civ. P. 60(b) Motion for Relief from Judgment); *Chisolm v. UHP Projects, Inc.*, 205 F.3d 731, 733-34 (4th Cir. 2000) (appeal of decisions on post-trial motions); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp.2d 706, 717, 732 (E.D. Pa. 2001) (noting that non-settling defendants could be entitled to set-off of "any judgment plaintiffs obtain against them" on Motion for class-wide settlement because such a set-off was undisputed and provided for in the settlement agreement); *In re Masters Mates & Pilots Pension Plan and IRAP Litig.*, 957 F.2d 1020, 1030 (3d Cir. 1992) (appeal of approval of class action settlement); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 228 F.R.D. 541, 559-60 (S.D. Tex. 2005) (considering effect of set-off on motion for class-wide settlement); *but see David P. Coldesina, D.D.S., P.C. Emp. Profit Sharing Plan Tr. v. Est. of Simper*, 2006 WL 1702632, at *5 (D. Utah June 16, 2006) (considering whether one Defendant was permitted to set-off the settlement award paid by another defendant at summary judgment).  This Court thus declines Defendants' request for an opinion determining their potential liability if Plaintiffs were to succeed on their remaining claims.